# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

ZANE BROWN,

**Plaintiff,**

v.                                                              2:23-cv-00355-DHU-GJF

**LEA COUNTY BOARD OF
COUNTY COMMISSIONERS,
COREY HELTON, and
MICHAEL WALKER,**

**Defendants.**

## THIRD AMENDED COMPLAINT

Plaintiff Zane Brown ("Plaintiff"), through undersigned counsel, submits this Third Amended Complaint against the Lea County Board of County Commissioners (the "Board"), Corey Helton ("Helton"), and Michael Walker ("Walker") (collectively, "Defendants").

### JURISDICTION AND VENUE

1.  This Court has subject matter jurisdiction pursuant to 28 U.S.C § 1331 because Plaintiff sues under 42 U.S.C § 1983 for deprivation of rights afforded him by the United States Constitution as well as Title VII of the Civil Rights Act.

2.  Venue and forum are proper because all parties reside in the District of New Mexico and a substantial amount of the facts giving rise to Plaintiff's claims occurred in the District of New Mexico.

### PARTIES

3.  Plaintiff Zane Brown resides in Lea County, New Mexico.

4.  Defendant Lea County Board of County Commissioners is the local governing authority for Lea County, New Mexico. Its subsidiaries include the Lea County Sheriff's Office ("LCSO"). The Board is headquartered in Lea County, New Mexico.

5.  Defendant Corey Helton is the sheriff of Lea County, New Mexico. He resides in Lea County, New Mexico. He is sued in his official and individual capacity.

1

6.  Defendant Michael Walker is undersheriff at LCSO. He resides in Lea County, New Mexico. He is sued in his official and individual capacity.

## ALLEGATIONS

7.  This case and others like it pending against the same Defendants are symptoms of the same cancer within the Lea County Sheriff's Office: Corey Helton and his cronies believe that because they have the power to enforce the law, they are above the law.

8.  Plaintiff is a certified police officer with over a decade of experience.

9.  From 2014 to 2022, Plaintiff worked at LCSO.

10. For the first 7 years that Plaintiff was at LCSO his record was impeccable. He rose through the ranks to become an investigator and was a repeated recipient of the department's Good Conduct Award.

11. Things changed for Plaintiff, though, near the end of 2021 when he raised concerns about questionable hiring practices within LCSO.

12. To wit, in September 2021, Plaintiff was ordered to conduct a background investigation on Ahmaad White ("White"), an African American officer at the Hobbs Police Department ("HPD") who was applying for a position at LCSO.

13. Plaintiff completed the background check on White and found nothing that would disqualify him from employment at LCSO.

14. Plaintiff, however, was ordered to conduct a second background check on White. Plaintiff was told to scrutinize any records available related to White and find any inconsistency that LCSO could use as a pretext for denying his application. Plaintiff had never received similar instructions for any of the background investigations he performed on Hispanic and Caucasian applicants.

15. Plaintiff was concerned that the disparate treatment of White's application may have been due to White's race and voiced concerns to LCSO officials about the abnormal hiring process.

16. From that point forward, Plaintiff was targeted by a powerful clique of LCSO employees that included investigator Diana Garcia ("Garcia"), sergeant Sonia Estrada ("Estrada"), public relations officer Aileen Vizcarra ("Vizcarra"), and Walker, LCSO's second in command.

17. The clique held meetings and exchanged text messages and other communications to come up with ways to get Plaintiff in trouble and ultimately get him fired.

18. Shortly after expressing his concerns about LCSO's handling of White's job application, Walker wrote Plaintiff up for, supposedly, not doing a FARO scan of a suicide scene.

19. A copy of the write-up was not, however, added to Plaintiff's personnel file, in violation of Lea County's human resources policies. On information and belief, this was done to prevent Plaintiff from reviewing and contesting the baseless charges.

20. In October 2021, Plaintiff was also issued a frivolous write up for "bullying" Garcia.

21. Plaintiff's supervisor, Sergeant Jeremy Grady ("Grady") told Plaintiff he disagreed with the bullying write-up, but that he had been overruled by his superiors because they wanted to create a paper trail of purported misconduct by Plaintiff. This write-up was also omitted from the personnel file available to Plaintiff.

22. In early 2022, Garcia submitted a meritless grievance against Plaintiff. Walker then substantiated the grievance and issued Plaintiff a formal reprimand.

23. In June of 2022, three more baseless complaints were submitted against Plaintiff. These complaints were made as part of the clique's ongoing effort to get Plaintiff fired.

