**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**ZANE BROWN,**

  **Plaintiff,**          **No. 2:23-CV-00355-DHU-GJF**

**v.**

**LEA COUNTY BOARD OF
COUNTY COMMISSIONERS,**

  **Defendant.**

## <u>DEFENDANT LEA COUNTY BOARD OF COUNTY COMMISSIONERS'<br>AMENDED MOTION FOR SUMMARY JUDGMENT</u>

Defendant Lea County Board of County Commissioners (the "County") by and through

counsel of record, MYNATT SPRINGER P.C. (Benjamin J. Young and Haley R. Grant), submit

this Amended Motion for Summary Judgment.   Plaintiff opposes the relief requested herein.

### INTRODUCTION

The County disciplined Plaintiff for serious failings as a criminal investigator. Plaintiff

persistently failed to investigate serious crimes while blaming prosecutors for his omissions

causing substantial damage to public trust in the district attorney.  Plaintiff also sexually harassed

and stalked his co-workers and traumatized a child victim of severe sexual violence.  All of these

report support Plaintiff's discipline, including termination, had he not resigned.   The Court must

enter summary judgment against all counts on undisputed facts showing credible allegations, many

of which Plaintiff confirmed, supported his discipline.

### UNDISPUTED MATERIAL FACTS ("UMF")

1.  On January 7, 2022, Lea County Sheriff's Office ("LCSO") Criminal Investigations

Division ("CID") Investigator Diana Jurado (formerly Garcia) submitted a second complaint

against Plaintiff, another LCSO Investigator, accusing him of bullying her. [Ex. 1, Grady Declaration, Attach. 1, BN 32 Formal Complaint].

2.      Investigator Jurado reported to Plaintiff's supervisor then Sergeant Jeremy Grady, Plaintiff intentionally excluded her from a homicide crime scene response despite his admission that, as the on-call supervisor, he was required to call all CID members to respond.  [Ex. 1, Grady Declaration, Attach. 1, BN 30-32 Formal Complaint; Attach. 2, BN 5, Jurado Interview, 00:50, 01:40]; [Ex. 2, Plaintiff's Deposition, pg. 91, ln. 9-24, pg. 93, ln. 17-24].

3.      Plaintiff admitted he did not alert Investigator Jurado, though he called multiple other LCSO deputies and CID personnel to the scene.  [Ex. 1, Grady Declaration, Attach. 3, BN 7 Plaintiff Interview, 02:00, 04:05, 05:15].

4.      On January 12, 2022, LCSO Sgt. Sonia Estrada reportedly heard from Deputy Vivian Sanchez, Plaintiff claimed he hoped Investigator Jurado "would fucking leave," and he confirmed spreading this rumor.  [Ex. 1, Grady Declaration, Attach. 3, BN 7 Plaintiff Interview, 12:05, 13:00, 15:45; Attach. 6, BN 34-35 Estrada Letter].

5.      Sergeant Grady's investigation found Plaintiff displayed continued animosity towards Investigator Jurado which existed since her first bullying complaint. and that he had not learned from his prior counseling from Sergeant Grady, resulting in a verbal reprimand of Plaintiff. [Ex. 1, Grady Declaration, ¶ 7]; [Ex. 3, Martinez Declaration, Attach. 1, BN 10-11 Grievance Review].

6.      Phoenix House Executive Director Gretchen Koether complained to Helton about Plaintiff's work in June 2022.  [Ex. 18, Helton Disc. Resps., Rog. 3].

7.      On June 28, 2022, Chief Martinez received a complaint against Plaintiff from a Social Worker Selena Savell with the Child Advocacy Center ("CAC") in Hobbs and assigned

LCSO Captain Victor Hernandez to investigate the complaint of Plaintiff's inappropriate behavior. [Ex. 3, Martinez Declaration, Attach. 4, BN 251 Savell Complaint]; [Ex. 5, Hernandez Declaration, Attach. 1, BN 259 Investigative Report].

8.      Ms. Savell expressed concerns that Plaintiff was scaring child victims, interfering with the ability to collect viable information from victims, and treated CAC personnel poorly.  [Ex. 3, Martinez Declaration, Attach. 4, BN 251 Savell Complaint]; [Ex. 5, Hernandez Declaration, Attach. 2, BN 246 Savell Interview, 08:45; Attach. 3, BN 244 Lucero Interview, 00:45, 03:00].

9.      Ms. Savell and CAC Forensic Interviewer Laura Lucero accused Plaintiff of improperly interviewing a child victim on June 15, 2022.  [Ex. 3, Martinez Declaration, Attach. 4, BN 251 Savell Complaint]; [Ex. 5, Hernandez Declaration, Attach. 2, BN 246 Savell Interview, 01:30; Attach. 3, BN 244 Lucero Interview, 00:45; Attach. 4, BN 242 Santana Interview, 4, BN 242 Santana Interview, 01:05, 02:20, 03:25, 04:25, 08:00, 11:20, 14:45, 17:15].

10.      Ms. Savell and Ms. Lucero claimed Plaintiff wanted more information from the child victim, became angry, shouted at her to "get over here," telling her she had no choice but to comply   Ms. Lucero claimed she told Plaintiff he could not interview the child nor could Lucero ask leading questions.  [Ex. 3, Martinez Declaration, Attach. 4, BN 251 Savell Complaint]; [Ex. 5, Hernandez Declaration, Attach. 2, BN 251 Savell Interview, 01:30, 02:00, 03:40, 04:30; Attach. 3, BN 244 Lucero Interview, 3:40, 04:30, 06:15; Attach. 5, BN 236 Plaintiff Interview, 27:30, 32:25, 39:15].

11.      Plaintiff later laughed and cursed at the child victim and jokingly blamed New Mexico Children Youth and Families Department ("CYFD") Victim's Advocate Ana Santana for removing the child.  [Ex. 3, Martinez Declaration, Attach. 4, BN 251 Savell Complaint]; [Ex. 5,

Hernandez Declaration, Attach. 3, BN 246 Savell Interview, 02:00, 03:40, 04:30; Attach. 4, BN 244 Lucero Interview, 05:00; Attach. 5, BN 236 Plaintiff Interview, 27:30, 32:25, 39:15].

12. Ms. Savell and Victim Advocate Blanca Perez further claimed Plaintiff told Ms. Lucero and SANE Nurse Becky Kesner he could see why some women, including his wife, deserved to be hit by their partners. [Ex. 5, Hernandez Declaration, Attach. 6, BN 245 Perez Interview, 10:50].

13. When confronted, Plaintiff denied ever saying women and his *current* wife deserved to be hit, but he believed his ex-wife deserved to be hit. Later, he recanted, admitting he was indeed referring to his wife and the temporary restraining order she filed against him. [Ex. 5, Hernandez Declaration, Attach. 5, BN 236 Plaintiff's Interview, 15:55, 16:55]; [Ex. 1, Grady Declaration, Attach. 7, Brown BN 769 Plaintiff Grady Recording, 10:45].

14. On September 19, 2022 Walker recommended another verbal reprimand for Plaintiff's inappropriate comments and conduct and a written reprimand for failing to activate his body worn camera during the interaction. [Ex. 4, Helton Declaration, Attach. 2, BN 254 Discipline Recommendation]; [Ex. 5, Hernandez Declaration, Attach. 1, BN 259, 268 Investigative Report]; [Ex. 3, Martinez Declaration, ¶ 8].

15. On June 11, 2022, Fifth Judicial District Attorney DA Luce personally complained to Helton about Plaintiff's poor investigative work. [Ex. 19, Helton Discovery Responses, Interrogatory No. 3]; [Ex. 4, Helton Declaration, Attach. 1, BN 922-924 Luce Complaint].

16. DA Luce's subsequent written complaint accused Plaintiff of misrepresenting statements made by Asst. District Attorney ("ADA") Kirk Williams in a draft criminal complaint and alleged Plaintiff refused to correct the error until after being confronted with the recording. [Ex. 4, Helton Declaration, Attach. 1, BN 922 Luce Complaint].

17.     On August 24, 2022, Helton opened a third investigation of Plaintiff relating to Luce's allegations about Plaintiff failing to appear for mandatory court hearings; insisting on keeping fabrications in a criminal complaint; failing to conduct proper follow up on at least one case; failing to provide evidentiary disclosures despite the DA's Offices' repeated requests; acting unprofessionally with the DA's Office; and denigrating the DA's Office to a victim's family. [Ex. 4, Helton Declaration, ¶ 7, Attach. 4, BN 128 Disciplinary Recommendation]; [Ex. 6, Jimenez Declaration, Attach. 1, BN 144 Investigative Report].

18.     During the investigation ADA Williams disclosed that he and Plaintiff interviewed a homicide co-defendant.  ADA Williams said he spoke with Plaintiff beforehand to discuss a possible offer of immunity to the co-defendant but made clear he could not offer anything without the DA's authorization.  [Ex. 6, Jimenez Declaration, Attach. 2, BN 122 Williams Interview, 02:40, 03:00].

19.      ADA Williams reported that the criminal complaint Plaintiff drafted included promises to the defendant that Williams never made.  [Ex. 4, Helton Declaration, Attach. 1, BN 922 Luce Complaint]; [Ex. 6, Jimenez Declaration, Attach. 2, BN 122 Williams Interview, 03:45]; Attach. 3, BN 198 Draft Criminal Complaint].

20.     ADA Williams confronted Plaintiff, Plaintiff claimed the offer was captured in the interview recording. It was not.  [Ex. 6, Jimenez Declaration, Attach. 2, BN 122 Williams Interview, 04:15, 05:25; Attach. 7 BN 126 Plaintiff Interview, 01:23:00].

21.     ADA Williams reported Plaintiff treated the issue flippantly despite Williams' concern that the error might jeopardize his law license.  Plaintiff later changed the complaint omitting the erroneous information and admits in this lawsuit that the edits to his original complaint "were factually accurate edits that [DA] Luce had ordered." [Doc. 56, pg. 6, ¶ 47]; [Ex. 6, Jimenez

Declaration, Attach. 2, BN 122 Williams Interview, 05:25; 07:10; Attach. 4, BN 234 Final Criminal Complaint].

22.     According to ADA Williams, Plaintiff told the victim's family that the DA's Office was the reason for the delayed charges, and there was nothing Plaintiff could do.   ADA Williams reported this was untrue because Plaintiff failed to complete required tasks before the preliminary hearing so charges would survive the hearing.  [Ex. 4, Helton Declaration, Attach. 1, BN 922 Luce Complaint]; [Ex. 6, Jimenez Declaration, Attach. 2, BN 122 Williams Interview, 08:45].

