25

basically said that they needed an experienced detective and their chief was understanding and really didn't -- wasn't, like, the good ol' boy system that goes in the County and just to apply. So I applied, and my experience at the sheriff's office as an investigator was sufficient to get hired on over there.

They have basic -- as far as the structure, you have patrol officers and then you have corporals, corporal patrol officers, and then you have patrol sergeants.

Then you have regular detectives and detective corporals, and then detective sergeants. And then there's a detective commander.

And then they have, like, an Internal Affairs commander sergeant, they have SRO, school resource officers, and officers, and sergeants, and corporals. And then they have a patrol commander and then I think the Internal Affairs commander.

The corporal position is basically like a supervisor, like an assistant manager in the business world.

Q Okay. I got you.

But just speaking in terms of the CID --

26

right? -- because I doubt there are going to be any SROs, or Student Resource Officers, in CID, right --

A It was detective, detective -- I was the only detective corporal, and then the detective sergeant, and then the detective commander.

Q Okay. And then you mentioned you were contacted by somebody from Artesia PD looking for an experienced investigator; who was that person?

A He was a former employee of Lea County Sheriff's Office, Chris Rider.

Q Chris Rotor?

A Rider. Sorry. R-i-d-e-r.

Q Rider. I got you. Okay.

Did you know Chris Rider from your time at the sheriff's office? Or how did you come to know him?

A I've known Chris Rider before I became a cop. He was real good friends with one of my mentors, and then we worked together at the sheriff's office before he left.

Q So you worked together back at Lovington PD?

A Lovington PD and Lea County Sheriff's Office.

27

Q Got you. Okay.

And was Rider also in CID? Or what position was he in at the time he contacted you?

A He was a patrol sergeant.

Q Okay. So it looks like you were at Artesia PD for somewhere about, like, nine months -- or -- yeah, just about nine months.

Why was it that you left?

A The drive every day, three hours driving, an hour and a half to drive there and an hour and a half to drive back, and getting called out in the middle of the night. It was -- it was kind of getting hard for my kids.

Q Got you. While you were with Artesia PD, did you have any kind of discipline?

A Yes, ma'am, I was involved in a -- I backed into a vehicle in the parking lot, and I got wrote up for that.

Q Okay. Anything else?

A That's it.

Q And while you were with Artesia PD, were you able to communicate directly with the DA's office and their prosecutors?

A I -- yes.

Q And I know one of your allegations in this

28

lawsuit has to do with, you know, issues with the Fifth Judicial District Attorney's Office and Diana Luce; is that right?

A Yes, ma'am.

Q Okay. And I believe that there were allegations that you -- that the DA's office was not going to prosecute cases that you had investigated; is that right?

A Yes, ma'am.

Q Okay. But you're telling me that while you were with the Artesia Police Department, you were able to communicate back and forth with the DA's office.

Were you also able to investigate cases that they -- the DA's office subsequently brought charges for?

A Yes.

Q Okay. Tell me about the nature of your relationship with the DA's office while you were with Artesia PD. I know that you probably obviously interact with them while you were with the sheriff's office; did you notice any kind of a difference in terms of how those interactions went?

A I was told whenever I got hired on that

**EXHIBIT 2**

other ones that he's been present for, I'll have someone come tell me: The sheriff's here.

Obviously, see each other, but then they'll come tell me he's, like -- he's talking crap about me. And: "Why is Zane here?" And this is his county, and I need his permission to be there and all this good stuff.

Q Okay. And this one that we're talking about, this one instance where you personally heard the sheriff, was that at a fundraiser for the sheriff's office?

A It was at a -- I don't know -- well, I do now know that the sheriff's office hosted a Special Olympics at the golf course in Hobbs.

Q Okay.

A It was a community golf tournament.

Q Okay. You were present for that?

A Yes, ma'am, I was.

Q Were you a golfer or...

A No, the Lovington Police Department had a booth out there, and I was asked to volunteer.

Q Got you.

Okay. Let's talk about Undersheriff Walker. Tell me a little bit about when it was that you first met Undersheriff Walker and...

A I knew who he was throughout my career before he became the -- the undersheriff at the sheriff's office, and didn't really start interacting with him.

Same, it was never -- never any negative interaction with him up until the point where I -- I was tasked with doing Ahmaad White's background, and it kind of -- he would walk around the office and he -- he likes to joke and -- like, you were able to joke and, like, talk crap with him and just be -- be yourself.

And then after the -- I was tasked with doing Ahmaad White's background, the relationship kind of stopped and kind of started having problems with him then. But I didn't know him up until he became the undersheriff.

