IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

ZANE BROWN,

Plaintiff,                                  No. 2:23-CV-00355-DHU-GJF

v.

LEA COUNTY BOARD OF
COUNTY COMMISSIONERS,
COREY HELTON, and
MICHAEL WALKER,

Defendants.

#### DECLARATION OF FERNANDO JIMENEZ

1. I am over the age of eighteen and am competent to testify as to the matters set forth herein.

2. I swear under penalty of perjury and the laws of the State of New Mexico that the matters set forth in this Declaration are true, accurate, and based on my personal knowledge.

3. I was a certified law enforcement officer in the State of New Mexico and was a chief deputy with the Lea County Sheriff's Office ("LCSO") at all times relevant to this Declaration.

4. On August 24, 2022, LCSO Sheriff Corey Helton assigned to investigation of a complaint from Fifth Judicial District Attorney Dianna Luce against Plaintiff Zane Brown.

5. A copy of my investigative report with my findings and conclusions is enclosed and accurately reflects the evidence I reviewed and interviews I conducted. *See* Attach. 1, BN 144-156 Investigative Report.

6. As part of the investigation, I conducted several witness interviews which are enclosed. *See* Attach. 2, BN 122 Williams Interview; Attach. 5 BN 123 Kirtley Interview; Attach. 6, BN 125 Grady Interview; Attach. 7, BN 124 Grady Interview 2; Attach. 9, BN 126 Plaintiff Interview.

7. I also received and reviewed a draft and then a final criminal complaint for Zachary Gonzales sent to me by Assistant District Attorney ("ADA") Kirk Williams of which portions of both documents are enclosed. *See* Attach. 3, BN 166-167, 198-199, BN Draft Criminal Complaint; Attach. 4, BN 204, 234-235 Final Criminal Complaint.

8. I also received the enclosed email from Mr. Brown as to these allegations. Attach. 8, BN 471 Email from Plaintiff.

9. I also conducted an investigation into allegations that Mr. Brown interfered with a third-party investigation conducted by attorney Cody Rogers and reviewed the materials she evaluated during her investigation. *See* Attach. 10, BN 59-77 Investigative Report.

10. For this investigation, I reviewed several enclosed documents received from witnesses including text messages with Mr. Brown from LCSO Deputy Jasmine Sanchez dated July 2, 3, 7, 14, 15, 16, 22, and 23; a photo of a phone log with two missed call from Brown on July 15, 2022, and a missed phone call from Brown on July 16, 2022 missed phone from Mr. Brown.

11. I also conducted several enclosed witness interviews. *See* Attach. 11, BN 39 Sanchez Interview; Attach. 12, BN 41 Tello Interview; Attach. 13, BN 40 Sandoval Interview; Attach. 14, BN 37 Jurado Interview (formerly Garcia); Attach. 15, BN 42 Walker Interview; Attach. 16, Garcia Interview.

FURTHER DECLARANT SAYETH NAUGHT

**EXHIBIT 6**

Doc ID: 9010b744f197fb9fffab410ebb489e1312675e32

Doc ID: 9010b744f197fb9fffab410ebb489e1312675e32



Fernando Jimenez, Declarant

04 / 07 / 2026

Date:

Doc ID: 9010b744f197fb9fffab410ebb489e1312675e32



**Corey Helton**
Sheriff

**Michael Walker**
Undersheriff

## Lea County Sheriff's Office

September 2, 2022

TO:   Sheriff Corey Helton
      Undersheriff Michael Walker

FR:   Chief Deputy Fernando Jimenez

RE:   Investigator (Inv.) Zane Brown, Administrative Investigation #22AI-011

**BASIS FOR INVESTIGATION**

On Wednesday, August 24, 2022, I was notified that I would be assigned an internal Investigation on Inv. Zane Brown.

22AI-011 is in reference to a complaint filed by District Attorney (DA)Dianna Luce. DA Luce alleges several issues with Inv. Brown. This investigation could result in several policy violations but not limited to the Code of Ethics and General Conduct, Employee Duties, and Restrictions of Speech.

**INCIDENT DETAILS**

DA Luce provided a detailed complaint that I attached to this document. I have listed her complaints below.

1.  Zachary Gonzales investigation
    I asked him to review the case with Lovington Prosecutors since I was in Santa Fe. I spoke with him after the review with several questions and concerns. I asked for follow-up. The next time my staff spoke to the victim's family they were upset that I

www.leacountysheriff.com
1417 South Commercial · Lovington, NM · (575) 396-3611
3720 West College Lane · Hobbs, NM · (575) 397-9600

*In God We Trust*

File No. 1273-004          **ATTACHMENT 1**          MS_000144

was in Santa Fe and was not responding to Inv. Brown. Inv. Brown further put items in a draft of the complaint claiming Mr. Williams had said things in an interview with a co-defendant. Mr. Williams confronted Inv. Brown because he did not say any of the things mentioned in the complaint. Inv. Brown laughed it off. When preparing for the preliminary hearing on this case and the co-defendant's case Inv. Brown could not be bothered to bring the required discovery to the office and Sgt. Grady had to bring the disclosure. The family has continually told our office that Inv. Brown has put issues off onto our office, which he has often been responsible.