24. On June 28, 2022, Plaintiff was informed that an Internal Affairs ("IA") investigation had been opened about the complaints

25. In July of 2022, Plaintiff learned that Walker had driven home after becoming extremely intoxicated during a recent night out. Walker's intoxicated state and decision to drive home were witnessed by, among other people, Estrada, Garcia, and Karina Tello ("Tello").

26.

27. At the time, Tello did not work at LCSO. Notably, however, less than a year later she became an LCSO deputy and was targeted by the same clique that conspired against Plaintiff.

28. Plaintiff was initially skeptical that a law enforcement officer—especially one in a leadership position—would disregard the safety of those he was sworn to protect by driving drunk. But after watching videos of Walker recorded that evening and talking to people who were there, Plaintiff was convinced.

29. Plaintiff wished to file a complaint against Walker personally but was worried that the retaliation he was experiencing would intensify if he did. So, he provided the information he collected to a police officer at a different department, who submitted a complaint.

30. Estrada and Garcia protected Walker by claiming he was fit to drive that night, and other witnesses with firsthand knowledge were afraid to speak out due to fears of retaliation.

31. Ultimately, no disciplinary action was taken against Walker by LCSO, and the claim that he had driven drunk was hardly investigated. Instead, the department's investigation focused on plugging any leaks, and making sure Walker was protected.

32. LCSO turned a blind eye to Walker's intoxicated driving even though it was aware at all relevant times that Walker had struggled with alcoholism and was likely to recidivate.

33. Shortly after the complaint against Walker was filed, LCSO's brass learned that the information it contained had either come from or been substantiated by Plaintiff.

34. After Walker learned that Plaintiff was involved in the drunk driving complaint, he recommended Plaintiff for demotion.

35. On July 12, 2022, Plaintiff met with Lea County's human resources director, Craig Bova, to file a complaint against Walker and obtain copies of the disciplinary write-ups. Bova refused to let Plaintiff file the report. Bova also said that Walker had sole possession of any disciplinary documents, but that he would "attempt" to get copies. Bova never provided the documents to Plaintiff.

36. On July 17, 2022, Plaintiff was removed from the night shift. Officially, this was done because LCSO decided to no longer have investigators on duty overnight. Plaintiff learned,

4

however, that the real reason for the policy change was so Plaintiff could be more easily monitored. Indeed, another investigator was allowed to continue working nights.

37. On information and belief, another motivating factor behind the decision to take Plaintiff off the night shift was to interfere with the custody arrangements he had with his children. On weeks Plaintiff worked nights, he would have custody of his children during the day.

38. During the morning of July 20, 2022, Plaintiff learned that Vizcarra was bragging about submitting a complaint against Plaintiff on Walker's direction, so that Plaintiff would be fired.

39. In the afternoon of July 20, 2022, Plaintiff was called into Helton's office and told he was being placed on administrative leave for "attempting to influence an investigation of alleged misconduct of department personnel," referring to the drunk driving complaint against Walker. Plaintiff was escorted out of the building and required to turn in his badge and firearm.

40. On July 22, 2022, LCSO employees including Garcia contacted White to try and convince him to ignore Plaintiff's allegations concerning White's job application.

41. At around the same time, LCSO hired a New Mexico attorney named Cody Rodgers ("Rodgers") to "investigate" the drunk driving complaint against Walker. In truth, though, Rodgers' investigation focused almost entirely on Walkers' accusers.

42. More specifically, Rodgers' mandate from LCSO appeared to be uncovering evidence that Plaintiff had attempted to bring down the undersheriff. She even suggested to interviewees that Plaintiff had been hiding in the bushes outside the restaurant, waiting for Walker to get into his vehicle so that he and his co-conspirators could arrest him for drunk driving.

43. Rodgers never interviewed Plaintiff or the person who reported Walker for driving while intoxicated.

44. On July 28, 2022, Helton called White and told him not to have any contact with Plaintiff. Helton threatened to block an anticipated merger of the LCSO and HPD SWAT teams if White refused.

5

45. At the time, White led HPD's SWAT team, and had long advocated for combining the SWAT teams, as it would provide both units with additional resources, improve their effectiveness, and enhance officer safety.

46. On July 31, 2022, Plaintiff learned that LCSO officials were attempting to find a way to press criminal charges against Plaintiff.

47. On August 25, 2022, Plaintiff was placed under two more IA investigations. The first related to his efforts to expose Walker's drunk driving. The second was based on a complaint filed by the 5th Judicial District Attorney, Dianna Luce ("Luce"). The 5th Judicial District includes Lea County.