23.     Plaintiff later admitted he told the homicide victim's family the DA's Office did not want to file the arrest warrants.  [Ex. 2, Plaintiff's Deposition, pg. 111, ln. 18-22, pg. 112, 14-16, pg. 113, ln. 1-2, Ex. 3, Brown BN 682 Pre-Disciplinary Hearing, 17:00].

24.     DA Luce and the ADAs alleged further that Plaintiff was responsible for the months long delay in the bringing charges after the victim's family told the DA's office Plaintiff blamed the DA's Office for the delays.   [Ex. 4, Helton Declaration, Attach. 1, BN 922 Luce Complaint]; [Ex. 6, Jimenez Declaration, Attach. 5, BN 123 Kirtley Interview, 20:10].

25.     Plaintiff admitted he did not advise the DA's Office about the victim family's concerns until the day multiple billboards went up in Hobbs attacking the DA's Office for the delay.  [Ex. 2, Plaintiff's Deposition, Ex. 3, BN 682 Pre-Disciplinary Hearing, 17:20]; [Ex. 6, Jimenez Declaration, Attach. 5, BN 123 Kirtley Interview, 09:15].

26.     ADA Kirtley, ADA Williams, and DA Luce tried to get the statements from Plaintiff, but couldn't until Sergeant Grady produced recordings already in LCSO's possession on the eve of the homicide case's preliminary hearing.   [Ex. 4, Helton Declaration, BN 922 Luce Complaint]; [Ex. 6, Jimenez Declaration, Attach. 5, BN 123 Kirtley Interview, 09:10, 21:15; Attach. 6, BN 125 Grady Interview, 09:00, 11:55, 13:00].

27.     ADA Kirtley reported that despite Plaintiff's assurances, he never prioritized providing evidence to the DA's Office.  [Ex. 4, Helton Declaration, Attach. 1, BN 924 Luce Complaint]; [Ex. 6, Jimenez Declaration, Attach. 5, BN 123 Kirtley Interview, 21:30; 22:30].

28.     Further, due to Plaintiff's failure to attend pretrial interviews ("PTIs") three times in one of the cases related to the homicide, the defense counsel filed a motion to suppress.  [Ex. 4, Helton Declaration, Attach. 1, BN 922, 923 Luce Complaint]; [Ex. 6, Jimenez Declaration, Attach. 5, BN 123 Kirtley Interview, 03:10]; [Ex. 7, BN 844-845 Lerke Motion to Suppress].

29.     ADA Kirtley said Plaintiff missed the first PTI  but the defense attorney agreed to reschedule even though a dying witness was involved.  [Ex. 6, Jimenez Declaration, Attach. 5, BN 123 Kirtley Interview, 02:00, 04:45].

30.     ADA Kirtley said that Plaintiff showed up to the DA's office right before the rescheduled PTI but told her he was unavailable and instead attended a meeting with DA Luce and CYFD Attorney Dickey concerning other missing disclosures.   [Ex. 2 Plaintiff's Deposition, pg. 127, ln. 12-25, pg. 128, ln. 1-25, pg. 129, ln. 1-19]; [Ex. 6, Jimenez Declaration, Attach. 5, BN 123 Kirtley Interview, 02:25, 04:45; Attach. 6, BN 125 Grady Interview, 22:45]; [Ex. 4, Helton Declaration, Attach. 1, BN 922-923, 924 Luce Complaint].

31.     A third PTI was set, but Plaintiff called the day before to relay that he would not be able to attend while he was on administrative leave.  [Ex. 4, Helton Declaration, Attach. 1, BN 922-923 Luce Complaint]; [Ex. 6, Jimenez Declaration, Attach. 5, BN 123 Kirtley Interview, 03:25].

32.     Despite several requests,  Plaintiff failed to produce a video deposition in the Brian Berry homicide until Sergeant Grady produced the footage.  [Ex. 4, Helton Declaration; Attach. 1,

BN 923 Luce Complaint]; [Ex. 6, Jimenez Declaration, Attach. 6, BN 125 Grady Interview, 13:00, 14:05, 15:35].

33.      In a case involving the shooting of the three-year-old, ADA Kirtley said a four-year-old witness was interviewed and used a color crayon to mark a diagram. ADA Kirtley said Plaintiff only produced a black and white copy and she had to request a color copy to present to the child during the deposition so the child could understand and recall the diagram. [Ex. 4, Helton Declaration, Attach. 1, 923 Luce Complaint]; [Ex. 6, Jimenez Declaration, Attach. 5, BN 123 Kirtley Interview, 09:30].

34.      ADA Kirtley tried calling Plaintiff before the deposition, but he had not responded. When Plaintiff finally responded, he said the color copy did not exist, so ADA Kirtley said she would get a copy of the video showing the copy the next morning. [Ex. 6, Jimenez Declaration, Attach. 5, BN 123 Kirtley Interview, 09:30].

35.      ADA Kirtley said that when she called Plaintiff to coordinate the next morning, he did not answer. ADA Kirtley said she went to LCSO and waited for him, but it was Sergeant Grady who produced the video two hours later. [Ex. 6, Jimenez Declaration, Attach. 5, BN 123 Kirtley Interview, 09:30; Attach. 6, BN 125 Grady Interview, 20:10, 29:10].

36.      While waiting Plaintiff texted ADA Kirtley calling her a "snitch" and a "rat" because he was upset that she involved Sergeant Grady. Plaintiff admitted his comments but claimed he was joking. [Ex. 6, Jimenez Declaration, Attach. 5, BN 123 Kirtley Interview, 09:30, 12:05; Attach. 7 BN 126 Plaintiff Interview, 01:38:00].

37.      In a CYFD human trafficking and child abuse case, CYFD attorney Kristen Dickey complained about Plaintiff, because Dickey had not yet heard back from him or received discovery in a tablet showing images of the suspect pointing a gun. [Ex. 4, Helton Declaration, Attach. 1,

923 Luce Complaint]; [Ex. 6, Jimenez Declaration, Attach. 6, BN 125 Grady Interview, 20:10, 22:45].

38.     Plaintiff advised he would get search warrants for a tablet and would review it the next day on June 8, 2022.  On August 14, 2022, DA Luce still did not have warrants despite the completion of forensic interviews and children's drug testing.  [Ex. 2, Plaintiff's Deposition, pg. 127, ln. 12-25, pg. 128, ln. 1-25, pg. 129, ln. 1-18]; [Ex. 4, Helton Declaration, Attach. 1, BN 923 Luce Complaint]; [Ex. 6, Jimenez Declaration, Attach. 6, BN 125 Grady Interview, 23:30, 24:25].

39.     Plaintiff claimed he could not review the tablet or obtain the search warrants to raise charges arising from the CYFD case because he was waiting on materials from CYFD and was prohibited from contacting the CAC during the CAC investigation.  However, Plaintiff did not receive any directive not to communicate with CAC personnel until June 28, 2022, or 20 days after he purportedly claimed he would provide the discovery.  [Ex. 2, Plaintiff's Deposition, Ex. 3, BN 682 Pre-Disciplinary Hearing, 17:00, 18:00, 20:10].

40.     Sergeant Grady said he understood Plaintiff had only finished preparing the arrest and search warrants the day he was put on administrative leave.  [Ex. 6, Jimenez Declaration, Attach. 6, BN 125 Grady Interview, 20:10, 22:45, 23:45, 25:05].

41.     ADA Kirtley reported that Plaintiff delayed sending DNA to the lab on another case and had to be repeatedly reminded to get the DNA results so charges could be brought.  [Ex. 6, Jimenez Declaration, Attach. 6, BN 123 Kirtley Interview, 15:50].

42.     Sergeant Grady claimed he was unaware of any issues the DA's Office had with 1) Plaintiff's criminal complaint and any misrepresentation as to a proffer made by ADA Kirk Williams, 2) that Plaintiff's testimony concerning a related homicide case might be suppressed for missing multiple pretrial interviews, 3) Plaintiff was missing preliminary hearings requiring cases

to be dismissed and refiled; or 4) that the DA's Office was having issues with Plaintiff's untimely production of discovery disclosures and evidence.  [Ex. 6, Jimenez Declaration, Attach. 6, BN 125 Grady Interview, 16:05, 33:15].

43.    Plaintiff claimed he only missed court when he was investigating a homicide and that he warned the DA's Office.  However, Sergeant Grady recalled DA Luce contacting him long before the investigation to complain about Plaintiff missing hearings and that he verbally admonished Plaintiff on multiple prior occasions for failing to complete reports. Still, Sergeant Grady reportedly never issued any formal discipline.  [Ex. 6, Jimenez Declaration, Attach. 6, BN 125 Grady Interview, 06:45, 33:15; Attach. 9, BN 126 Plaintiff Interview, 1:06:00].

44.    After Plaintiff left LCSO, Sergeant Grady discovered missing reports from 13 cases Plaintiff investigated including five cases from incidents in 2022, seven cases from incidents in 2021, and one case from an incident as far back as 2019.  [Ex. 1, Grady Declaration, ¶¶ 8-9].

45.    Plaintiff testified that, as an investigator, his reports were supposed to be included with a deputy's initial report that went to the DA's Office before charges were filed.  [Ex. 2, Plaintiff's Deposition, pg. 84, ln. 20-25, pg. 85, ln. 1-25, pg. 86, ln. 1-21].

46.    Sergeant Grady admitted he should have more closely supervised Plaintiff including asking specific questions rather than taking Plaintiff's word and should not have assumed Plaintiff was on top of these cases. [Ex. 6, Jimenez Declaration, Attach. 6, BN 125 Grady Interview, 06:45, 08:05, 26:15, 33:15, 38:00; Attach. 9, BN 126 Plaintiff Interview, 01:07:50].

47.    Sergeant Grady conceded he would have disciplined Plaintiff had he known what he later discovered.  [Ex. 6, Jimenez Declaration, Attach. 6, BN 125 Grady Interview, 06:45, 08:05, 26:15, 33:15, 38:00, 39:30, 42:15].

48.     Helton removed Plaintiff from the night shift as a result of the verbal complaint from DA Luce during a June 2022 event and the complaints from the CAC and Phoenix House. [Ex. 4, Helton Declaration, ¶ 8]; [Ex. 19 Helton Discovery Responses, Interrogatory Answer No. 3].