Q I got you. Okay.

And you said that he was not negative before this point and you didn't interact with him much. So you were just kind of like you see him in the office and you say hello kind of a thing before --

A Yes, ma'am.

Q Okay. And it doesn't sound like you were friends with each other. You're not spending any

kind of time together outside of the office?

A No, ma'am.

Q And tell me how you perceived this shift in your relationship. What happened and how -- how did you seem to think that things were negative after that point?

A I didn't really think things were negative up until the point whenever I was -- I was tasked with Ahmaad White's background, and I spoke up on the things that I thought were weird, and it kind of just died down.

And I would see him in the office, and he really wouldn't talk to me the way that he -- he typically would in the past.

And then I started having a lot of problems with another investigator, Diana Garcia, and I -- she started complaining. And I was getting write-ups, but the write-ups were coming directly from Walker, not from -- the previous one was from my supervisor. So then, per policy, the write-ups weren't matching what policy was saying.

Q I got you. So was -- it was actually Walker's signature on all these write-ups?

A Yes.

Q Okay.

MS. GRANT: My pen has died, so why don't we just take a quick five-minute break and then we'll come back on.

THE WITNESS: Yes, ma'am.

THE VIDEOGRAPHER: Okay. We are going off the record. The time is 10:39 a.m.

(WHEREUPON, a recess was had.)

THE VIDEOGRAPHER: We are going back on the record. The time is 10:52 a.m.

BY MS. GRANT:

Q All right, Mr. Brown. I think when we last left off, we were talking about Walker and the fact that he had signed some of your disciplinary notices; is that right?

A Yes, ma'am.

Q Okay. And at any time during your employment with the sheriff's office, while you weren't on administrative leave, did you ever fail to receive a notice of any internal investigations in, like, a written form?

A Not that I know. I don't think so.

Q What about any notices of discipline?

A I don't think so.

Q What about notices of intent to discipline?

Transcript of Zane Brown
Conducted on January 28, 2026

73

A I be- -- I don't think so.

Q Okay. And when you were placed on administrative leave, what kind of contact did you have with the sheriff's office?

A Personnel?

Q You're right. That's a -- that's not a great question.

What contact did -- were you required to have as part of your being on administrative leave? Was there a contact person that you were supposed to be checking in with?

A I wasn't -- I don't remember the exact terms of it, as I was advised not -- who I can't talk to and what I can and can't do.

Most of the communication I had was through Chief Deputy Jimenez and Chief Deputy Martinez. Officially.

Q Got you. Okay.

Let me back up here a little bit. While -- have you received, while you were employed with the sheriff's office, copies of the investigative reports for the IAs that you were a part of?

A The -- I haven't received, like, the full report and all the -- all the details. I just --

74

like, the conclusion and the recommendation.

Q Okay.

A With the exception of the -- I think the only one that I didn't receive anything on was the IA involving Walker and Diana for the -- her birthday party. I don't think that I ever received anything pertaining to that as far as what the outcome was or anything.

I -- that's the only one that I've never received anything on.

Q Okay. And I think there -- there were, like, two investigations that came out of that one, right? There was one investigation of Undersheriff Walker; is that right?

A I don't know what -- what they did on that.

Q Okay. Do you recall receiving a subsequent notice of investigation concerning whether you were contacting other witnesses for the Walker investigation?

A No, ma'am. I think that I resigned before they were able to finish that.

Q Did you -- were you ever contacted by any investigator on the Walker allegations?

A Yes, I've never spoke with her directly:

75

Cody Rogers.

Q Okay. And do you know -- why was it that you did not speak with her?

A Actually, she -- I believe she left me a voicemail or emailed me, and my attorney at the time, Joe Zebas, told me not to --

Q Wait. Wait. Wait. You don't need to tell me about what your attorney said.

A I was just advised not to talk to her without him present and...

Q Okay. How many interviews have you had with Chief Deputy Jimenez as part of your Internal Affairs investigations?

A I think it was only one -- one sit-down, and there was two investigations conducted on -- during that.

Q Okay. And the other investigation was -- was -- or, excuse me, the other interview was not a sit-down, it was -- was it, like, over the phone or something?

A Well, no, as far as an official interview pertaining to that, it was one interview, but it was for multiple -- or two different Internal Affairs investigations.

Q Okay. Tell me a little bit about your

76

relationship with Investigator Sandoval. When was it that the two of you first met?

A Her and I went to junior high together; high school together; we went to the police academy together; we worked at Lovington PD together; worked on patrol at the sheriff's office together; we were promoted at the same time to investigator. She's one of my best friends.