2. Ashley Lerke case
The PTI (pre-trial interview) by defense was set 3 times for Inv. Brown. The first setting Inv. Brown called Ms. Kirtley and informed her that he was working a potential homicide and requested that she reset the interviews. The second setting was during the CYFD meeting listed below. He laughed about it afterwards that this meeting allowed him to miss the PTI. I explained to him that he should have told me when we scheduled the meeting with CYFD and that he could be suppressed as a witness. Inv. Grady was notified. The third setting, Inv. Brown, who was notified the day before by Ms. Kirtley who sent him his report to prepare, did not answer his phone and did not call back after Ms. Kirkley contacted him and asked why he did not answer his phone. He replied that he forgot, but never contacted the office to complete the PTI. Inv. Brown's testimony will now be suppressed in the Lerke matter.

3. Investigation in the shooting of the 3-year-old child
I was contacted by CYFD Attorney Kristen Dickey to have a meeting on this case as she could not get discovery for the CYFD case and could not get Inv. Brown to respond. We met on this matter, and it was going to do follow-up and I was told a search warrant for a tablet would be completed and review of the device would happen the next day. I still do not have any information on the SW or review of the tablet. The CYFD investigation lead to a concern of possible child abuse human and trafficking by Alisha Luna. The other children inside the home at the time of the shooting gave forensic interviews. One of the male children at a forensic interview and explained that he worked in front of a Allsups by washing car windows of customers and made $250 a week to give to his mom. Two other children tested positive from drugs. CYFD provided those records. I have not received any follow-up from this investigation.

4. Brian Berry case
Inv. Brown did not provide necessary evidence for the video deposition in the case. Ms. Kirtley contacted him multiple times about his failure to give the State disclosure. Finally, Ms. Kirtley contacted Sgt. Grady. After Sgt. Grady was contacted, Ms. Kirtley had to obtain the evidence from the evidence department herself and Brown was then combative with Ms. Kirtley for contacting Sgt. Grady.

File No. 1273-004                                                      MS_000145

---

5. James Laws case – 22S017670
Inv. Brown admitted to calling three different attorneys in the Lovington office to attempt to make re-entry into this home to retrieve guns after the parties within the home were already arrested. Inv. Brown later admitted he knew this would not be legal, but was still attempting to get approval anyway.

6. General issues with not appearing for hearings
Cases set for preliminary hearing have been dismissed and re-filed because he did not log-on to the hearing since he was not working a morning shift. Inv. Grady was contacted.

7. Lack of responsibility on cases
   a. Inv. Brown continually asks to not appear for settings where he is the case agent because he claims that Inv. Sandoval was with him the entire time, so he does not know why his presence is necessary.

   b. Inv. Brown repeatedly does not appear for PTIs and our office has to file for extensions of time to attempt to complete said interview. Inv. Brown treats his added work he creates for not only the attorneys who have to draft the motions for extension, but also assistants who have to draft many documents and correspond with multiple parties to try to set up these interviews, as if it is not his problem or a joke. We all agree that these interviews are inconvenient or an annoyance, but the judges will exclude his testimony or dismiss the cases if we do not complete them. "

### WRITTEN NOTIFICATION OF ADMINISTRATIVE INVESTIGATION

On Thursday, August 25, 2022, I served Investigator Zane Brown with an employee's Written Notice of Investigation

### RECORDED INTERVIEWS

**Sergeant (Sgt.) Jeremy Grady**

| | |
|---|---|
| Date: | August 29, 2022 |
| Time: | 14:22 – 15:19 |
| Location: | Lea County Sheriff's Office<br>1417 S Commercial<br>Lovington, NM 88270<br>Chief Deputy Jimenez Office |
| Present: | Chief Deputy Fernando Jimenez and Sergeant Jeremy Grady |

File No. 1273-004                                                      MS_000146

---

### EMPLOYEE COMPLAINT HISTORY
Complaint – 7-2-21 (sustained) Insubordination
Complaint – 10-6-21 (sustained) Verbal Harassment and Bullying
Complaint – 1-7-22 (sustained) Bullying

### CREDIBILITY DETERMINATIONS

**NONE**

### OTHER MISCONDUCT IDENTIFIED DURING THE INVESTIGATION
ADM 1-04-6   FALSE STATEMENTS
OPR 2-02-1   SPECIAL COURT NOTICES
ADM 1-03-2   ENFORCEMENT OF LAWS, ORDINANCES, AND SHERIFF'S OFFICE
REGULATIONS

### FINDINGS

1. In the Zachary Gonzalez issue - it is found that Inv. Brown purposely wrote what he wanted in the complaint. ADA Williams listened to the recordings and had to prove to Inv. Brown that what he wrote was not true for it to be changed. Such an inaccuracy could cost ADA Williams his bar license. It was also found that Inv. Brown intentionally spoke bad about the DA Office and didn't disclose his case properly to the ADA Office.

2. In the Ashley Lerke issue - it is found that Inv. Brown missed his PTI's and failed to contact the ADA office. It is also clear that Inv. Brown purposely missed his third PTI. It is also clear that Inv. Brown's testimony will now be suppressed in this case, which is a homicide.

3. In the shooting of the three-year-old child issue - it is found that Inv. Brown failed to process a search warrant for the tablet because he was busy with the case. Inv. Brown also failed to notify his supervisor of the necessity to complete a search warrant. Inv. Brown cited he also did not process the tablet because he had an active IA involving CYFD.