48. The most serious charge in Luce's complaint was that in February of 2022, Plaintiff had coerced a suspect into making a confession, and then lied in a criminal complaint about the incident. Luce's allegations were provably wrong. Plaintiff had been in an interview room with a suspect when an Assistant District Attorney ("ADA") *employed by Luce* attempted to extract a confession from the suspect through improper means. The whole conversation was audio recorded. After the interview, Plaintiff had objected in writing to the ADA's actions, and accused him of acting unlawfully. As for the so-called false statements in the criminal complaint, they were factually accurate edits that Luce had ordered.

49. On information and belief, Luce submitted the complaint to LCSO because Helton asked her to.

50. On August 31, 2022, Plaintiff was interviewed by LCSO Chief Deputy Fernando Jimenez ("Jimenez") as part of the plethora of IA investigations. During the interview, Jimenez repeated the fanciful claim that Plaintiff had spied on Walker from the bushes as part of a plot to arrest the undersheriff for drunk driving.

51. On October 7, 2022, Plaintiff learned that he had been "exonerated" of the coerced confession and false statement charges leveled by Luce, without explanation.

52. On October 14, 2022, Walker informed Plaintiff that he had been demoted. Plaintiff's salary was also drastically reduced.

6

53. Unable to tolerate the hostile work environment at LCSO any longer and knowing that it was just a matter of time before he was fired, Plaintiff submitted his resignation.

54. After leaving LCSO, Plaintiff applied for a position at HPD. His application was reviewed by HPD employee Robert Blanchard ("Blanchard").

55. Blanchard requested Plaintiff's personnel file from LCSO and received the stack of write-ups that had been withheld from Plaintiff. On information and belief, Bova either had copies of the write-ups in his position all along or obtained them from Walker specifically so he could provide them to HPD.

56. Blanchard was skeptical of the write-ups given Plaintiff's prior years of unblemished service, so he recommended hiring Plaintiff.

57. Upon learning that Plaintiff might be hired despite the negative information LCSO had provided, Helton arranged a meeting with HPD's chief of police and demanded that Plaintiff not be offered a job.

58. Helton also punished Blanchard for favorably considering Plaintiff's employment application. Helton banned Blanchard from county buildings and used political pressure to have him reprimanded by HPD.

59. In conjunction with Helton's demand, Luce notified HPD that she would not prosecute any case investigated by Plaintiff. On information and belief, Luce took that position at Helton's request.

60. HPD was concerned about retaliation from Helton and declined to hire Plaintiff.

61. Needing to find work to provide for his family, Plaintiff took a job as a delivery driver at a UPS store in Hobbs.

62. Once word got to Helton that Plaintiff had found a job, Helton went to the UPS store twice to meet with the manager. Helton's goal was to convince the manager to fire Plaintiff.

63. Plaintiff eventually lost his job at UPS due to an auto accident.

64. Following extended periods of unemployment, Plaintiff started working at the Artesia Police Department ("APD") in Eddy County in November of 2023.

65. Plaintiff is unable to obtain employment at a Lea County law enforcement agency due to Helton's ongoing actions. Helton often boasts that he will keep Plaintiff from ever working in Lea County again.

66. When Plaintiff applied for his current position at APD, Luce recommended him and stated he was a good investigator.

67. On June of 2024, Plaintiff submitted inquiries with the City of Hobbs to see if he was eligible to apply again for a position HPD.

68. Plaintiff learned that he was still blacklisted at HPD due to pressure applied by Helton and Luce.

69. Plaintiff is currently attempting to get a job at the Lovington Police Department but anticipates that he will be disqualified due to the baseless write-ups in his LCSO personnel file and pressure from Helton and Luce.

70. Gallagher has been aware of the unlawful and retaliatory actions taken against Plaintiff at all relevant times, but has made no effort whatever to stop, correct, or prevent them.

71. As a result of Defendants' actions, Plaintiff has suffered damages including extreme emotional distress and lost earnings.

## CAUSES OF ACTION

### First Cause of Action
**Whistleblower Protection Act, N. M. S. A. 1978, § 10-16C-1 et seq.**
**Against the Board**

72. Plaintiff incorporates all allegations in this complaint as if fully set forth in this paragraph.

73. Plaintiff is a "public employee" as that term is used in NMSA 1978, Section 10-16C-1.

74. The Board is a "public employer" as that term is used in NMSA 1978, Section 10-16C-1.

75. Plaintiff suffered adverse employment action including, among other things, being subjected to a hostile work environment, demoted, having his pay cut, and being written up on baseless charges, and being prevented from obtaining employment in Lea County.