49.     Sergeant Grady was disciplined for his failure to properly supervise Plaintiff. [Ex. 8, Bova Declaration, Attach. 1, BN 138 Written Reprimand].

50.     DA Luce also alleged Plaintiff would ask not to appear for court settings resulting in requests for multiple extensions of time, but Plaintiff did not seem to think these issues were his fault. [Ex. 4, Helton Declaration, Attach. 1, BN 924 Luce Complaint].

51.     ADA Kirtley said Plaintiff repeatedly insisted that she approve a search warrant for a residence even though she could not think of a legal way to reenter the residence to support the warrant without consent, but Plaintiff pressed the issue. [Ex. 6, Jimenez Declaration, Attach. 6, BN 123 Kirtley Interview, 17:00. 18:10, 20:10, 22:45].

52.     ADA Kirtley said Plaintiff contacted ADA Williams to get a second opinion but he advised the same on the search warrant. [Ex. 6, Jimenez Declaration, Attach 6, BN 123 Kirtley Interview, 17:00; Attach. 7 BN 126 Plaintiff Interview, 01:45:00].

53.     After concluding the investigation, Walker recommended Plaintiff's demotion to deputy for several policy violations. [Ex. 4, Helton Declaration, ¶ 9, Attach. 4, BN 128-130 Disciplinary Recommendation]; [Ex. 6, Jimenez Declaration, Attach. 1, BN 144, 154-156 Investigative Report].

54.     Helton reviewed and agreed with Walker's recommendations and Plaintiff was issued Plaintiff a Notice of Intent to Take Disciplinary Action ("Notice of Intent") advising of the

proposed demotion. [Ex. 4, Helton Declaration, ¶ 9]; [Ex. 8, Bova Declaration, Attach. 2, BN 136-137 Notice of Intent].

55.    Plaintiff signed the Notice of Intent on September 29, 2022. [Ex. 2, Plaintiff's Deposition, pg. 72, ln. 16-25, pg. 73, ln. 1]; [Ex. 8, Bova Declaration, Attach. 5, BN 136-137 Notice of Intent].

56.    Walker's September 19, 2022 recommendation identified several policy violations under for Plaintiff's false statements; the use of profane, insolent, and/or similar language; violating the LCSO code of ethics; violating court appearance requirements; and making arrests, searches, and seizures without proper lawful cause. [Ex. 4, Helton Declaration, Attach. 2, BN 252-254 Disciplinary Recommendation].

57.    Plaintiff also admitted the DA's Office refused to prosecute cases he investigated. [Doc. 56, pg. 7, ¶ 58]; [Ex. 2, Plaintiff's Deposition, pg. 28, ln. 5-9, 25].

*58.*    After a pre-disciplinary hearing, Plaintiff signed and received a copy of the Notice of Demotion on October 14, 2022. [Ex. 2, Plaintiff's Deposition, pg. 72, ln. 16-25, pg. 73, ln. 1]; [Ex. 8, Bova Declaration, Attach. 3, BN 140-143 Notice of Demotion; Attach. 4, BN 127 Demotion Status].

59.    On July 7, 2022, Helton received a complaint from Aaron Rodriguez who alleged Walker drove drunk following a birthday party for Investigator Jurado. Helton began investigating but could not reach Mr. Rodriguez. [Ex. 4, Helton Declaration, Attach. 13, BN 43, 48, 52-54 Formal Complaint].

60.    Witnesses reported that they did not find Walker drank excessively or that he appeared to be intoxicated. Witnesses also reported that Plaintiff contacted them asking whether

Walker had been drinking during the party and accused anyone who said otherwise of lying.  [Ex. 4, Helton Declaration, Attach. 4, BN 55-56 Disciplinary Recommendation].

*61.*    Helton also reportedly heard from HR Director Bova that Plaintiff had just left the HR Department and was claiming 1) Walker and Investigator Jurado were having a romantic affair and 2) Helton and Walker were creating a hostile work environment for Plaintiff.  [Ex. 4, Helton Declaration, Attach. 4, BN 55 Disciplinary Recommendation].

62.    Seeing these reports, Helton concluded that a third-party investigator would need to investigate the Walker allegations further on July 20, 2022.  [Ex. 4, Helton Declaration, Attach. 4, BN 55 Disciplinary Recommendation; Attach. 14, BN 300-301 Helton Memorandum].

63.    In the meantime, the County placed Plaintiff on administrative leave over concerns he was trying to coerce witnesses to support allegations that Walker drove drunk.  The County also hired attorney Cody Rogers to investigate the Walker allegations.  [Ex. 4, Helton Declaration, Attach. 3, BN 313, Email re Administrative Leave; Attach. 10, BN 305-307 Jurado Memorandum]; [Ex. 8, Bova Declaration, ¶¶ 7-8].

64.    Plaintiff did not attend the party and refused Ms. Rogers' interview on the advice of his attorney, and his attorney refused to allow Plaintiff's interview.  [Ex. 9, Rogers Declaration, ¶ 7].

65.    In Mr. Rodriguez' interview, Plaintiff reportedly admitted he was not present for the birthday party but claimed there were videos showing Walker with an alcoholic beverage during the party and a video of Walker getting into his vehicle.  [Ex. 9, Rogers Declaration, Attach. 4, BN 325 Rodriguez Interview, 00:10].

66.    Deputy Sanchez reported to Ms. Rogers that she saw Walker having an alcoholic beverage at Texas Roadhouse, or the second stop of the party when she first arrived, but she was

seated at a different table after the party moved, so Sanchez did not know whether he drank there. Deputy Sanchez denied seeing any evidence that Walker was intoxicated and indicated that he was quiet that night. [Ex. 9, Rogers Declaration, Attach. 5, BN 326 Sanchez Interview, 03:40].

67.     Other witnesses including Investigator Jurado, Officer Tello, Deputy Ibarra, Records Technician Claudia Regino, and Deputy Scott Wimberley reportedly denied seeing signs that Walker was drunk at the party. [Ex. 9, Rogers Declaration, Attach. 7, BN 328 Tello Interview, 08:30, 09:25, 12:00; Attach. 8 BN 836 Ibarra Interview, 09:30, 11:15, 12:25].; Attach. 10, BN 339 Wimberly Interview, 04:00, Attach. 11, BN 328 Walker Interview, 01:30, 03:45].

68.     Deputy Sanchez and Officer Tello also claim Plaintiff tried to convince them to disclose to the investigator that Walker was drunk. Plaintiff also alleged Walker and Investigator Jurado were in a romantic relationship leading to a conspiracy to get him fired. [Ex. 9, Rogers Declaration, Attach. 5, BN 326 Sanchez Interview, 05:50]; [Ex. 9, Rogers Declaration, Attach. 7, BN 328 Tello Interview, 15:45; 18:40, 20:30].

69.     Deputy Sanchez claimed Plaintiff often gossiped about Investigator Jurado and it seemed like he was targeting Jurado. Deputy Sanchez claimed Plaintiff frequently told her to stay away from Investigator Jurado, asked about Jurado's case files, and often complained about Jurado. [Ex. 9, Rogers Declaration, Attach. 5, BN 326 Sanchez Interview, 08:00, 13:20].

70.     Deputy Sanchez also claimed Plaintiff said that he and White had a lawsuit and needed footage of Walker driving after the party, so they tried to obtain security surveillance footage from Applebee's without success. [Ex. 9, Rogers Declaration, Attach. 5, BN 326 Sanchez Interview, 14:40].

71.     Deputy Sanchez discussed and produced a recorded phone call in which Plaintiff told her that he planned on talking to everyone at the party and reporting to HR, so that no one

could lie to say Walker was not drinking alcohol at the party.  [Ex. 9, Rogers Declaration, Attach. 5, BN 326 Sanchez Interview, 13:45, 17:15, Attach. 6, BN 38 Sanchez Recording].

72.    Deputy Sanchez' report and text messages claimed Plaintiff repeatedly called her asking about whether Walker was drinking and driving.  Plaintiff reported that he was with Investigator Sandoval during his initial call with Deputy Sanchez and wanted to catch Walker driving drunk by having HPD conduct a traffic stop and promised Sanchez immunity for assisting Plaintiff.  [Ex. 9, Rogers Declaration, Attach. 5, BN 326 Sanchez Interview, 09:45, 21:30, 24:10, 29:00]; [Ex. 2, Plaintiff's Deposition, pg. 120, ln. 13-25, pg. 121, ln. 1-8].

73.    Officer Tello alleged she heard partygoers asking each other if they were okay to drive and coordinated amongst themselves as to any necessary designated drivers.  [Ex. 9, Rogers Declaration, Attach. 7, BN 328 Tello Interview, 12:00].

74.    Officer Tello claimed Plaintiff contacted her a day or two later, called her a traitor and asked who was at the party and whether Walker and Investigator Jurado were in a romantic relationship.  [Ex. 9, Rogers Declaration, Attach. 7, BN 328 Tello Interview, 15:00].

75.    Officer Tello also claimed Mr. Rodriguez previously disclosed to her that he was trying to sue LCSO when they worked together at HPD.  [Ex. 9, Rogers Declaration, Attach. 7, BN 328 Tello Interview, 29:30].

76.    Officer Tello reported feeling that, if Mr. Rodriguez and Plaintiff came together over the Walker complaint, Rodriguez would be willing to make something up so Plaintiff could sue.  [Ex. 9, Rogers Declaration, Attach. 7, BN 328 Tello Interview, 29:30].

77.    Investigator Sandoval reported that she also figured Plaintiff wanted information on the birthday party due to issues between Plaintiff and Investigator Jurado.  Investigator Sandoval claimed Plaintiff purportedly told her Walker had been drinking that night and would be

reporting Walker to HR.  [Ex. 9, Rogers Declaration, Attach. 3, BN 327 Sandoval Interview, 10:50, 19:25, 53:05].

78.    In Walker's interview, he reportedly drank water all night and consumed two beers at Drylands, two beers with a steak dinner at Texas Roadhouse, and two beers at Applebee's before driving home arriving at about 11 am.  [Ex. 9, Rogers Declaration, Attach. 10, BN 338 Walker Interview, 01:30].

79.    Walker denied he was intoxicated at any point of the night and recalled that the group checked in with each other at the end to verify that everyone was okay to drive home, LCSO Sergeant Sonia Estrada asked him, and he said told her he was fine.  [Ex. 9, Rogers Declaration, Attach. 11, BN 328 Walker Interview, 03:45].