Q Got you.

Okay. And it sounds like your careers kind of roughly tracked each other -- right? -- In terms of, you know, where you ended up going, right?

Did -- when you applied to LPD the first time, was that something that you and Sandoval, you know, helped to -- hoped to do together? Or how was it that you all both ended up at the LPD the first time?

A She -- I was self-sponsored through the police academy. My -- my goal was to put myself through the academy and then get hired on with the sheriff's office.

Within the first month of the academy, Lovington PD came and offered me a job where Investigator Sandoval was already employed.

Transcript of Zane Brown
Conducted on January 28, 2026

investigators who are going to be taking it on, or are there others who respond to the sheriff's office?

A Every time it was typically the -- the -- there's not -- there wasn't a policy or a -- at the time, there wasn't a something set in stone how it worked.

There's normally, like: I'm on a call. I got this call. And then you notify your supervisor. And then everyone typically comes out.

We had a group message where, if something happened, we would send a message in the group, like, hey, this is what happened. It wasn't like, hey, I need -- calling people and say I need you to come respond; it was just everybody typically responded without having to be asked.

Q And then you mentioned before, when you have -- like, when you're called out to a scene, it usually can come from dispatch, or it might come from, what was it, like, a phone -- phone call?

A Yes.

Q Okay. And who -- who's usually making those phone calls to you to come out for those kinds of things?

A The patrol deputies were -- was contacting us.

Q Okay. So do you understand whether the patrol deputy would also be contacting other members of the sheriff's office? Or how was that put out to the rest of the CID?

A They would just contact the on-call.

Q Okay. And that's the on-call --

A Detective.

Q -- investigator?

A Investigator detective, yes, ma'am.

Q Okay. And then, from there, how was the information disseminated to the rest of CID to respond?

A Well, it just depends on what the case was. Like, if it was a -- if it was a case that required, like, a big scene where you know you need help, you just contact your supervisor and let them know, like: Hey, this is what I got; can -- could I get help?

But if it was a small -- small scene or something little, like, you would just respond and handle it on your own.

Q Okay. So if --

A Regardless -- go ahead.

Q I'm sorry. No, I want to hear what you said. You were saying?

A Regardless of anything that we did, we had a group message, so everything was put through the group message. No matter what -- what it was, we were sending a text in the group so our sergeant knew what was going on.

Q Okay. And so if it was a, you know, quote/unquote, big scene, a homicide, is that information about, you know, the need for these other CID members to come out, is that put through the group message, or who's responsible for getting that information out? Is it the sergeant?

A So if I was on-call, I would send the group message out, like, hey, we have a homicide here or suspected homicide and then let the sergeant know.

And, to my understanding, we would all just show up. Like, it wasn't -- the sergeant didn't have to call anybody and say, hey -- it was kind of just an understanding after the first couple homicides we had that everybody showed up and helped.

But it wasn't like a requirement. I didn't have any knowledge of the sergeant calling and telling people to come out; we show up and help.

Q Got you. Okay.

And if the -- when the sergeant shows up on scene, what's the sergeant's role in that situation?

A I don't know what his initial role is. At the point in time that I remember, it was just like, hey, what do you need me to help with? He would just help.

Q Okay.

A I do remember a homicide that we had, and I didn't respond to it because it was -- it was something that didn't require six investigators.

Q And is that something that you all have discretion to do is, like, you don't -- you don't need me there; I'm just not going to be there?

A Yeah, I remember -- I remember the case exactly. A mother stabbed her juvenile child in the -- in the chest, and he ultimately died.

And from the group message, seeing everything in the group message, and I was I believe on vacation or sick during that point in time. I remember calling and asking, hey, do you

Transcript of Zane Brown
Conducted on January 28, 2026

109

addressed to you?

A Yes.

Q Okay. And is this -- down at the bottom of the document, is that your signature?

A Yes, ma'am.

Q Okay. All right. And so would you agree with me that this was a document that you received? And it looks like --

A Yes, ma'am.

Q -- August 25th of 2022.

A Mm-hm.

Q Okay.

A Yes.

Q All right. Great. I'm going to go ahead and mark this as Exhibit 1 to your deposition.

(WHEREUPON, Brown Deposition Exhibit No. 1 was marked for identification.)

MS. REPORTER: Counsel, will you be dropping those in the chat to attach?

MS. GRANT: Yes, I will.

BY MS. GRANT:

Q I'm going to be showing you another document here.

(Exhibit shared.)