4. In the Brian Berry issue - it is found that Inv. Brown failed to provide ADA Kirtley with evidence disclosure. Sgt. Grady stated that Inv. Brown didn't notify him of his need for disclosure. It is also found that Brown got upset with ADA Kirtley about contacting his supervisor and called her a snitch and a rat.

5. In the James Laws issue - it is unfounded as three different Deputies make contact with the ADA office about this case in reference to different issues pertaining to this case.

File No. 1273-004                                                      MS_000153

---

Sgt. Grady has never disciplined Inv. Brown for missing Court/PTI's. Inv. Brown has shown a problem with presenting himself for his PTI's and notifying the ADA Office if he isn't attending.

Sgt. Grady has never disciplined Inv. Brown, who shows he has a problem keeping up with his duties on disclosures for his cases.

Sgt. Grady has never disciplined Inv. Brown for Code of Ethics and General Conduct. Inv. Brown admitted to talking bad (negative) about another agency we have to work with and keeping a professional image for the office.

Sgt. Grady never disciplined Inv. Brown for Restrictions of Speech on his name-calling to ADA Kirtley.

### NOTED VIOLATIONS

1) ADM 1-04-6   FALSE STATEMENTS
   A. Personnel shall not alter, misrepresent, or otherwise make a false statement on any public record document or county document which has been filled out in the course of their employment.

      1. Violation of this section may result in prosecution for violation of the New Mexico Statues Annotated, including but not limited to, Paying or Receiving Public Money for Service Not Rendered (NMSA 30-23-2), Making or Permitting False Public Voucher (NMSA 30-23-3), Perjury (NMSA 30-25-1), or Tampering with Public Records (NMSA 30-26-1).

**Inv. Brown purposely wrote what he wanted in the complaint. ADA Williams listened to the recordings and had to prove to Inv. Brown that what he wrote was not true for it to be changed. Such an inaccuracy could cost ADA Williams his bar license**

2) ADM 1-04-5   RESTRICTIONS ON SPEECH
   Personnel shall not use coarse, violent, profane, or insolent language or gestures while acting in an official capacity.

**Inv. Brown was unprofessional when speaking to the family about the ADA office.**

**Inv. Brown clearly got upset with ADA Kirtley and called her a snitch and a rat.**

ADM 1-02-2   DEPUTY SHERIFF CODE OF ETHICS AND GENERAL CONDUCT
As a duly commissioned Deputy Sheriff, I recognize that I am given a special trust and confidence by the Sheriff and the public that I serve. This trust and confidence is my bond to ensure that I shall behave and act according to the highest professional

File No. 1273-004                                                      MS_000154

principles. In furtherance of this pledge, I will abide by the following Code of Ethics and General Conduct:

    I.    I SHALL ENDEAVOR to perform my duties in a competent and professional manner according to the standards given to me in my training and supervision.

**Inv. Brown was unprofessional when speaking to the family about the ADA Office and not completing his duties on submitting disclosure.**

   3)  OPR 2-02-1   SPECIAL COURT NOTICES
     A. Cases involving persons in custody will normally be set within ten days of arraignment day, however personnel notified by "Special Court Notice" in lieu of a subpoena or posted court notice will appear at the date and time specified.

**Inv. Brown missed his PTI and admitted to missing one on purpose.**

   4)  ADM 1-03-2   ENFORCEMENT OF LAWS, ORDINANCES, AND SHERIFF'S OFFICE REGULATIONS

     B. Full-time, sworn deputies are reminded they are considered by New Mexico law to be in the performance of their duties at all times; to this end they shall:

     2. Make only those arrest, searches, and seizures which they know or should know are legal and in accordance with Sheriff's Office procedures.

**Inv. Brown failed to secure a search warrant on a tablet and stated he was too busy with the case and never requested supervisor assistance to get this completed. Brown also stated he was delayed due to being put on an IA that involved CYFD.**

   5)  ADA 2-01-1   POSITIONS WITHIN THE CHAIN OF COMMAND

     D. Command Staff and supervisors are accountable for the performance of employees under their immediate control

**Sgt. Grady has never disciplined Inv. Brown for missing Court/PTI's. Inv. Brown has shown a pattern of not presenting himself for his PTI's and notifying the ADA Office if he isn't attending.**

**Sgt. Grady has never disciplined Inv. Brown, who has shown he has a problem keeping up with his employee duties on his disclosures for his cases.**

Sgt. Grady has never disciplined Inv. Brown for Code of the Ethics and General Conduct. Inv. Brown admitted to talking bad (negative) about another agency and keeping a professional image for the office.

Sgt. Grady never disciplined Inv. Brown for Restrictions of Speech on his name-calling to ADA Kirtley Restrictions.

Respectfully,

*[signature]*

Chief Deputy Fernando Jimenez

---

---

---

STATE OF NEW MEXICO
COUNTY OF LEA
IN THE MAGISTRATE COURT

STATE OF NEW MEXICO        No. _____
COUNTY OF LEA           LCSO # 22S000097
v.                 Date Filed:_____
Zachary Ray Gonzales, Defendant
DOB:    1995
SOC:

### CRIMINAL COMPLAINT SUPPLEMENT

On Monday, January 3, 2022, at approximately 0723 hours, Deputies with the Lea County Sheriff's Office were dispatched to the intersection of Reed Road Hillburn Road, in reference to a male subject who was found lying in the ditch, unresponsive, cold to the touch and did not appear to be breathing. Coordinates for the location N 33.09752 W -103.3522.