76. The Board engaged in retaliatory action against Plaintiff because Plaintiff "communicate[d] to the public employer or a third party information about an action or a failure

77. The Board also engaged in retaliatory action against Plaintiff because Plaintiff "object[ed] to or refuse[d] to participate in an activity, policy or practice that constitutes an unlawful or improper act." NMSA 1978, § 10-16C-3(c).

78. Plaintiff is entitled to damages as well as reasonable attorney's fees and costs of suit. NMSA. 1978, § 10-16C-4.

**Second Cause of Action**
**Violation of Title VII of the Civil Rights Act of 1964, as amended**
**42 U.S.C. §§ 2000e, et seq.**
**Against the Board**

79. Plaintiff incorporates all allegations in this complaint as if fully set forth in this paragraph.

80. Plaintiff was performing his job in a way that was consistent with the Board's legitimate expectations.

81. Plaintiff engaged in protected activity by, among other things, objecting to or opposing discriminatory hiring practices.

82. Plaintiff suffered adverse employment action including, among other things, being subjected to a hostile work environment, demoted, having his pay cut, being written up on baseless charges, and being prevented from obtaining employment in Lea County.

83. Plaintiff's engagement in protected activities was a motivating factor in the Board's mistreatment of Plaintiff.

84. On January 26, 2024, Plaintiff received a right-to-sue letter on his discrimination charges from the Equal Employment Opportunity Commission.

85. The Board acted with evil intent or was reckless or callously indifferent to Plaintiff's federally protected rights, such that punitive damages are warranted.

### Third Cause of Action
### Violation of the New Mexico Civil Rights Act
### NMSA 1978, § 41-4A-3
### Against the Board

86. Plaintiff incorporates all allegations in this complaint as if fully set forth in this paragraph.

87. The New Mexico Constitution guarantees rights including speech, due process, equal protection, and happiness.

88. The Board has deprived Plaintiff of rights, privileges, or immunities secured by the constitution of New Mexico by, among other things, wrongfully and maliciously preventing him from obtaining employment in Lea County.

89. Helton and those acting under his direction are acting on behalf of, under color of, or within the course and scope of the Board's authority.

90. The deprivation of Plaintiff's rights proximately caused him to suffer damages, including emotional distress and loss of income.

91. Plaintiff is also entitled to a permanent injunction preventing the Board from committing further violations of rights afforded him by the New Mexico Constitution.

### Fourth Cause of Action
### Violation of the First Amendment
### 42 U.S.C. § 1983
### Against the Board

92. Plaintiff incorporates all allegations in this complaint as if fully set forth in this paragraph.

93. Municipal liability can attach under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), for the existence of a municipal policy or custom.

94. Plaintiff engaged in First Amendment-protected speech on matters of public concern by, among other things, objecting to hiring practices that he reasonably believed to be discriminatory, and by providing to a third-party information about illegal activity by Walker.

95. Plaintiff's speech was not made pursuant to his official duties.

96. As an investigator, Plaintiff's job was to investigate crimes. And while performing background checks, he was paid to collect information in the way his superiors requested him to do and report his findings. Plaintiff was not paid to provide his opinion to his superiors on whether LCSO's disparate treatment of applicants was lawful.

97. Likewise, Plaintiff was not acting within the scope of his job description when he provided information to third parties about Walker's drunk driving. There is no allegation that Plaintiff worked in IA or was tasked with investigating Walker. Indeed, Plaintiff was retaliated against because his employer did not want Walker to be investigated.

98. The Board's interests, as employer, in promoting the efficiency of the public service are insufficient to outweigh Plaintiff's free speech interests.

99. Helton and Walker retaliated against Plaintiff for engaging in protected speech by, among other things, subjecting him to a hostile work environment, demoting him, cutting his pay, writing him up on baseless charges, and preventing him from obtaining employment in Lea County.

100. Plaintiff's protected speech was a motivating factor in the adverse employment actions he suffered.

101. The Board would not have reached the same employment decision in the absence of the protected conduct—indeed, Plaintiff had been a decorated member of LCSO.

102. As alleged herein, the Board has a custom or practice of writing up, demoting, or otherwise punishing employees who object to, complain about, or refuse to participate in wrongful conduct by LCSO officials. The Board similarly has a custom or policy of preventing such persons from securing other employment in Lea County.