80.    When asked whether and how he knew Mr. Rodriguez, Walker reported that Rodriguez applied for a job with LCSO so Walker met with him, but Rodriguez could not be hired due to the reported circumstances of his termination from HPD.   Walker reportedly learned Mr. Rodriguez had also been terminated by other law enforcement agencies.   [Ex. 9, Rogers Declaration, Attach. 11, BN 328 Walker Interview, 08:00].

*81.*    Ms. Rogers concluded that the Walker allegations were unsubstantiated based on witness accounts and information but recommended investigation into Plaintiff's involvement in the complaint and influence over other witnesses. [Ex. 9, Rogers Declaration, Attach. 1, BN 321-322 Rogers Investigation].

82.    On August 24, 2022, Chief Deputy Fernando Jimenez was assigned to investigate Plaintiff's potential attempted interference with the Walker investigation in violation of County policy, or the fourth investigation revealing Plaintiff's alleged misconduct. This investigation led

Plaintiff's recommended termination.  [Ex. 4, Helton Declaration, Attach. 4, BN 58, Discipline Recommendation]; [Ex. 6, Jimenez Declaration, Attach. 10, BN 59 Investigative Report].

83.    Plaintiff admitted he knew County policy prohibiting him from contacting witnesses during the investigation of a complaint but also that he spoke with Mr. Rodriguez, Deputy Sanchez, and Officer Tello on the Walker allegations.  [Ex. 2, Plaintiff's Deposition, pg. 119, ln. 15-17, pg. 120, ln. 3-6, Ex. 7, Brown BN 680 Plaintiff Interview, 11:45]; [Ex. 6, Jimenez Declaration, Attach. 9, BN 126 Plaintiff Interview, 11:20, 12:45, 14:30, 21:50, 22:45, 36:30; Attach. 12, BN 41 Tello Interview, 08:30]; [Ex. 9, Rogers Declaration, Attach. 6, BN 38 Sanchez Recording, 00:40]; [Ex. 10, Plaintiff's Discovery Responses, Request for Admission No. 5].

84.    Chief Jimenez interviewed several witnesses, including Plaintiff, and reviewed the Rogers and Helton investigative materials.  [Ex. 6, Jimenez Declaration, Attach. 10, BN 59-75 Investigative Report]; [Ex. 9, Rogers Declaration, Attach. 6, BN 38 Sanchez Recording]; [Ex. 4, Helton Declaration, Attach. 5, BN 103-105 Vizcarra Statement; Attach. 7, BN 109-119 Sanchez Statements; Attach. 13, BN 43-54 Helton Memorandum].

85.    In her interview, Deputy Sanchez advised consistent with what she already reported as to Investigator Jurado's birthday party, contact Plaintiff, and his previous representations to her about Jurado and Walker.  [Ex. 6, Jimenez Declaration, Attach. 10, BN 59-75 Investigative Report, Attach. 11, BN 39 Sanchez Interview, 14:10, 15:45; 16:45; 21:20, 23:45, 24:40; 27:05, 29:45, 31:45, 35:55].

86.    Deputy Sanchez further went on to advise that Plaintiff recently asked her to pull Investigator Jurado's case files for him claiming Jurado was not doing any work on her cases, and he wanted to see if her case load compared with his and Investigator Sandoval's.  [Ex. 6, Jimenez Declaration, Attach. 11, BN 39 Sanchez Interview, 16:45, 31:05].

87.     Deputy Sanchez alleged that Plaintiff would always reference how he performed her background investigation when she was hired as if she owed him something and said she felt like he was plotting against Walker and would say anything to keep his job.  [Ex. 6, Jimenez Declaration, Attach. 11, BN 39 Sanchez Interview, 32:45].

88.     In his own interview, Plaintiff claimed Walker only attended the birthday party, because he and Detective Jurado were in an intimate relationship.  [Ex. 6, Jimenez Declaration, Attach. 11, BN 39 Interview with Sanchez, 24:05].

89.     In Deputy Sanchez' recorded call, Plaintiff told her he spoke with Officer Tello and told Tello that he was the reason she was previously hired at LCSO and asked Sanchez to report Walker's drinking.  [Ex. 6, Jimenez Declaration, Attach. 11, BN 39 Sanchez Interview, 34:40, 35:05, 36:35]; [Ex. 9, Rogers Declaration, Attach. 6, BN 38 Sanchez Recording, 00:25; 01:35]; [Ex. 2, Plaintiff's Deposition, pg. 126, ln. 11-13, 25, pg. 127, ln. 1-6, Ex. 13, BN 38 Sanchez Recording].

90.     Deputy Sanchez told Plaintiff she did not want to be involved.  Plaintiff said he knew but that he was holding Officer Tello's "feet to the fire more than everybody else's." Plaintiff also admitted to Chief Jimenez that he coerced Deputy Sanchez by offering her immunity from his lawsuit. [Ex. 6, Jimenez Declaration, Attach. 9, BN 126 Plaintiff Interview, 24:00]; [Ex. 9, Rogers Declaration, Attach. 6, BN 38 Sanchez Recording, 01:00].

91.     Plaintiff also advised that he tried to call Officer Tello multiple times, but she ignored his calls.  Plaintiff said it was not an issue, because he had recorded a phone call with Officer Tello, and she "could lie if she wants" since she was interviewing for an LCSO deputy position that week.  [Ex. 9, Rogers Declaration, Attach. 6, BN 38 Sanchez Recording, 01:00].

92.     Plaintiff further claimed he knew witnesses had already been interviewed concerning the complaint against Walker, but that they had lied by claiming Walker was only drinking water that night and were going to be in trouble.  [Ex. 9, Rogers Declaration, Attach. 6, BN 38 Sanchez Recording, 00:25].

93.     Deputy Sanchez also mentioned Plaintiff would often call her during and after work, while she was out of town, and somehow knew when she was off duty.  [Ex. 2, Plaintiff's Deposition, Ex. 8, BN 330-337 Plaintiff's Text with Plaintiff]; [Ex. 6, Jimenez Declaration, Attach.11, BN 39 Sanchez Interview, 41:30, 43:35].

94.     Deputy Sanchez described some of Plaintiff's alleged sexual advances toward her on more than 10 occasions but felt she could only jokingly reject them or he might treat her like an enemy.  Deputy Sanchez claimed she feared Plaintiff would try to ruin her reputation by manipulating and lying about her in a believable way as she knew he had done to others.  [Ex. 6, Jimenez Declaration, Attach. 11, BN 39 Sanchez Interview, 46:50, 50:20].

95.     Plaintiff denied ever contacting Deputy Sanchez excessively or inappropriately and claimed Deputy Sanchez tried to sleep with him.  [Ex. 6, Jimenez Declaration, Attach. 9, BN 126 Plaintiff Interview, 33:15; Attach. 14, BN 37 Jurado Interview, 36:00, 39:15].

96.     In one example, Deputy Sanchez alleged she opted out of joining the CID mentorship program after Plaintiff told her about it, because he said he would be her mentor in a sexually suggestive way, and she did not want to work with him.  [Ex. 6, Jimenez Declaration, Attach. 11, BN 39 Sanchez Interview, 52:20].

97.     Officer Tello confirmed allegedly receiving a phone call from Plaintiff two days after Investigator Jurado's birthday party.  Officer Tello also confirmed the other allegations she reported to Ms. Rogers and Helton and her efforts to advise Plaintiff that she did not want to be

involved in his allegations against Walker and Investigator Jurado. [Ex. 6, Jimenez Declaration, Attach. 12, BN 41 Tello Interview, 02:10, 02:50, 04:40, 05:40, 05:55, 07:40].

98.    Plaintiff denied making any such coercive comments in his communications with Officer Tello and Deputy Sanchez concerning Walker but admitted he suspected Investigator Jurado and Walker were behind his discipline and claimed he only wanted to prove they were in a relationship given their conspiracy to get him fired. [Ex. 6, Jimenez Declaration, Attach. 9, BN 126 Plaintiff Interview, 11:20, 12:45, 14:30, 21:50, 22:45, 36:30; Attach. 12, BN 41 Tello Interview, 08:30].

99.    Plaintiff's friend, Investigator Sandoval, denied being involved in any plan to take Walker down, but admitted she knew Plaintiff had been speaking with people about Walker. [Ex. 6, Jimenez Declaration, Attach. 13, BN 40 Sandoval Interview, 11:40, 13:45, 14:25, 37:50, 42:05,42:50, 4705, 49:25].

100.    Investigator Jurado claimed she too was once friendly with Plaintiff, but the relationship changed when she noticed Plaintiff acting like he wanted a romantic relationship, often mentioned cheating on his wife, asked about Jurado's sex life, criticized her celibacy and what she wore, and seemed to act like a jealous spouse. [Ex. 6, Jimenez Declaration, Attach. 14, BN 37 Jurado Interview, 26:30, 27:40, 36:55, 38:30].

101.    Investigator Jurado reported instances when she would have a man over to her house, Plaintiff would somehow know and then demand to know why. In one reported instance, Plaintiff became angry at Investigator Jurado for having her child's father come to her house to repair a broken pipe which Plaintiff claimed he noticed as he happened to drive by her house. According to Investigator Jurado, Plaintiff would simply laugh these instances off when she

confronted him.  [Ex. 6, Jimenez Declaration, Attach. 14, BN 37 Jurado Interview, 29:00, 30:00, 31:00; 43:15, 46:25].

102.    Investigator Jurado went on to allege that Plaintiff was never secretive about asking private questions of LCSO employees, was always asking about her whereabouts on and off duty, and once angrily accused her of having sex with someone while she was on vacation. [Ex. 6, Jimenez Declaration, Attach. 14, BN 37 Jurado Interview, 33:00; 36:00, 39:15, 40:05].

103.    Chief Jimenez further interviewed Walker who disclosed that he saw Plaintiff driving in his unit going the opposite direction as Walker drove to Albertson's, but that when Walker came out of the store, he saw Plaintiff in his unit about three spaces from Walker's vehicle. [Ex. 6, Jimenez Declaration, Attach. 10, BN 64-65 Investigative Report; Attach. 15, BN 42 Walker Interview, 02:05].