110

BY MS. GRANT:

Q Can you see what I'm showing you, Mr. Brown?

A Yes, ma'am.

Q Do you recognize this document?

A I've never seen it before.

Q Okay.

A I don't think so.

Q Okay. I'll represent to you that this is a document that former Sergeant White filed. It's a civil complaint against Lea County and other defendants. I just want to direct your attention down here just a little ways.

Okay. And under here under Paragraph 6.10, this indicates -- and I'll just read it for the record. It says: "Mr. Brown informed plaintiff of the biased investigation being done, and plaintiff was thus forced to withdraw his application. The withdrawal was only done by plaintiff because the discrim-" -- discriminatory bias being shown by LCSD" -- I think that's meant to be LCSO -- "through Mr. Helton, Mr. Walker, Mr. Gallagher, and Mr. Bova."

Is what you're reading here, is that

111

correct to the best of your understanding?

A Yes, ma'am.

Q Okay.

MS. GRANT: I'm going to go ahead and mark this as Exhibit Number 2.

(WHEREUPON, Brown Deposition Exhibit No. 2 was marked for identification.)

BY MS. GRANT:

Q Okay. Now I'm going to go ahead and play a recording your attorneys submitted on your behalf in those discovery responses.

MS. GRANT: Let me know if anybody's having any trouble hearing what I've got here.

MR. GUBERNICK: I don't hear anything.

MS. GRANT: It's not quite there yet.

MR. GUBERNICK: Oh, okay.

BY MS. GRANT:

Q Okay. And I'll represent to you that this is -- this document is Brown Bates Number 682. And I understand that this was a disciplinary hearing that you recorded. I'm just going to play a short section.

And just let me know if and when you recognize what this recording is, and then I'll ask you some questions about it.

112

A Yes, ma'am.

Q Can you hear?

A No, ma'am.

Q Okay. Let me...

(Audio recording played.)

BY MS. GRANT:

Q Can you hear any of that?

A Yes, ma'am.

(Audio recording played.)

BY THE WITNESS:

A I know what that is.

BY MS. GRANT:

Q Okay. Tell me what it is.

A That's my -- pre-disciplinary hearing or basically the opportunity I had to fight the -- them wanting to demote me.

Q Okay. Got you.

Do you know what the date of this -- when the date of this recording was taken?

A No, ma'am.

Q Okay. Would it -- if there were records indicating when you had a pre-disciplinary hearing, would you have any reason to disagree with the dates on that?

A No, ma'am.

Transcript of Zane Brown
Conducted on January 28, 2026

117

"To date, it has been 52 calendar days of this investigation, and I have not been notified of a delay."

A Yes.

Q Was that correct?

A Yes, ma'am.

Q All right. I'm going to go ahead and play another recording for you.

(Audio recording played.)

BY MS. GRANT:

Q I'm going to pause it right here.

Do you recognize the voice of who appears to be the caller?

A Yes, ma'am.

Q Who is that?

A Victor Hernandez.

Q Let me double-check that real quick here for a second.

(Audio recording played.)

BY MS. GRANT:

Q So that's Victor Hernandez. Do you know who is on the other side of that call?

A Me.

Q Okay. All right. Let's go ahead and continue that.

118

(Audio recording played.)

MS. GRANT: And I'm going to go ahead and mark this as Exhibit Number 5.

(WHEREUPON, Brown Deposition Exhibit No. 5 was marked for identification.)

BY MS. GRANT:

Q I'm going to share my screen again.

(Exhibit shared.)

BY MS. GRANT:

Q Okay. Mr. Brown, are you seeing what I'm showing you here?

A Yes, ma'am.

Q Okay. You see that this is dated -- this is a document that's dated July 20 of 2022?

A Yes, ma'am.

Q Okay. And it looks like it's addressed to you from Sheriff Corey Helton --

A Yes.

Q -- is that right?

A Yes, ma'am.

Q And it's about your paid administrative leave?

A Yes, ma'am.

Q Okay. Is this your signature here down at the bottom?

119

A Yes, ma'am.

Q Okay. And then did you date this as July 20 of 2022?

A Yes, ma'am.

Q Okay. Let me know if you can hear anything, and then I'll ask you the same thing, whether you recognize the participants to this conversation.

But I'll represent to you that this is a recording that your attorneys produced in response to the County's discovery requests.

A Yes, ma'am.

(Audio recording played.)

BY MS. GRANT:

Q Okay. Do you recognize who is on this phone call?

A Yes, that was myself and Chief Deputy Jon Martinez.

Q Okay.