Upon arrival, Deputies observed a male subject who was laying approximately a foot west of the roadway on his right shoulder what appeared to be the fetal position facing south. Deputies approached the male in attempt to render aid. As Deputies approached, they observed discoloration purple bruising of possible blood pool on the right side of his face. Deputies did not observe any signs of life in the male subject.

Deputies made with Joe Sisneros who was the reporting party. Joe stated his wife had called him while she was on her way to work in Tatum, New Mexico. Joe stated she told him she observed what possibly appeared to be person on the side of the road, however, was not for sure. Joe stated his wife wanted him to check the area to possibly confirm what she saw. Joe stated as he arrived, he observed a male individual and attempted to yell at him, however, did not respond. Joe stated he called emergency personnel to respond. Joe stated as he stood by waiting, a vehicle was passing by, and he waved it down. Joe stated the individual was a nurse and she attempted to go check for a pulse.

Deputies contacted Jessica Lizardo who was the nurse on scene. Jessica stated she was on her way to take her kids to school in Tatum, New Mexico. Jessica stated she exited her vehicle and went to render aid and check for a pulse but was unable to find one.

Due to the nature of the call, I, Investigator Brown was contacted and briefed on what occurred. I advised the deputies on scene to secure the area and I will be responding to the location. Deputies advised they were not able to identify the male subject due to the way his body was positioned. Deputies advised they were not able to see any visible injuries on the male subject, however, blood was present underneath his body.

The area south and north of the male subject was cordoned off with crime scene tape.

While en route to the area, I contacted Investigator Sandoval to come assist with the investigation and scene processing.

I contacted Zachary Gonzales, who was sitting in interview room two. I asked Zachary if he wanted to speak with me about the homicide investigation. Zachary advised he did not want to speak with me and wanted to go home. I told Zachary he was free to leave. Zachary was given my business card and advised to call me if he changed his mind about speaking with me.

On Wednesday, March 9, 2022, Assistant District Attorney Kirk Williams and I traveled to the Gaines County Sheriff's Office located in Seminole, Texas to interview Robert Lewis. Lewis was placed in an interview room inside the Gaines County Sheriff's Office. Lewis was read his advice of rights and agreed to speak with ADA Kirk Williams and I. ADA Williams told Lewis he wanted to know what happened with Zachary on the night of the murder. Lewis stated he has "left bits and pieces of but I'll give you this one of my, our initial plan of that night, not more less plan, but fucking stupid". Lewis stated, "it had nothing to do with a mother fucker getting smoked". Lewis told ADA Williams if he could get him a deal in writing he would cooperate with the District Attorneys Office. ADA Williams told Robert he would get with the Public Defenders Office and write up a deal for him on a later date. Lewis asked ADA Williams what he wanted to know about Zachary. ADA Lewis advised he wanted to know everything that happened and about the plan. Lewis advised he acted as security and a driver for Cheyenne while she sells and buys dope. Lewis stated on the day of the Homicide they met up with Brooke at her house. Lewis stated they all set around, until Cheyenne received a phone call from Jeremy Holliman. Lewis stated Cheyenne received several calls from him within the last couple weeks. Lewis advised he felt like Cheyenne and Jeremy something going on or had something in the past. Lewis went on to advised "Baby Ray" Zachary Gonzales came into the conversation. Lewis advised Cheyenne was on the phone with Zachary and Brooke got upset during this conversation, and advised she was not going to go with them anymore. Lewis stated him and Cheyenne left Brooke's house to pick up Zachary. Lewis stated, "by this time I've already heard, we just need to get his money, punk him and his dope". Lewis advised this conversation was between Cheyenne and Zachary. Lewis stated, "I proceeded right, I mean, you know, I just, I knew I guess of a robbery". Lewis stated Cheyenne called Jeremy and they met at McDonalds. Robert stated Cheyenne got out of his car and got into the vehicle with Ashely and Jeremy. Lewis stated after dropping off Cheyenne they went to Allsups and then to meet them at Brookes house. Lewis advised him and Zachary got to Brookes before Ashley, Jeremy and Cheyenne. Lewis stated before they arrived, he overheard Zachary asking for 40. Cal bullets. Lewis stated there wasn't a "strategic plan". Lewis stated Zachary was at "oddly at ease". Lewis stated, "they pulled up into the drive, and I pulled up directly behind Ashley". Lewis stated they got out and went directly to the front passenger seat and found Cheyenne sitting there. Lewis stated Zachary went and opened the rear passenger door and then saw Jeremy moving to the rear driver side passenger door. Lewis stated Zachary ran around to where Jeremy was sitting and opened the door. Lewis stated by this time Zachary already had a gun out fully extended". Robert stated by the time he got to the door where they were at Zachary already shot Jeremy. Lewis stated Jeremy grabbed his chest and Ashley turned around in her seat to see what happened. Lewis stated he saw the light fade from Jeremy. Lewis stated he grabbed Jeremy by belt, and he "reached in and grabbed him by the belt and pulled him". It should be noted that Jeremy did not have a belt on when he was located. Lewis advised during this time he felt Ashleys vehicle begin to reverse. Lewis stated his car was right behind Ashleys. Robert stated he hopped in his car, so she didn't hit and drove away. Robert was asked if he knew what happened to the gun after. Robert stated Zachary left with the gun and was picked up at the Four-Season Apartments by his mom. The interview was audio recorded.