103. The Board was aware of Helton and Walker's improper, retaliatory actions yet took no action to prevent, correct, or stop their wrongdoing.

104. County officials including Bova and Gallagher ratified or sanctioned Helton and Walker's unconstitutional conduct.

11

105. The Board failed to adequately train and supervise county employees in matters related to the exercise of free speech.

106. The deprivation of Plaintiff's rights proximately caused him to suffer damages, including emotional distress and loss of income

107. The Board acted with evil intent or was reckless or callously indifferent to Plaintiff's federally protected rights, such that punitive damages are warranted

**Fifth Cause of Action**
**Violation of the First Amendment**
**42 U.S.C. § 1983**
**Against Helton and Walker in their individual capacities**

108. Plaintiff incorporates all allegations in this complaint as if fully set forth in this paragraph.

109. Plaintiff engaged in First Amendment-protected speech on matters of public concern by, among other things, objecting to hiring practices that he reasonably believed to be discriminatory, and by providing to a third-party information about illegal activity by Walker.

110. Helton retaliated against Plaintiff for engaging in protected speech by, among other things, demoting him, cutting his pay, subjecting him to a hostile work environment, and by using his power and influence as sheriff to prevent Plaintiff from obtaining employment in Lea County

111. Walker retaliated against Plaintiff for engaging in protected speech by, among other things, subjecting him to a hostile work environment, demoting him, and writing him up on baseless charges.

112. Helton and Walker acted under color of law.

113. Plaintiff's speech was not made pursuant to his official duties.

114. As an investigator, Plaintiff's job was to investigate crimes. And while performing background checks, he was paid to collect information in the way his superiors requested him to do and report his findings. Plaintiff was not paid to provide his opinion to his superiors on whether LCSO's disparate treatment of applicants was lawful.

115. Likewise, Plaintiff was not acting within the scope of his job description when he provided information to third parties about Walker's drunk driving. There is no allegation that Plaintiff worked in IA or was tasked with investigating Walker. Indeed, Plaintiff was retaliated against because his employer did not want Walker to be investigated.

116. The Board's interests, as employer, in promoting the efficiency of the public service are insufficient to outweigh Plaintiff's free speech interests.

117. Plaintiff's protected speech was a motivating factor in the adverse employment actions he suffered.

118. Plaintiff would not have suffered the same adverse actions in the absence of the protected conduct—indeed, Plaintiff had been a decorated member of LCSO for years.

119. The deprivation of Plaintiff's rights proximately caused him to suffer damages, including emotional distress and loss of income.

120. Helton and Walker acted with evil intent or were reckless or callously indifferent to Plaintiff's federally protected rights, such that punitive damages are warranted.

### Sixth Cause of Action
### Violation of the New Mexico Human Rights Act
### NMSA 1978, § 28-1-1, et seq.
### Against the Board

121. Plaintiff incorporates all allegations in this complaint as if fully set forth in this paragraph.

122. Plaintiff was performing his job in a way that was consistent with the Board's legitimate expectations.

123. Plaintiff engaged in protected activity by, among other things, objecting to or opposing discriminatory hiring practices.

124. Plaintiff suffered adverse employment action including, among other things, being subjected to a hostile work environment, demoted, having his pay cut, being written up on baseless charges, and being prevented from obtaining employment in Lea County.

125. Plaintiff's engagement in protected activities was a motivating factor in the Board's mistreatment of Plaintiff.

126. On January 26, 2024, Plaintiff received a right-to-sue letter on his discrimination charges from the Equal Employment Opportunity Commission.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment against Defendant as follows:

1. Require Defendants to pay actual damages;
2. Require Defendants to pay punitive damages;
3. Require Defendants to pay interest, reasonable attorney's fees, expenses, and costs of suit;
4. An injunction barring Defendants from further violating Plaintiff's rights;
5. Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues so triable.

Respectfully submitted,

**WALDO GUBERNICK
LAW ADVOCATES LLP**

By:_____
Benjamin Gubernick
WALDO GUBERNICK
LAW ADVOCATES LLP
Benjamin Gubernick (SBN 145006)
E-mail: ben@wglawllp.com
Telephone (346) 277-0287
Fax: 346-341-0169
717 Texas St. Suite 1200
Houston, TX 77002

14

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was electronically filed on July 24, 2024, and served on all counsel of record, in compliance with the Federal Rules of Civil Procedure.

*/s/ Benjamin Gubernick*
Benjamin Gubernick