104.    Chief Jimenez' investigative report concluded that Plaintiff committed multiple policy violations related to prohibitions against harassment, intimidation of deputies and witnesses, stalking, creating a hostile work environment, and violations of the County's Code of Ethics and General Conduct.   [Ex. 6, Jimenez Declaration, Attach. 7, BN 126, Plaintiff Interview, 25:00; Attach. 9, BN 126 Plaintiff Interview, 35:50; Attach. 10, BN 70-75 Investigative Report, ¶¶ 1-10; Attach. 16, BN 36 Garcia Interview, 09:45, 10:25].

105.    Consequently, Helton prepared an October 11, 2022 memorandum recommending Plaintiff's termination citing Plaintiff's previous discipline and the findings and policy violations addressed by Chief Jimenez.  [Ex. 4, Helton Declaration, ¶, Attach. 4, BN 55-58 Disciplinary Recommendation].

106.    On October 20, 2022, in response to his demotion, Plaintiff resigned his employment effective immediately alleging that he was subjected to a hostile work environment,

retaliation, discrimination, and harassment.  [Ex. 8, Bova Declaration, Attach. 3, BN 140-143 Notice of Demotion; Attach. 6, BN 653 Email Resignation].

107.    On September 15, 2021, then HPD Sergeant White, who is African American, submitted an employment application to LCSO for a deputy position.  [Ex. 3, Martinez Declaration, Attach. 8, BN 1083-1086 Deputy Position Description]; [Ex. 11, Hobbs Declaration, ¶¶ 4-5, Attach. 1, BN 1093-1098 New Applicant Report]; [Doc. 56, pg. 2, ¶ 12].

108.    Neither Helton nor Walker were involved in any decision-making concerning the hiring process for White's 2021 application.  Helton and Walker only became involved during applicant interviews, but White withdrew his application before he was interviewed.  [Ex. 4, Helton Declaration, ¶ 11].

109.    Under PER 1-01-4(C) of the LCSO Personnel Policy and the County's HR policies, LCSO must conduct background investigations on all employment applicants to ensure they meet "the necessary requirements set forth by the Sheriff of Lea County and the State of New Mexico." The application also included applicant's certification they are providing true information with notice that misrepresentations, falsifications, and omissions are grounds for rejection.  [Ex. 12, PER 1-01, PER 1-01-4(C)]; [Ex. 13, BN 382, Lea County HR Policies and Procedures Handbook].

110.    The advertised deputy position required "successfully complet[ing] pre-employment requirements including a background check and drug/alcohol screening." [Ex. 3, Martinez Declaration, Attach. 8, BN 1083-1086 Deputy Position Description].

111.    On September 17, 2021, Cpl. Hobbs received White's application and assigned White's background investigation to Plaintiff on September 29, 2021. [Ex. 11, Hobbs Declaration, ¶¶ 4, 7, Attach. 1, BN 1093-1098 New Applicant Report].

112.     Plaintiff submitted White's background investigation report to Cpl. Hobbs on October 5, 2021.   [Ex. 11, Hobbs Declaration, ¶ 9, Attach. 1, BN 1093-1098 New Applicant Report, Attach. 2, White Background Report].

113.     White's application disclosed that LCSO declined his employment in 2008, so Cpl. Hobbs requested White's 2008 application to determine the reason for the rejection from HR without success, because HR records no longer maintained 2008 applications.  [Ex. 1, Hobbs Declaration, ¶¶ 10-11, Attach. 3 BN 458 White HR Emails; Attach. 4, BN 1104-1105 White Amended Application; Attach. 6, BN 1122 Hobbs Memorandum].

114.     Cpl. Hobbs spoke with Chief Martinez who advised that he reviewed White's prior LCSO application and saw White's disclosure that he sold marijuana as an adult before applying to LCSO.  [Ex. 3, Martinez Declaration, ¶¶ 10-11]; [Ex. 11, Hobbs Declaration, ¶ 12, Attach. 6, BN 1122 Hobbs Emails].

115.     Since LCSO did not have White's application on file, Cpl. Hobbs asked Plaintiff to check with White and HPD on White's application to verify whether this information was reported to HPD during White's hiring process.   [Ex. 8, Bova Declaration, ¶ 13]; [Ex. 11, Hobbs Declaration, ¶¶ 11, 13, Attach. 6, BN 1122 Hobbs Emails].

116.     Plaintiff subsequently submitted an amended background report advising that White admitted he used and distributed marijuana as an adult, as Chief Martinez recalled, but that HPD advised Plaintiff that White disclosed this in his HPD application.   [Ex. 11, Hobbs Declaration, ¶ 15, Attach. 5, BN 1123-1124 Amended Background Report]; [Ex. 3, Martinez Declaration, ¶¶ 10-11].

117.    White also submitted an amended application correcting his prior drug use and distribution representations to admit he had used and distributed marijuana.  [Ex. 11, Hobbs Declaration, ¶ 14, Attach. 4, BN 1104-1105 White Amended Application].

118.    The Lea County Policy and Procedure Manual provides that "[a]n applicant shall be considered ineligible for hire or rehire [] if the applicant has "[m]ade any false statements or deliberate omission on the employment application[,] failed to submit a complete application[, m]akes a materially false statement, affirmatively or by way of omission." [Ex. 13, BN 382-383 Lea County Policies and Procedures Manual].

119.    Still, Cpl. Hobbs submitted White's application materials to Chief Martinez on October 19, 2021.  Chief Martinez approved the application allowing White to progress to the interview phase of the application process.  [Ex. 3, Martinez Declaration, ¶¶10-13]; [Ex. 11, Hobbs Declaration, ¶ 16, Attach. 4, BN 1098-1113 White Amended Application].

120.    On October 20, 2021, Cpl. Hobbs spoke with White to congratulate him on progressing to the next phase and to schedule White's interview.  [Ex. 11, Hobbs Declaration, ¶ 17, Attach. 1, BN 1093-1098 New Applicant Report].

121.    White asked what the starting wages would be, Cpl. Hobbs advised confirmed the posted $30.55 hourly rate, White claimed the wages were much less than his current HPD wages and asked for an exception.  [Ex. 11, Hobbs Declaration, ¶¶ 17-18, Attach. 1, BN 1093-1098 New Applicant Report].

122.    Cpl.  Hobbs spoke with Walker to find out whether the pay could be increased to keep White in the running, but Walker explained it was beyond his authority.  [Ex. 11, Hobbs Declaration, ¶ 19, Attach. 1, BN 1093-1098 New Applicant Report]; [Ex. 14, Walker Declaration, ¶¶ 5-6].

123.    Cpl. Hobbs phoned White to explain, but White withdrew his application, so no interview was scheduled.  [Ex. 11, Hobbs Declaration, ¶ 20, Attach. 1, BN 1093-1098 New Applicant Report]; [Ex. 15, White Response to Request for Admission No. 2].

124.    LCSO later hired a white male for the deputy position at the posted $30.55 hourly rate.  [Ex. 8, Bova Declaration, Attach. 7, J. Brown Offer Letter].

125.    In his EEOC charge of discrimination, Plaintiff swore White's background check "did not completely clear due to an issue with some medication" claiming *not hiring* White would "possibly be" discrimination alleging two other candidates were hired over White. [Ex. 16, BN 459-460 EEOC Charge of Discrimination].

126.    However, in his current complaint, Plaintiff alleges White's background check "found nothing that would disqualify [White] from employment at LCSO" alleging "questionable hiring practices" and "disparate treatment of White's application" "due to White's race" when he was asked to scrutinize White's prior employment records.  [Doc. 56, pg. 2, ¶¶ 11, 13-15].

127.    In his discovery responses and deposition testimony, Plaintiff claimed "they" or who he assumed was LCSO administration wanted to compare White's LCSO application with his previous HPD application to see if White was lying for "so much as a comma" that was inconsistent between the documents.  [Ex. 2, Plaintiff's Deposition, pg. 145, ln. 20-25, pg. 146, ln. 1-25, pg. 147, ln. 1, pg. 164, ln. 9-24, pg. 165, ln. 1-3, 10-24]; [Ex. 10, Plaintiff's Discovery Responses, Interrogatory Answers 1-4].

128.    Plaintiff also admitted White was a friend of his before and since he conducted White's background investigations.  [Ex. 10, Plaintiff's Discovery Responses, Interrogatory Answer No. 1].

129.    Plaintiff alleges he was written up for the baseless and frivolous accusations that he failed to conduct a FARO scan at crime scene, but the incident happened before the White application.  [Doc. 56, pg. 3, ¶ 18]; [Ex. 1, Grady Declaration, Attach. 8, BN 650-651 Verbal Reprimand].

130.    Plaintiff further alleges his discipline was not included his personnel file due to an LCSO conspiracy to "prevent Plaintiff from reviewing and contesting the baseless charges." However, Plaintiff admitted he received and signed copies of all written disciplinary notices.  [Doc. 56, pg. 4, ¶¶ 19-23, 30-34].  [Ex. 2, Plaintiff's Deposition, pg. 72, ln. ln. 16-25, pg. 73, ln. 1, pg. 74, ln. 1; pg. 140, ln. 12-15].

131.    Plaintiff also testified that he reviewed his personnel file before he was placed on administrative leave with the County.  [Ex. 2, Plaintiff's Deposition, pg. 14, ln. 14-22].

132.    County policy provides that "[c]urrent employees may ask [HR] to inspect their personnel file.  This inspection is to be supervised by [HR].  No documents may be removed from the file…Former employees may not have access to, or copies of, the former employee's personnel file unless required by law." [Ex. 13, BN 394 County HR Policies and Procedures Manual].

133.    Plaintiff accused LCSO of planning to prevent him from obtaining employment with LPD based on these baseless write-ups, though he admits LPD hired him.  [Ex. 2, Plaintiff's Deposition, pg. 14, ln. 1-14, pg. 15, ln. 5-14].

134.    Plaintiff accuses Helton of trying to convince the manager of the UPS Store, where Plaintiff worked, to fire him but admits he lost his job as a UPS driver when he struck a vehicle. [Doc. 56, pg. 6, ¶ 62]; [Doc. 56, pg. 7, ¶ 61]; [Ex. 17, Helton Deposition, pg. 47, ln. 18-25, pg. 48, ln. 1-23].

135.    Plaintiff also alleged "HPD was concerned about retaliation from Helton and declined to hire him." However, in his deposition, Plaintiff testified that personnel from HPD told him that, "if [Plaintiff] was terminated or [he] left [LCSO] during [] an IA, [he] would be ineligible to apply with [HPD]." [Doc. 56, pg. 7, ¶ 59; pg. 8, ¶ 67]; [Ex. 2, Plaintiff's Deposition, pg. 80, ln. 23-25, pg. 81, ln. 1-245, pg. 82, ln. 1].