MS. GRANT: I'm going to go ahead and mark this as Exhibit -- gosh, we're -- well, let me go back. I missed an exhibit. So I'm going to mark the previous exhibit as Number 6, and that was Bates-numbered 313, Notice of Administrative Leave.

120

(WHEREUPON, Brown Deposition Exhibit No. 6 was marked for identification.)

MS. GRANT: And then this exhibit will be Exhibit Number 7, Brown Bates-numbered 680.

(WHEREUPON, Brown Deposition Exhibit No. 7 was marked for identification.)

MS. GRANT: I'll pull up another exhibit.

(Exhibit shared.)

BY MS. GRANT:

Q Okay. Mr. Brown, are you able to see what I'm sharing on the screen here?

A Yes, ma'am.

Q All right. These look like a series of text messages. These were also produced by your attorney in the discovery responses in this litigation.

Do you see this phone number here at the top?

A Yes, ma'am, that was my work number.

Q Okay. And do you recognize this conversation, this text conversation?

A Yes, ma'am.

Q Who was this -- these -- who are these texts with?

A Jasmine Sanchez.

125

If you would go ahead and just, as before, let me know when you recognize what the call is.

I'll represent to you that this is Brown Bates number 696. This is another recording that your attorneys produced to us in this litigation.

(Audio recording played.)

BY THE WITNESS:

A That is a voicemail from Chief Deputy Fernando Jimenez to have me meet with him.

BY MS. GRANT:

Q Okay. Got you.

My apologies there. I think I may have played the wrong one for you. I think that was Exhibit 11, Brown Bates number 696. This is the correct one. It's another voicemail.

(Audio recording played.)

BY MS. GRANT:

Q Okay. Do you recognize that?

A Chief Deputy Fernando Jimenez, a voicemail he left to schedule one of the interviews.

Q Okay. And that's a phone call you received on your phone?

A A voicemail, yes, ma'am.

Q Excuse me. Voicemail.

MS. GRANT: I'm going to mark that one

126

Brown Bates number 697 as Exhibit Number 12. Let me get this through in the chat box.

(WHEREUPON, Brown Deposition Exhibit No. 12 was marked for identification.)

BY MS. GRANT:

Q Okay. Pull another recording here.

I'll let you know when I've got this playing.

(Audio recording played.)

BY MS. GRANT:

Q Sorry. Do you recognize this phone call?

A Yes, that's myself and Jasmine Sanchez on a conversation she recorded.

Q Okay. Do you have any recording of the other side of this conversation?

A I never recorded any conversations with her.

Q Okay. Do you have any recordings with Karina Tello?

A No, ma'am.

Q Okay. So if you previously said that you had recordings with Karina Tello, that would be untrue?

A Yes, ma'am.

MS. GRANT: All right. I'm going to mark

127

this as Bates number (inaudible). I'm marking this as Exhibit Number 13. Get this through.

(Reporter clarification.)

MS. GRANT: It's Bates numbered 38.

(WHEREUPON, Brown Deposition Exhibit No. 13 was marked for identification.)

BY MS. GRANT:

Q I'm going to share a document with you here.

(Exhibit shared.)

BY MS. GRANT:

Q Okay. Mr. Brown, do you see what I'm showing you here?

A Yes, ma'am.

Q Do you -- this looks like it's the name of a contact from a -- like an iPhone. Do you recognize this?

A Yes, that's a screenshot that I took from my phone from Kirk Williams' contact information.

Q Okay. I got you.

And so this is -- this is Kirk Williams' phone number here, this 816-729-2097 number?

A Yes, ma'am.

Q Okay. And Kirk Williams was an Assistant District Attorney with the Fifth Judicial District

128

Attorney's Office; is that right?

A Yes, ma'am.

Q Okay. I'm going to scroll down here.

Okay. It looks like these are some text messages with ADA Kirk; is that right?

A Yes, ma'am.

Q Williams? Yeah. Okay.

All right. Are these dates that are reflected on these text messages consistent with messages that you sent and received to Mr. Williams?

A Yes, ma'am. I provided those screenshots.

Q Okay. I'm going to go ahead and scroll down. As I'm scrolling, there are additional messages, but does that stand that these are all from -- to and from you and Mr. Williams?

A Yes, ma'am.

Q Okay. I'll get down to the bottom.

All right. So this one looks like it's another contact screenshot taken from an iPhone.

Do you recognize this -- what I'm showing you in this -- on the screen?

A Yes, that's a screenshot from my phone of Diana Luce's contact information.

Q Okay. And this phone number is