---



Signature of Complainant Date

Z. Brown
Printed Name of Complainant

Investigator 801
Title (if any)

STATE OF NEW MEXICO
COUNTY OF LEA
IN THE MAGISTRATE COURT

STATE OF NEW MEXICO
COUNTY OF LEA
v.
Zachary Ray Gonzales, Defendant
DOB: [redacted]1995
SOC: [redacted]

No. M-25-FR-2022-00013
LCSO # 22S000097
Date Filed: ____________

**CRIMINAL COMPLAINT SUPPLEMENT**

On Monday, January 3, 2022, at approximately 0723 hours, Deputies with the Lea County Sheriff's Office were dispatched to the intersection of Reed Road Hillburn Road, in reference to a male subject who was found lying in the ditch, unresponsive, cold to the touch and did not appear to be breathing. Coordinates for the location N 33.09752 W -103.3522.

Upon arrival, Deputies observed a male subject who was laying approximately a foot west of the roadway on his right shoulder what appeared to be the fetal position facing south. Deputies approached the male in attempt to render aid. As Deputies approached, they observed discoloration purple bruising of possible blood pool on the right side of his face. Deputies did not observe any signs of life in the male subject.

Deputies made contact with Joe Sisneros who was the reporting party. Joe stated his wife had called him while she was on her way to work in Tatum, New Mexico. Joe stated she told him she observed what possibly appeared to be person on the side of the road, however, was not for sure. Joe stated his wife wanted him to check the area to possibly confirm what she saw. Joe stated as he arrived, he observed a male individual and attempted to yell at him, however, did not respond. Joe stated he called emergency personnel to respond. Joe stated as he stood by waiting, a vehicle was passing by, and he waved it down. Joe stated the individual was a nurse and she attempted to go check for a pulse.

Deputies contacted Jessica Lizardo who was the nurse on scene. Jessica stated she was on her way to take her kids to school in Tatum, New Mexico. Jessica stated she exited her vehicle and went to render aid and check for a pulse but was unable to find one.

Due to the nature of the call, I, Investigator Brown was contacted and briefed on what occurred. I advised the deputies on scene to secure the area and I would be responding to the location. Deputies advised they were not able to identify the male subject due to the way his body was positioned. Deputies advised they were not able to see any visible injuries on the male subject, however, blood was present underneath his body.

The area south and north of the male subject was cordoned off with crime scene tape.

While en route to the area, I contacted Investigator Sandoval to come assist with the investigation and scene processing.

Investigator Sandoval served the Zachary with the search warrant and collected buccal DNA swabs. Investigator Sandoval advised Zachary asked her if he was free to leave once, she was done collecting his DNA.

Prior to Investigator Sandoval collecting Zachary's DNA, I asked Corporal Hobbs to complete a field interview card on Zachary to update his information in the Sheriff's Office Spillman system. Zachary provided and address of 7508 N. Plainfield Dr. in Hobbs, New Mexico. Phone number 575-441-6863, date of birth 8/15/1995, social security number 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.

Corporal Hobbs provided me with the field interview card after speaking with Zachary. I observed the phone number in which Zachary provided to be the same phone number which was at 1204 W. De Baca on Monday, January 3, 2022, during the time of the homicide. Zachary did tell Corporal Hobbs that "you" took his phone referring to the deputies on scene prior to him being transported.

I contacted Zachary Gonzales, who was sitting in interview room two. I asked Zachary if he wanted to speak with me about the homicide investigation. Zachary advised he did not want to speak with me and wanted to go home. I told Zachary he was free to leave. Zachary was given my business card and advised to call me if he changed his mind about speaking with me.

On Wednesday, March 9, 2022, Assistant District Attorney Kirk Williams and I traveled to the Gaines County Sheriff's Office located in Seminole, Texas to interview Robert Lewis. Lewis was placed in an interview room inside the Gaines County Sheriff's Office. Lewis was read his advice of rights and agreed to speak with ADA Kirk Williams and I. ADA Williams told Lewis he wanted to know what happened with Zachary on the night of the murder. Lewis stated he has "left bits and pieces of but I'll give you this one of my, our initial plan of that night, not more less plan, but fucking stupid". Lewis stated, "it had nothing to do with a mother fucker getting smoked". Lewis asked ADA Williams what he wanted to know about Zachary. ADA Williams advised he wanted to know everything that happened and about the plan. Lewis advised he acted as security and a driver for Cheyenne while she sells and buys dope. Lewis stated on the day of the Homicide they met up with Brooke at her house. Lewis stated they all set around, until Cheyenne received a phone call from Jeremy Holliman. Lewis stated Cheyenne received several calls from him within the last couple weeks. Lewis advised he felt like Cheyenne and Jeremy something going on or had something in the past. Lewis went on to advised "Baby Ray" Zachary Gonzales came into the conversation. Lewis advised Cheyenne was on the phone with Zachary and Brooke got upset during this conversation, and advised she was not going to go with them anymore. Lewis stated him and Cheyenne left Brooke's house to pick up Zachary. Lewis stated, "by this time I've already heard, we just need to get his money, punk him and his dope". Lewis advised this conversation was between Cheyenne and Zachary. Lewis stated, "I proceeded right, I mean, you know, I just, I knew I guess of a robbery". Lewis stated Cheyenne called Jeremy and they met at McDonalds. Robert stated Cheyenne got out of his car and got into the vehicle with Ashely and Jeremy. Lewis stated after dropping off Cheyenne they went to Allsups and then to meet them at Brookes house. Lewis advised him and Zachary got to Brookes before Ashley, Jeremy and Cheyenne. Lewis stated before they arrived, he overheard Zachary asking for 40. Cal bullets. Lewis stated there wasn't a "strategic plan". Lewis stated Zachary was at "oddly at ease".