## LEGAL STANDARDS

Summary judgment is proper when a movant proves entitlement to judgment as a matter of law based on undisputed material facts.  Fed. R. Civ. P. 56(a). Courts "view the evidence and make inferences in the light most favorable to the nonmovant." *Nanho-Lopez*, 625 F.3d at 1283. A fact is "material" if it might affect a case's resolution under applicable law, and a dispute of material fact is "genuine" if a reasonable jury could not return a verdict for the nonmoving party. *Forth v. Laramie Cty. Sch. Dist. No. 1*, 85 F.4th 1044, 1052 (10th Cir. 2023).

## ARGUMENT

**I.      The Court must enter summary judgment on Count IV and Count VI against the County as Plaintiff cannot prove unlawful retaliation.**

Plaintiff cannot pursue municipal liability claims based on alleged First Amendment retaliation without demonstrating Helton or Walker committed First Amendment violations. *See Crowson v. Wash. Cty. State of Utah*, 983 F.3d 1166, 1191 (10th Cir. 2020) ("Because municipalities act through officers, there will be a municipal violation only where an individual officer commits a constitutional violation.").  Plaintiff alleges he was disciplined for raising concerns about race discrimination against White's 2021 LCSO employment application.  [UMF ¶¶ 280-281].[1] Plaintiff believes his check on White "found nothing that would disqualify him from

---

[1] Insofar as Plaintiff alleges wrongful discipline for the FARO scan, this occurred prior to Plaintiff's claims of discrimination and retaliation .  [UMF ¶¶ 135, 139-141].

employment at LCSO," while overlooking the amended report he prepared detailing exactly the inconsistencies he discovered from White. Plaintiff further overlooks White's admitted inconsistencies in his applications in comparison to Plaintiff's previous allegations against the County. [Doc. 56, pg. 2, ¶¶ 11-15].

Plaintiff cannot keep his complaint allegations straight and admitted to many of the facts at issue in his discipline at the time each incident was investigated. Voluminous witness statements, Plaintiff's own recorded statements and admissions, and inconsistencies in his report shows his discipline was justified. Helton and Walker did not commit any First Amendment violations, and Plaintiff admitted he knew there was no impropriety in White's application process. [UMF ¶¶ 1-8]. Plaintiff's retaliation claims are contradicted by his own representations such that the Court must disregard the inference of retaliation. *Compare* [Doc. 56, pg. 2, ¶¶ 11-15; pg. 4-5, ¶ 35; pg. 6, ¶ 62; pg. 7, ¶ 58]; [UMF ¶¶ 17-18, 21, 25-28, 30, 41, 43-44, 50, 61, 63, 66, 69, 77-78, 89, 94-98, 104, 119, 121-122, 131-133, 135, 139-141].

In two years, Plaintiff was the subject of multiple investigations. [UMF ¶¶ 1-112]. Self-preservation prompted Plaintiff's resignation rather than any alleged protected activity. [UMF ¶ 1-70, 112]. The Court must enter summary judgment against Count IV's municipal liability claim based on the lack of First Amendment retaliation by County officials. [Doc. 56, pg. 10-11, ¶¶ 91-106]; *Crowson*, 983 F.3d at 1191. "[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). "[A] public employer cannot retaliate against an employee for exercising his constitutionally protected right of free speech." *Dill v. City of Edmonds, Okla.*, 155 F.3d 1193, 1201 (10th Cir. 1998). Proving unlawful retaliation requires the plaintiff to prove, among other things, that their speech was on a matter of public concern, and that the employer

would not have reached the same employment decision absent the speech. *Brown v. City of Tulsa*, 124 F.4th 1251, 1267 (10th Cir. 2025). Plaintiff did not report a public concern, because he knowingly made false allegations concerning a background investigation he prepared. [UMF ¶¶ 114-129, 131-133]. There was no pretext in the handling of White's application which was guided by his own misrepresentations. Plaintiff's discipline was only motivated by reported misconduct through witnesses, recordings, and his own misrepresentations. [UMF ¶ 1-64, 70]. Plaintiff would have been disciplined anyway. [UMF ¶¶ 1-59, 63, 65-111]. Plaintiff confirmed White misrepresented, by omission, that he previously used and distributed drugs. [UMF ¶¶ 114-129, 131-133]. White's reported prior drug use and whether he reported the same to another law enforcement agency was crucial to determining whether 1) White had also committed another misrepresentation and 2) the County should employ an officer for arrestable infractions. Plaintiff's later claim that no such inconsistency existed to justify scrutinizing White's application was known to be false and, therefore, not a public concern. [Doc. 56, pg. 2, ¶¶ 11-14].

Courts "narrowly interpret the term "public concern" as a "topic of interest to the community." *Rogers v. Riggs*, 71 F.4th 1256, 1259 (10th Cir. 2023). Individual employee interests that predominate over public interests are considered private matters. *Id*. at 1261. Courts must "focus on the motive of the speaker and whether the speech *is calculated to disclose misconduct* or merely deals with personal disputes and grievances []." *Trant v. Okla*., 754 F.3d 1158, 1165 (10th Cir. 2014). "[A] public concern exists only when the speech contains enough specificity to help the public evaluate governmental conduct." *Rogers*, 71 F.4th at 1261. Deliberate or reckless false statements rarely receive First Amendment protection. *Moore v. City of Wynnewood*, 57 F.3d 924, 932-933 (10th Cir. 1995); *Pickering v. Bd. Of Educ.*, 391 U.S. 563, 574 (1968) ("[A]bsent proof of false statements *knowingly or recklessly* made by him," protected speech was not a basis

for a termination.) (emphasis added)); *compare Dill*, 155 F.3d at 1202 ("[D]eliberately or recklessly false statements do not receive First Amendment protection[.]").

Plaintiff's amended background report offered a specific and detailed account of White's inconsistencies as to his prior drug use and distribution. [UMF ¶ 122]. Yet, Plaintiff claims "he raised concerns about questionable hiring practices" via a request to further scrutinize White's current and previous employment applications to "find any inconsistency that LCSO could use as a pretext for denying his application." [Doc. 56, pg. 2, ¶¶ 11, 14]. Any inconsistency as to an applicant's reported information is grounds to disqualify them. [UMF ¶¶ 113, 115-116, 119-124]. Once Martinez advised Hobbs that LCSO previously rejected White's application for drug use, it was clear that White misrepresented on his application that he *never* used or distributed marijuana, as Plaintiff now misrepresents. [UMF ¶¶ 114-129, 131-133].

Plaintiff was the first to confirm White's misrepresentation, yet this lawsuit exists. [Doc. 56, pg. 2, ¶¶ 11, 14-15]; [UMF ¶¶ 118-123]; *see Moore*, 57 F.3d at 932-933 (Courts "assume that deliberately or recklessly false statements by public employees are either unprotected by the First Amendment or, at least, that such intentional falsity would weigh heavily against protection."). Plaintiff's duty was to scrutinize the only potentially available law enforcement application that LCSO might have access to. [UMF ¶¶ 115, 119, 121, 124]. Suggesting otherwise ignores the position description for the job White applied for as well as County policies and ordinances, the applications White signed and submitted, and Plaintiff's own amended background investigation. [UMF ¶¶ 113-124]; *see id*. Plaintiff omits evidence of his serious County policy violations. To name a few, credible allegations indicated that Plaintiff 1) jeopardized the integrity of multiple serious criminal investigations [UMF ¶¶ 23-26, 29-58, 63]; 2) sexually harassed and stalked his co-workers [UMF ¶¶ 1-8, 71, 74-75, 83, 91-95, 100-103, 105-109]; 3) misrepresented information

to a homicide victim's family causing a loss in public trust [UMF ¶¶ 27-30]; and 4) traumatized a child victim of sexual violence [UMF ¶¶ 10-16].  Plaintiff's after-the-fact claims are meaningless when weighed against evidence, witness reports, and his own deposition admissions that *blatantly contradict* his suit allegations.  [Doc. 56, pg. 2, ¶¶ 11-70]; [UMF ¶¶ 17-18, 21, 25-28, 30, 41, 43-44, 50, 61, 63, 66, 69, 77-78, 89, 94-98, 104, 119, 121-122, 131-133, 135, 139-141].; *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When two opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, the court should reject that version of the facts."). The Court must prevent Plaintiff from pivoting to a self-serving explanations.  [Doc. 56, pg. 2, ¶¶ 11, 14-15]; [UMF ¶¶ 118-123].  Plaintiff's friendship with White suggests he was only doing his friend a favor to support their respective lawsuits against the County.  [UMF ¶ 134]; *White v. Bd. Of Cty. Comm'rs of Lea Cty.*, 23-cv-1081; *Singh v. Cordle*, 936 F.3d 1022, 1036 (10th Cir. 2019) (personal grievances are not actionable).

White's employment application arose before Plaintiff's subsequent discipline, but there is no nexus between the two in time or causation.  [UMF ¶¶ 1-134];  [Doc. 56, pg. 2, ¶ 12]; [UMF ¶¶ 7-8, 19, 63, 118-122].  Plaintiff claims a group of LCSO employees including Investigator Diana Jurado, Sergeant Sonia Estrada, Records Technician Aileen Vizcarra conspired to get him fired via baseless internal complaints and external complaints from , [Doc. 56, ¶¶ 17-18, 21-24, 46].[2] "To establish the requisite causal connection [between speech on a public concern and the adverse employment action], [the p]laintiff must show that the decisionmakers took action against him out of a desire to retaliate []." *Singh*, 936 F.3d at 1043. "Speculation or hunches amidst rumor and

---

[2] Plaintiff claims Karina Tello witnessed Walker's alleged intoxication and drunk driving.  [Doc. 56, pg. 3, ¶ 25].  Ms. Tello's statements and interviews show otherwise, and she suggested Plaintiff's capacity for filing frivolous lawsuits.  [UMF ¶¶ 73-74, 79-82].  *See Karina Tello v. Lea County Bd. Of Cty. Comm'rs, et al.*, Civ. No. 24-390 KG/GJF, [Doc. 199].

innuendo will not suffice." *Id*. "[E]vidence such as a long delay between the employee's speech and challenged conduct, or evidence of intervening events, tend to undermine any inference of retaliatory motive and weaken the causal link." *Roberts v. Winder*, 16 F.4th 1367, 1382 (10th Cir. 2021). Other evidence of causation may include an *employer's* "expressed opposition to the employee's speech, or evidence the speech implicated the employer in serious misconduct or wrongdoing." *Couch v. Bd. of Trs. of the Mem. Hosp.*, 587 F.3d 1223, 1241 (10th Cir. 2009). When "another person or committee higher up in the decision-making process [] independently investigate the grounds for [adverse employment action], [i]t is well-established" that this [] "breaks the causal chain" *Singh*, 936 F.3d at 1038. "The causal chain can even be broken by an independent review that takes place after the adverse action." *Id*. at 1039. "[S]imply asking an employee for his or her version of events may defeat the inference that an employment decision was discriminatory, as such an inquiry demonstrates that the employer has taken care not to rely exclusively on the say-so of the biased subordinate." *Thomas*, 803 F.3d at 516-517.