Lewis stated, "they pulled up into the drive, and I pulled up directly behind Ashley". Lewis stated they got out and went directly to the front passenger seat and found Cheyenne sitting there. Lewis stated Zachary went and opened the rear passenger door and then saw Jeremy moving to the rear driver side passenger door. Lewis stated Zachary ran around to where Jeremy was sitting and opened the door. Lewis stated by this time Zachary already had a gun out fully extended". Robert stated by the time he got to the door where they were at Zachary already shot Jeremy. Lewis stated Jeremy grabbed his chest and Ashley turned around in her seat to see what happened. Lewis stated he saw the light fade from Jeremy. Lewis stated he grabbed Jeremy by belt, and he "reached in and grabbed him by the belt and pulled him". It should be noted that Jeremy did not have a belt on when he was located. Lewis advised during this time he felt Ashleys vehicle begin to reverse. Lewis stated his car was right behind Ashleys. Robert stated he hopped in his car, so she didn't hit it and drove away. Robert was asked if he knew what happened to the gun after. Robert stated Zachary left with the gun and was picked up at the Four-Season Apartments by his mom.

ZB 801 — 3/16/2022
Signature of Complainant Date

Z. Brown
Printed Name of Complainant

Investigator 801
Title (if any)

3/16/2022

**Corey Helton**
**Sheriff**

**Michael Walker**
**Undersheriff**

# Lea County Sheriff's Office

September 13, 2022

**To:**  Sheriff Corey Helton
      Undersheriff Michael Walker

**From:** Chief Deputy Fernando Jimenez

**Re:**  Investigator (Inv.) Zane Brown, Administrative Investigation #22AI-010

### BASIS FOR INVESTIGATION

On Wednesday, August 24, 2022, I was assigned an internal investigation on Inv. Zane Brown.

22AI-010 is in reference to the findings from a complaint that was investigated by Jarmie & Rogers, P.C. Attorney Law Firm. In those findings, there were several areas of concern noted by the independent investigator. This investigation could result in several policy violations including Harassment, Intimidation of Deputies/Witnesses, Stalking, Hostile Work Environment, Code of Ethics and General Conduct.

### INCIDENT DETAILS

On July 6, 2022, a complaint was filed against Undersheriff Michael Walker by a citizen named Aaron Rodriguez. This complaint was eventually sent to Sheriff Helton. Sheriff Helton conducted an inquiry into the complaint by speaking with several Sheriff's Office employees. During Sheriff Helton's inquiry, he discovered there were more issues that needed to be investigated than just the original complaint. This information was discussed with Human Resources and the County



www.leacountysheriff.com
1417 South Commercial • Lovington, NM • (575) 396-3611
3720 West College Lane • Hobbs, NM • (575) 397-9600

*In God We Trust*

**File No. 1273-004**      **ATTACHMENT 9**      **MS_000059**

---

Sexual Harassment
Workplace Bullying

### FINDINGS

1. **Inv. Zane Brown was possibly involved in the development and submission of the formal complaint.** It is found that Inv. Brown assisted Aaron Rodriguez with gathering information on the original complaint by questioning those who attended the birthday gathering. Inv. Brown made a statement in his interview I asked Karina Tello if the Undersheriff was driving because Aaron wanted him to ask her.

2. **Inv. Zane Brown possibly attempted to influence the investigation of the complaint by contacting potential witnesses and making threatening or coercive statements.** It is found that Inv. Brown spoke to witnesses in this investigation. It is also clear that Inv. Brown used coercive statements by telling Dep. Jasmine Sanchez that she would have immunity from the lawsuit that he would be filing.

3. **Inv. Zane Brown potentially sexually harassed Dep. Jasmine Sanchez and Inv. Diana Garcia.** It is found that both Dep. Jasmine Sanchez and Dep. Diana Garcia disclosed in my interview and the one conducted by the Jarmie & Rogers law firm (Dep. J Sanchez only) that they were sexually harassed by Inv. Brown but did not want to come forth with those allegations because of how they would be looked at by their fellow co-workers.

4. **Inv. Zane Brown possibly Harassed and or Stalked Inv. Diana Garcia and Undersheriff Walker by trying to prove an intimate relationship.** It is found that Inv. Brown is obsessed with proving that Undersheriff Walker and Inv. Garcia had an intimate relationship with each other. Inv. Brown has asked several people to help him prove it so he can get dirt on the Undersheriff. Both Undersheriff Walker and Inv. Garcia disclosed that they have either been followed by Inv. Brown or Inv. Brown has made comments as to why certain individuals are at their residence.