"[T]he ultimate fact of retaliation turns on [the d]efendants' state of mind, [and] it is particularly difficult to establish by direct evidence." *Ramirez v. Okla. Dep't of Mental Health*, 41 F.3d 584, 596 (10th Cir. 1994). Courts "do not ask whether the employer's proffered reasons were wise, fair or correct; [courts] ask only whether the employer honestly believed those reasons and acted in good faith upon those beliefs." *Bird*, 832 F.3d at 1201. Plaintiff knew his allegations concerning racial bias in LCSO's handling of White's application were false based on known inconsistencies he personally confirmed with White. [UMF ¶¶ 114-129, 131-133]. Thus, there is no causal nexus with Plaintiff's subsequent discipline as the independent investigations that led to Plaintiff's discipline and his termination, had he not resigned, form intervening grounds showing his complaint about White's application was not a substantial motivating factor. [UMF ¶¶ 1-112].

Plaintiff has not alleged that LCSO ever denounced his alleged report of White's discrimination. *See Couch*, 587 F.3d at 1241 (Other evidence of causation may include an employer's "expressed opposition to the employee's speech[]."). Plaintiff has not described any other reason or evidence to link his alleged report to his adverse employment action. [Doc. 56, pg. 3-5, ¶¶ 16-42; pg. 6-7, ¶¶ 46-60; pg. 8, ¶¶ 64-68]; *see Singh*, 936 F.3d at 1043 (Employer must act "out of a desire to retaliate *for his [an employee's] discrimination complaints*.") (emphasis added).

Plaintiff's inability to prove some link is fatal to his retaliation claims. *See Maesta*, 416 F.3d at 1188 ("[T]he employee must show the protected speech *played a substantial part* in the employer's [adverse employment action."). Plaintiff only offers purely conspiratorial speculation. [Doc. 56, pg. 3-5, ¶¶ 16-42; pg. 6-7, ¶¶ 46-60; pg. 8, ¶¶ 64-68]; *id.* ("Speculation or hunches amidst rumor and innuendo will not suffice."). The intervening events between Plaintiff's purported White complaint and when Plaintiff was disciplined are highly significant. *Compare* [Doc. 56, pg. 2, ¶ 12] with [UMF ¶¶ 1-70, 121]; *see Roberts*, 16 F.4th at 1382 ("[E]vidence such as a long delay between the employee's speech and challenged conduct, or evidence of intervening events, tend to undermine any inference of retaliatory motive and weaken the causal link."). LCSO progressively disciplined Plaintiff via verbal then written reprimands followed by demotion. [UMF ¶¶ 1-60, 65-87]. Though Plaintiff left before he was terminated, the result would have been the same. [UMF ¶¶ 65, 88-112]; *compare Deschenie v. Bd. of Educ. of Cent. Consol. Sch. Dist. No. 22*, 473 F.3d 1271, 1273-1275, 1278 (10th Cir. 2007) (The plaintiff only offered speculation and hunches, due to his job performance issues and lack of a causal link with the retaliation).

Plaintiff's alleged White complaint would have arisen in October 2021. [Doc. 56, pg. 2, ¶ 14]; [UMF ¶¶ 117-126]. Plaintiff may argue his retaliation began on January 7, 2022 when Investigator Jurado complained, but the relevant timeframe begins with actual discipline. *See*

*Roberts*, 16 F.4th at 1382 ("[A] long delay between the employee's speech and challenged conduct" may disprove retaliation). Like *Deschenie*, Plaintiff's verbal reprimand occurred around March 4, 2022, or about five months later. [Doc. 56, pg. 2, ¶ 14]; [UMF ¶¶ 8, 117-126]; *compare Deschenie*, 473 F.3d at 1273-1275, 1278. Consistent with the *Deschenie* timeline, the next discipline via a verbal reprimand occurred around September 19, 2022 about 11 months after the alleged White complaint. [UMF ¶¶ 19, 117-126]; *compare id*. Plaintiff's October 14, 2022 demotion occurred about a year the alleged White complaint. [UMF ¶ 64]; *compare id*. LCSO also ensured the allegations against Plaintiff were separately investigated by uninvolved persons in superior positions. [UMF ¶¶ 2, 7-8, 10, 22, 65-68, 70, 87-88, 110]; *see Singh*, 936 F.3d at 1038, 1039 ("The causal chain can even be broken by an independent review [] after the adverse action."); *Thomas*, 803 F.3d at 516-517 ("[S]uch an inquiry demonstrates that the employer has taken care not to rely exclusively on the say-so of the biased subordinate."); *compare Roberts*, 16 F.4th at 1371, 1382-1384 (employer prevailed though plaintiff's removal was motivated by his support of an opposing sheriff candidate, because removal was based on neutral reasons).

As described by the County's UMFs, credible allegations and evidence from the various individuals from outside agencies supported Plaintiff's mere verbal reprimand and write-up. [UMF ¶¶ 9-19]. That Plaintiff was only verbally reprimanded for potentially tainting a criminal investigation by interviewing a child victim of sexual violence and acting aggressively with the child actually demonstrates LCSO's restraint. [UMF ¶¶ 9-19]. Plaintiff cannot dispute what was reported to Hernandez and admitted the statements he was disciplined for. [UMF ¶¶ 9-18].

To traumatize a child victim of sexual violence and jeopardize the admissibility and veracity of the child's testimony against the advice of subject matter experts charged with protecting children must be worthy of *substantial* discipline. [UMF ¶¶ 9-16]. To also openly joke

about domestic violence against one's spouse with workers who confront the consequences of domestic violence, especially while the spouse has a TRO in place against them, would strike any reasonable jury as worthy of *substantial* discipline.  [UMF ¶¶ 17-18].

Chief Jimenez' investigation into the DA's Office complaints and his findings supporting Plaintiff's demotion are legitimate as based on the witness and evidence presented to Jimenez. [UMF ¶¶ 20-64].  DA's Office personnel including the DA Dianna Luce, ADA Megan Kirtley, and ADA Kirk Williams reported serious allegations that Plaintiff repeatedly failed to provide evidentiary disclosures, missed multiple PTIs, was difficult to reach, and failed to provide important case reports in multiple criminal cases seriously jeopardized the criminal prosecution of these cases.  [UMF ¶¶ 20-64].  More than this, when a victim's family had reportedly had enough of these delays and paid for billboards placing blame on the DA's Office, Plaintiff's failures directly caused an enormous loss of public trust in a critical public institution.  [UMF ¶¶ 20, 27-36].  Plaintiff is still prohibited from investigating cases with the DA's Office.  [Doc. 56, pg. 7, ¶ 58]; [UMF ¶ 63].

The harm Plaintiff allegedly caused is potentially immeasurable. Sergeant Grady regrets his lax supervision and Plaintiff's failures to diligently investigate multiple criminal cases dating back to 2019.  [UMF ¶¶ 31, 37, 40-42, 45, 47-49, 51-54].  Unfortunately, Sergeant Grady gave Plaintiff the benefit of the doubt against the DA's Office, rather than paying serious attention to the prosecutors' concerns. [UMF ¶¶ 31, 37, 40-42, 45, 47-49, 51-54].  An investigator who fails to investigate, and unquestionably one who seriously jeopardizes multiple prosecutions and harms public trust, is not fit to be an investigator.  Therefore, Plaintiff's demotion was undoubtedly warranted based on what was reported to the County.

Walker denied, and no interviewed witness present to observe Walker or his driving, reported that he seemed intoxicated. [UMF ¶¶ 73, 79, 84-85]. What the evidence from both investigations instead found was Plaintiff intended to avoid responsibility for stalking and harassing LCSO employees as well as not completing his investigative duties or taking responsibility for his failures. [UMF ¶¶ 87, 110]. Uniform witness statements and Plaintiff's own recorded statements supported this conclusion. [UMF ¶¶ 65-67, 69-86, 89-109].

Plaintiff knew there was credible information implicating him in serious civil and criminal misconduct, and it is no wonder Plaintiff concocted a conspiracy to avoid the serious allegations levied against him. [UMF ¶¶ 1-8, 9-18, 20-51, 54-58, 63, 66-67, 70-86, 89-109, 113-141]. Critically, the Tenth Circuit has "long recognized that loyalty and confidence among employees is especially important in a law enforcement setting." *Helget v. City of Hays*, 844 F.3d 1216, 1223 (10th Cir. 2017). "The need for workplace harmony is particularly acute in the context of law enforcement, where there is a heightened interest [] in maintaining discipline and harmony among employees" particularly in smaller departments and communities. *Id.* Plaintiff cannot credibly dispute that stalking, sexually harassing, jeopardizing homicide investigations, taunting child victims of sexual violence, and risking the exclusion of evidence is unworthy of, at least, the discipline the County meted against him before he resigned. On these undisputed material facts, the Court must enter summary judgment. *See id.*

## II.     The Court must enter summary judgment against Plaintiff in Counts II and VI for the lack of a causal link between the alleged White complaint and his discipline.

For essentially the same reasons as those provided above, Plaintiff's discipline cannot support Title VII or NMHRA retaliation claims for opposing unlawful discrimination. Title VII and NMHRA claims are interpreted the same, and Plaintiff's Count II and Count VI claims fail for the same reasons. *Rodriguez v. N.M. Dep't of Workforce Solutions*, 278 P.3d 1047, 1050 (N.M.

Ct. App. 2012) ("Owing to the similarities between the Human Rights Act and Title VII, our Supreme Court has noted that [New Mexico's] analysis of claims under the [NMHRA] is guided by the federal courts' interpretation of unlawful discrimination under Title VII.").