5. **Inv. Zane Brown possibly caused a Hostile Working Environment.** It is found that Inv. Brown has caused a hostile working environment for Undersheriff Walker and Inv. Garcia in the aspects of spreading rumors about them having an intimate relationship. This cause co-workers to raise unethical opinions on something that is totally false.

It is also found that Dep. Sanchez has not put in for the CID mentorship program because Inv. Brown makes her uncomfortable due to the sexual advancements he has made to her.

6. **Inv. Zane Brown possibly spoke of his IA investigation with other employees.** It is found that Inv. Brown called Captain Garcia after being served his IA notification, knowing that Captain Garcia would be a witness in this IA. Inv. Brown stated in his interview that Captain Garcia had came to his office to give him information about this IA before this IA was ever started. Captain Garcia had to stop his conversation with Inv. Brown and make it clear to him that he could not discuss IA matters with him.

**File No. 1273-004**      **MS_000070**

---

7. **Inv. Zane Brown possibly accused Undersheriff Walker of maliciously controlling his Internal Affairs investigations.** It is found that Inv. Brown stated in his interview that Undersheriff was controlling his IA's and was trying to ruin his career. Undersheriff did not investigate or handle any of his IA investigations.

8. **Inv. Zane Brown possibly made a controversial statement about taking the Undersheriff down with him if he goes down.** It is found that Inv. Brown made this statement to Dep. Sanchez and Karina Tello. Inv. Brown also admitted to saying something along those lines in his interview but couldn't recall how he said it.

9. **Inv. Brown possibly made some statements that could raise question about his integrity and honesty.** It is found that Inv. Brown made several statements in his interview that are found to be dishonest. It is found that Inv. Brown made several statements to other witnesses in this IA investigation that are dishonest as well.

10. It was found that Inv. Jeanette Sandoval made some statements in her interview with me and the interview with Jarmie & Rogers that would question her Integrity and Honesty.

### NOTED VIOLATIONS

**Lea County Policy and Procedure Manuel**

**Workplace Bullying**
**Policy**
The County defines bullying as "repeated inappropriate behavior, either direct or indirect whether verbal, physical or otherwise, conducted by one or more persons against another or others, at the place of work and/or in the course of employment." All employees will be treated with dignity and respect.

The purpose of this policy is to communicate to all employees that the County will not tolerate bullying behavior. Employees found in violation of this policy will be disciplined up to and including termination.

Bullying may be intentional or unintentional. However, it must be noted that where an allegation of bullying is made, the intention of the alleged bully is irrelevant and will not be given consideration when meting out discipline. As in sexual harassment, it is the effect of the behavior upon the individual that is important. The County considers the following types of behavior examples of bullying:

• Verbal Bullying-slandering, ridiculing or maligning a person or his/her family; persistent name calling that is hurtful, insulting or humiliating; using a person as the butt of jokes; abusive and offensive remarks.
• Physical Bullying-pushing, shoving, kicking, poking, tripping, assault or

**File No. 1273-004**      **MS_000071**

---

threat of physical assault; damage to a person's work area or property.
• Gesture Bullying-nonverbal threatening gestures or glances that convey threatening messages.
• Exclusion-socially or physically excluding or disregarding a person in work-related activities.
• Social Media-social media can become a forum for inappropriate, unwelcome remarks about employees by supervisors or among co-workers. This kind of behavior will not be tolerated.

*Inv. Brown used coercive statements by telling Dep. Jasmine Sanchez that she would have immunity from the lawsuit that he would be filing.*

**Workplace Harassment**
**Policy**
The County is committed to taking reasonable steps to provide a professional working environment free from all forms of harassment, whether based on sex, sexual orientation, gender identity, race, color, religion, national origin, age, disability or any other protected classification. Although this policy focuses on ==sexual harassment==, it applies equally to all forms of harassment based on a protected classification and the procedures described in this policy shall be followed for all such harassment. This policy also applies when a Lea County employee is subject to harassment in the workplace by someone outside of Lea County.

All County employees and members of the public have a right to be free from ==harassment== from employees on official duty. Lea County employees are prohibited from engaging in harassing conduct in the workplace. Employees are also prohibited from engaging in conduct outside of work that creates a ==hostile work environment at work==. Any act of harassment based upon a protected classification is a violation of Lea County policy.

*Sexual Harassment:*
*Both Dep. Jasmine Sanchez and Dep. Diana Garcia disclosed in my interview and the one conducted by the Jarmie & Rogers law firm (Dep. J Sanchez only) that they were sexually harassed by Inv. Brown but did not want to come forth with those allegations because of how they would be looked at by their fellow co-workers.*

*Harassment:*
*Inv. Brown is obsessed with proving that Undersheriff Walker and Inv. Garcia had an intimate relationship with each other. Inv. Brown has asked several people to help him prove it so he can get dirt on the Undersheriff. Both Undersheriff Walker and Inv. Garcia disclosed that they have either been followed by Inv. Brown or Inv. Brown has made comments as to why certain individuals are at their residence.*

**File No. 1273-004**      **MS_000072**

*Hostile Working Environment:*
*Inv. Brown has caused a hostile working environment for Undersheriff Walker and Inv. Garcia in the aspects of spreading rumors about them having an intimate relationship. This caused coworkers to raise unethical opinions on something that is totally false.*

*It is also found that Dep. Sanchez has not put in for the CID mentorship program because Inv. Brown makes her uncomfortable due to the sexual advancements, he has made to her.*

**State Statue**

**Stalking        30-3A-3**

A. Stalking consist of knowingly pursuing a pattern of conduct, without lawful authority, directed at a specific individual when the person intends that the pattern of conduct would place the individual in reasonable apprehension of death, bodily harm, sexual assault, confinement or restraint of the individual or another individual.