"Title VII forbids employers from retaliating against employees for opposing any activity that is unlawful under Title VII." *Fassbender v. Correct Care Sols., LLC*, 890 F.3d 875, 890 (10th Cir. 2018). "Title VII does not prohibit distasteful practices by employers." *Peterson v. Utah Dep't of Corr.*, 301 F.3d 1182, 1188 (10th Cir. 2002).  To prove Title VII retaliation for opposing unlawful practices, a plaintiff must show that their employer took adverse employment action against them based on their protected activity.  *Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1316 (10th Cir. 2017).  The NMHRA further prohibits persons and employers from "engag[ing] in any form of threats, reprisals, or discrimination against any person who has opposed any unlawful discriminatory practice." N.M. Stat. Ann. § 28-1-7(I)(2) (2024).  Under the direct or mixed motive analytical framework for proving unlawful discrimination, "a plaintiff may offer direct evidence that retaliation played a motivating part in the adverse employment decision." *Hansen v. SkyWest Airlines*, 844 F.3d 914, 924 (10th Cir. 2016).  If a plaintiff makes this showing, the burden shifts to the employer "to show that it would have taken the action without a retaliatory motive." *Id*. "Without direct evidence of discrimination, [courts] apply the burden-shifting scheme [in] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), in Title VII [] cases." *Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1181 (10th Cir. 2006). "[T]he plaintiff has the burden of presenting a prima facie case of discrimination." *Dixon Okla. Ex rel. Reg'l Univ. Sys. of the Okla. Bd. of Regents*, 125 F.4th 1321, 1334 (10th Cir. 2025).  This prima facie showing entails proof that the employee "(1) [] engaged in protected opposition to discrimination; (2) [] suffered an adverse action that a reasonable employee would have found material; and (3) there is a causal nexus

between [their] opposition and the employer's adverse action." *Antonio*, 458 F.3d at 1181.  If the plaintiff establishes prima facie case, the employer "must offer a legitimate, nonretaliatory reason for its decision." *Twigg v. Hawker Beechcract Corp.*, 659 F.3d 987, 998 (10th Cir. 2011).  If the employer makes this showing, "the plaintiff must demonstrate that the reason is pretextual." *Id.*

A plaintiff raising NMHRA retaliation claims for opposing unlawful discrimination must "present evidence that (1) [th]e[y] engaged in protected activity, (2) he was subject to adverse employment action subsequent to, or contemporaneous with the protected activity, and (3) a causal connection exists between the protected activity and the adverse employment action." *Juneau v. Intel Corp.*, 139 N.M. 12, 16, 127 P.3d 548 (N.M. 2005). The burden then "shifts to the employer to show a legitimate nondiscriminatory reason for its decision." *Slusser v. Vantage Builders, Inc.*, 306 P.3d 524, 534 (N.M. Ct. App. 2013). "Once rebutted, the presumption of discrimination drops from the case" unless the plaintiff proves the "nondiscriminatory reason was pretextual or otherwise inadequate." *Garcia v. Hatch Valley Pub. Sch.*, 458 P.3d 378, 386-387 (N.M. 2018).

The basis for Plaintiff's discipline thoroughly demonstrates a lack of causation.  [UMF ¶¶ 1-70].  Plaintiff's alleged misconduct was fully and independently investigated with supporting allegations from multiple witnesses including Plaintiff.  [UMF ¶¶ 1-112].  At most, the instruction to scrutinize White's application and compare it with his HPD application is non-actionable "distasteful" conduct.   [UMF ¶¶ 113-133]; *see Peterson*, 301 F.3d at 1188 ("[D]istasteful" employment practices are not actionable).  Walker never complained against Plaintiff, and so the retaliation claims are reviewed under a "cat's paw causation theory," or a "biased motive of a subordinate [] imputed to the unbiased, final decisionmaker." *Byrnes v. St. Catherine Hosp.*, 158 F.4th 1107, 1114 (10th Cir. 2025).  An employer is only liable "when (1) a biased subordinate performs a deliberate act of retaliatory animus (2) that is intended to cause a materially adverse

action, and (3) that act is a *but-for cause of the adverse action*, even though an impartial decisionmaker makes the ultimate choice to carry out that action." *Id*. (emphasis added).  The same break in causation discussed above applies to Title VII and the NMHRA.  *See id*.; *Rodriguez*, 278 P.3d at 1050.

"An employer can break the causal chain between the biased subordinate's unlawful actions and the adverse employment action by independently investigating the allegations against the employee." *Thomas*, 803 F.3d at 516. "[S]imply asking an employee for his or her own version of events may defeat the inference that an employment decision was discriminatory, [because] the employer has taken care not to rely exclusively on the say-so of the biased subordinate." *Id.* at 516-517.  [UMF ¶¶ 1-17, 19, 20-253].  A "virtually immediate post-termination review process []  designed to identify and unwind termination decisions that violated company practices and policies – sufficiently constrained any retaliatory animus [of another employee]." *Id*. at 517.  For the same reasons neither Helton nor Walker committed unlawfully First Amendment retaliation, the County did not unlawfully retaliate under Title VII or the NMHRA.  [UMF ¶¶ 1-111, 113-141].  Therefore, the Court must enter summary judgment against Counts II and VI.

**III.    The Court must enter summary judgment against Plaintiff's Count III New Mexico Civil Rights Act claims, because the NMCRA prohibits employment claims and Plaintiff has no cognizable rights under the provisions he raises.**

N.M. Stat. Ann. § 41-4A-3(D) (2021) provides that "[i]ndividuals employed by a public body shall be prohibited from using the New Mexico Civil Rights Act to pursue a claim arising from the individual's employment by the public body." Thus, Plaintiff's NMCRA claims fail. Further,  Article II, Section 4 is not an enforceable claim, Article II, Section 17 does not recognize retaliation claims or one any different than the First Amendment, and no Article II, Section 18 right to future employment exists.

Article II, Section 17 states that "[e]very person may freely speak, write and publish [their] sentiments on all subjects[]." Article II, Section 17 is a right secured through the NMCRA. *See Bolen v. N.M. Racing Comm'n*, 578 P.3d 1121, 1124 (N.M. 2025). However, there is no established Article II, Section 17 retaliation claim, and the Court must enter summary judgment against Count III insofar as it relates to Article II, Section 17. In the alternative, the above First Amendment analysis applies, and the Court must enter summary judgment. *See City of Albuquerque v. Pangaea Cinema LLC*, 284 P.3d 1090, 1099 (N.M. Ct. App. 2012) (finding no reason to depart from federal First Amendment precedent on Article II, Section 17 claims), *rev'd on other grounds by State v. Pangaea Cinema LLC*, 310 P.3d 604.

Plaintiff seems to allege the County interfered with his subsequent job opportunities. [Doc. 56, pg. 10 ¶¶ 86-87]. Whether raised as an Article II, Section 18 procedural or substantive due process violation, Plaintiff lacks an underlying protected interest to prevail against summary judgment. When "a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to [the]m, notice and an opportunity to be heard are essential." *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971). "[M]ere injury to reputation, even if defamatory, does not constitute the deprivation of a liberty interest." *Conn. Dep't of Pub. Safety v. Doe*, 538 U.S. 1, 6-7 (2003). A plaintiff may only state a claim for defamation or defamation *per se*, if the defendant attributes criminal behavior to a plaintiff. *Paul v. Davis*, 424 U.S. 693, 697 (1976).

A plaintiff must satisfy the "stigma-plus" burden "that the government has violated the Due Process Clause by damaging [the plaintiff's] reputation." *Hinkle v. Beckham Cty. Bd. of Cty. Comm'rs*, 962 F.3d 1204, 1229 (10th Cir. 2020). Notwithstanding, "[d]amage to prospective employment opportunities is too intangible to constitute deprivation of a liberty interest" even when the defendant made a plaintiff "less attractive to employers or clients." *Id*. at 1230 -1231.

The Tenth Circuit does "not recognize[] a substantive due process right in state-created employment." *Roberts*, 16 F.4th at 1375. Without a protected interest, courts consider the state action under a looser rational basis review or to determine whether the action is "rationally related to legitimate government interests." *Glucksberg*, 521 U.S. at 728. State actions are presumed constitutional and will be upheld "if there is any reasonably conceivable state of facts that could provide a rational basis []." *Petrella v. Brownback*, 787 F.3d 1242, 1266 (10th Cir. 2015). Plaintiff is alleging damage to his future employment prospects, and his claims do not satisfy Fourteenth Amendment procedural due process standards, nor did the County misrepresent the allegations against him. [Doc. 56, pg. 10, ¶¶ 86-87]; *see id*. As provided above, the undisputed material evidence supporting Plaintiff's discipline abounds and entitles the County to summary judgment. Finally, Article II, Section 4 is not "enforceable independent source of individual rights,[]." *Morris v. Brandenburg*, 376 P.3d 836, 854-855 (N.M. 2016). Thus, the Court must enter judgment against these claims in Count III. [Doc. 56, pg. 10, ¶ 86].

## IV.     The Court must enter summary judgment against Count I's New Mexico Whistleblower Protection Act claim.

An NMWPA "whistleblower" is a person "who, *believing that the public interest overrides the interest* of the organization that individual services, publicly blows the whistle []." *Lerma v. State*, 578 P. 3d 1111, 1119 (N.M. 2025); N.M. Stat. Ann. § 10-16C-2(E) (2010). Plaintiff is not a whistleblower, because he never believed he was asked to do something unlawful. *See id*. There is no reasonable inference the County retaliated against Plaintiff for the alleged White report. The weight of the evidence of Plaintiff's misconduct and lack of a temporal proximity between Plaintiff's alleged protected activity and his discipline entitles the County to summary judgment.

### CONCLUSION

The Court must enter summary judgment against all claims on the foregoing grounds.

Respectfully submitted,

MYNATT SPRINGER P.C.

BENJAMIN J. YOUNG
New Mexico Bar No. 144702
HALEY R. GRANT
New Mexico Bar No. 145671
P.O. Box 2699
Las Cruces, NM 88004
(575) 524-8812
bjy@mynattspringer.com
hrg@mynattspringer.com
*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of May 2026, a copy of the foregoing pleading was served on the following via CM/ECF and electronic mail:

Benjamin Gubernick    ben@wglawllp.com
Curtis R. Waldo    curtis@wglawllp.com
*Attorney for Plaintiff*

BENJAMIN J. YOUNG