*I am not clear how far Inv. Brown would go, but he was starting a pattern of stalking behavior. Brown is obsessed with proving that Undersheriff Walker and Inv. Garcia had an intimate relationship with each other.  Inv. Brown has asked several people to help him prove it so he can get dirt on the Undersheriff.  Both Undersheriff Walker and Inv. Garcia disclosed that they have either been followed by Inv. Brown or Inv. Brown has made comments as to why certain individuals are at their residence.*

**ADM   1-04-1**

**INSUBORDINATION**

A. Insubordination consists of any employee who:
1. Deliberately refuses any lawful order given by a superior without justifiable cause.
2. Knowingly, negligently and/or maliciously violates Sheriff's Office policy.

*Inv. Brown called Captain Garcia after being served his IA notification knowing that Captain Garcia would be a witness in this IA. Inv. Brown stated in his interview that Captain Garcia had come to his office to give him information about this IA before this IA ever started. Captain Garcia had to stop his conversation with Inv. Brown and make it clear to him that he could not discuss IA matters with him.*

**ADM   1-02-2**

**DEPUTY SHERIFF CODE OF ETHICS AND GENERAL CONDUCT**
As a duly commissioned Deputy Sheriff, I recognize that I am given a special trust and confidence by the Sheriff and the public that I serve. This trust and confidence is my bond to ensure that I shall behave and act according to the highest professional principles. In furtherance of this pledge, I will abide by the following Code of Ethics and General Conduct:

A. I SHALL ENSURE that in the performance of my duties, I will enforce and administer the law according to the principles of the United States and New Mexico Constitutions and applicable laws of our state, so that equal protection of the law and due process are guaranteed to everyone.

B. I SHALL NOT permit personal opinions, biases, prejudices, party affiliation, or consideration of the status of others to alter or lessen these principles.

C. I SHALL DEMONSTRATE standards of behavior consistent with the responsibilities, duties, obligations, and functions of a Deputy Sheriff.

D. I SHALL NOT ENGAGE IN NOR CONDONE brutal, cruel, or inhumane treatment of others or of anyone in my care and custody.

E. I SHALL ADHERE, at all times, to the standards and principles of honesty and integrity, and I shall keep my private life unsullied as an example to all.

F. I SHALL ENSURE that there is proper use and accountability of property and funds entrusted to my care.

G. I SHALL PRACTICE sound judgments and decisions in fulfilling the assigned responsibilities, duties and functions of my position as Deputy Sheriff.

H. I SHALL ENDEAVOR to maintain those standards of objectivity and merit for which I was hired, to the best of my ability.

I. I SHALL ENDEAVOR to perform my duties in a competent and professional manner according to the standards given to me in my training and supervision.

J. I SHALL ENSURE that during my tenure I shall not use the position of Deputy Sheriff for personal gain or self-aggrandizement.

K. I ACCEPT and will adhere to this Code of Ethics and General Conduct. As an employee, I accept responsibility for encouraging my peers to abide by this Code. As a supervisor, I accept responsibility for enforcing this code among my subordinates.

*Inv. Brown assisted Aaron Rodriguez with gathering information on the original complaint by questioning those who attended the birthday gathering. Inv. Brown stated in his interview that he asked Karina Tello if the Undersheriff was driving because Aaron wanted him to ask her.*

*It is found that Inv. Brown stated in his interview that Undersheriff was controlling his IA's and was trying to ruin his career. Undersheriff Walker did not investigate or handle any of his IA investigations.*

*Inv. Brown made this statement to Dep. Sanchez and Karina Tello. Inv. Brown also admitted to saying something along those lines in his interview but couldn't recall how he said it.*

File No. 1273-004                                        MS_000073

File No. 1273-004                                        MS_000074

*Inv. Brown made several statements in his interview that are found to be dishonest. It is found that Inv. Brown made several statements to other witnesses in this IA investigation that are dishonest as well.*

*Inv. Jeanette Sandoval*
*made statements in her interview with me and the interview with Jarmie & Rogers that would question her Integrity and Honesty. Inv. Sandoval was present during the phone call conversation between Karina and Inv. Brown. Inv. Sandoval lied to the private attorney and advised them she was not present. Inv. Sandoval gave me two contradicting statements and was then reminded of Garrity.  Inv. Sandoval advised that she could not recall what all was said in that conversation. Per the information that was obtained from the witnesses, Inv. Sandoval knew of Inv. Brown's plans and denied knowing.*

Respectfully,

_____
Chief Deputy Fernando Jimenez

File No. 1273-004                                        MS_000075