# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

ZANE BROWN,

      **Plaintiff,**                         **No. 2:23-CV-00355-DHU-GJF**

**v.**

**LEA COUNTY BOARD OF
COUNTY COMMISSIONERS,**

      **Defendant.**

### Declaration of Zane Brown

My name is Zane Brown. I am an adult over the age of 18. If called upon to testify I would competently do so as follows:

1.     I am a certified law enforcement officer currently employed at the Lovington Police Department in Lovington, New Mexico.

2.     I was served with a reprimand by Jeremey Grady. However, the document indicated it came from Michael Walker, and Mr. Grady told me he did not agree with it.

3.     I am familiar with the accusations of missed pretrial interviews and court dates made by Dianna Luce and Megan Kirtley. On one occasion I was unable to attend a pretrial interview because I was at a homicide along with another investigator. However, I did provide advance notice. I submitted an Inspection of Public Records Act to the District Attorney's Office for any documentation of pretrial interviews and court dates that I allegedly missed in the timeframe they complained about. The District Attorney's Office was unable to produce any documentation.

4.     For the six years prior to the incident with the Ahmaad White LCSO application, Ms. Luce and Ms. Kirtley never complained about my job performance.

1

Docusign Envelope ID: 186D65C6-1DBF-889F-818C-31C380207FA9

5.    When I was demoted from the Criminal Investigations Division, I had 13 open cases that had yet to be worked up. Supervisor approval was given for those cases to not have supplemental reports entered. This was common practice within the Criminal Investigations Division.

6.    I am aware that Chief Deputy District Attorney Ms. Kirtley is Corey Helton's daughter.

7.    In or around September of 2021, I was ordered by Mr. Hobbs to conduct a background check of Ahmaad White.

8.    Mr. White is African American.

9.    Upon completing the background check, Mr. Hobbs ordered me to go to the Hobbs Police Department, and to disqualify Mr. White if there was so much as a comma that did not match up with his LCSO application.

10.    I understood this to mean I was supposed to find a pretext that HPD could use to deny Mr. White's application.

11.    I immediately objected. I told Mr. Hobbs that what I was being asked to do appeared biased and wrong. Mr. Hobbs then laughed and said it was this was something "they" wanted and that it needed to be done. I understood "they" to mean Mr. Walker and Corey Helton.

12.    After talking to Mr. Hobbs I called Mr. White and informed him that I was concerned about racial bias in LCSO's handling of his application.

13.    I complained, through Aaron Rodriguez, about Michael Walker's drunk driving out of concern for the public's safety and LCSO's legitimacy.

14.    In regards to the CAC complaint, I did not yell "get over here," did not tell the child she had no choice about answering my questions, did not taunt the child, and did not act materially differently from other CAC interactions.

2

15.    While working at the UPS center in Hobbs, I observed Corey Helton walk in while I was preparing to leave on my route. Afterwards I was told by Aaron Rodriguez that Mr. Helton complained to UPS staff about UPS hiring me.

16.    The adverse employment action LCSO took against me and the continued blackballing have been emotionally and financially devastating. I have experienced long periods of unemployment and underemployment. Although I am currently employed at the Lovington Police Department, Mr. Helton and Ms. Luce's persistent efforts to harm my career have left my future in law enforcement deeply uncertain.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and recollection.


Date: 6/8/2026

Signed by:

B09D66446C53476...

Zane Brown

3

# EXHIBIT 2

**Ms. Ana Santana**

Date:          July 18, 2022
Time:          0816 - 0835  (On Duty)
Location:      Children Youth and Family Department
               907 W. Calle Sur St.
               Hobbs, NM 88240
Present:       Captain Victor Hernandez and Ms. A. Santana

Before beginning, I notified Ms. Santana of the reason for the interview and that I would use a digital recorder to memorialize the interview.

I asked Ms. Santana if she recalled the Child Advocacy Center (CAC) interview on June 15, 2022. Ms. Santana replied, "yes," and stated, "Inv. Brown, Ms. Lucero, Ms. Evon, (CAC advocate/receptionist), and herself were in the viewing room." I asked Ms. Santana how Inv. Brown's demeanor was that day, did he have a chip on his shoulder?  Ms. Santana replied, "no." I asked if she recalled Ms. Lucero asking Inv. Brown what the report number was going to be.  It's being alleged Inv. Brown said it's the same fucking report number as it was the first time.  Ms. Santana said Inv. Brown replied, "it's the same number as the last time," and she recalled he was trying to figure out if he was going to use the same report number because it was a different allegation.  She stated she didn't remember Inv. Brown using foul language.  I asked if she was sure Inv. Brown did not use foul language, and she replied, "I'm sure."

Ms. Santana stated she didn't recall any back and forth about leading questions between Ms. Lucero and Inv. Brown.  Ms. Santana did remember Inv. Brown was not angry, and there were conversations.  She said she was on her phone texting but didn't recall Inv. Brown becoming upset or angry.

I asked Ms. Santana if she recalled Inv. Brown using the "F'" word a lot in conversation.  Ms. Santana replied, "no" she heard him say it once but not constantly saying it, but she had heard him curse.

Ms. Santana stated Inv. Brown did ask the juvenile to come speak with him.  Ms. Santana said the juvenile did not refuse and came and spoke with them.  Ms. Santana recalled the juvenile saying she didn't feel comfortable with Inv. Brown.  Ms. Santana stated she did not remember the juvenile telling Inv. Brown that she did not like him, but she did mention it to me.  Ms. Santana stated that Inv. Brown did not raise his voice at the juvenile.  Ms. Santana recalled Inv. Brown saying I have to talk to you, but he did not say you don't have a choice.

Ms. Santana did remember Inv. Brown saying to the juvenile, "why don't you like me? I'm not the one who took your kids?" Ms. Santana did recall there was bantering back and forth in front of the juvenile regarding the child being in state custody.  Ms. Santana owned up to that and stated it was inappropriate, and they should not have talked about that in front of the juvenile because it is traumatizing.  Ms. Santana noted that the comment about the email was said in the observation room when the juvenile was absent.  The comment not made in front of the juvenile does not make it any less appropriate.

Regarding the interview with the juvenile, Ms. Santana said she and Inv. Brown were in the hallway near the observation room.  Ms. Santana stated the door leading to the lobby was closed but could not recall if the door to the observation room was open or closed.  Ms. Santana said Inv. Brown is the one who

Page **7** of **11**

initiated the idea of speaking with the child. Ms. Santana stated she only took notes, and there was no recording.

I asked again if she remembered Inv. Brown using the "F" word that day. Ms. Santana replied, "not that day and not with the child," but had heard him curse before.

I asked again if she remembered Inv. Brown becoming upset with Ms. Lucero regarding the leading questions. Ms. Santana replied, "no."

Ms. Santana later recalled her and Inv. Brown waiting for either Ivonne (advocate/receptionist for CAC) or Laura to get the juvenile. The door opened, the juvenile stood there, and Inv. Brown said, "Hey, come here, we need to talk to you." The juvenile stood there, "kinda like, you know, shy, I don't know but not ok, but she was gonna come and talk to us."

Ms. Santana advised that Inv. Brown was neither rude nor authoritarian toward the juvenile. Ms. Santana said Inv. Brown and her had not acted any different all the other times they have been to the CAC for interviews.

**Officer J. Jimenez**

Date:           July 20, 2022
Time:           0722 - 0727  (On Duty)
Location:       Hobbs High School, Room 203
                800 N. Jefferson
                Hobbs, New Mexico 88240
Present:        Captain Victor Hernandez and Officer J. Jimenez

Before beginning, I notified Officer Jimenez of the reason for the interview and that I would use a digital recorder to memorialize the interview.

Officer Jimenez recalled Officer Aguirre, Ms. Perez, Investigators Ibarra, and Brown being at the restaurant Delarosa on April 17, 2022.

I asked if she recalled Ms. Perez asking Inv. Brown that he needed to pay his bar tab. Officer Jimenez said she did not remember but later recalled Ms. Perez mentioning something about the drinks to Inv. Brown. Officer Jimenez said she didn't pay any more attention after she walked out. She said, "to be honest, I'm not going to say it word for word, but I don't know exactly what she said."

I asked Officer Jimenez again if she recalls Ms. Perez prompting Inv. Brown to pay for his drinks or to ask for his tab. Officer Jimenez replied, "no."

I asked Officer Jimenez if she recalled Inv. Ibarra staying behind. Officer Jimenez said, "yes." I asked if she knew why he stayed behind, and she responded, "I thought he was paying for his bill."

**File No. 1273-004**                                                              **MS_000266**

# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

ZANE BROWN,

      Plaintiff,                        No. 2:23-CV-00355-DHU-GJF

v.

LEA COUNTY BOARD OF
COUNTY COMMISSIONERS,

      Defendant.

## Declaration of Ivonne Etter

My name is Ivonne Etter. I am an adult over the age of 18. If called upon to testify I would competently do so as follows:

1.      I am currently employed by the United States Armed Forces, stationed in Germany.

2.      In June 2022, I was employed at the Child Advocacy Center ("CAC") in Hobbs, New Mexico.

3.      My co-workers at the time included Laura Lucero and Selena Savell

4.      Michael Walker has been president of CAC's board for approximately 8 years.

5.      In early to mid-June 2022, I was at work when Mr. Walker appeared at the CAC and asked to meet with Ms. Lucero and Ms. Savell.

6.      Mr. Walker's meeting request was unusual. Walker would sometimes appear at CAC for fundraisers and the like. But he was uninvolved in CAC's day-to-day operations, and I could think of no reason why he would wish to meet with line workers like Ms. Lucero and Ms. Savell.

7.      Once Ms. Lucero and Ms. Savell came out to the lobby, and Mr. Walker then led them to a back room, out of earshot.

1

8. Within a couple weeks after Walker's visit to the CAC, I began to hear rumors that an anonymous CAC employee (who some people believed to be me) had complained about Zane Brown's interactions with children at CAC.

9. Eventually, Ms. Lucero and Ms. Savell admitted to me that the complaint had come from them. However, they did not provide me with any details about Mr. Brown's alleged misconduct.

10. CAC provides a safe, comforting environment where children who have been victims of crimes can be interviewed by members of law enforcement.

11. During my time at CAC, I and other CAC staff members would, outside the presence of the interviewee, often ask investigators to soften their language, and caution them about topics that could trigger an emotional reaction.

12. That was true with Mr. Brown as well. I and other staff members provided feedback to Mr. Brown on several occasions about modifying his tone or choice of language in future interviews. For example, I suggested on one occasion that he refrain from making jokes during interviews.

13. From my observations, Mr. Brown responded well to CAC staff feedback.

14. Compared to other members of law enforcement who conducted witness interviews, Mr. Brown's demeanor and performance were wholly unexceptional.

15. Neither Ms. Lucero nor Ms. Savell expressed any concerns about Mr. Brown's competency or suitability to interview child victims prior to their meeting with Mr. Walker.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and recollection.

Date: 6/8/2026

Signed by:

Ivonne Etter

# EXHIBIT 4

**Investigator D. Ibarra**

Date:           July 6, 2022
Time:           1007- 1026 (On Duty)
Location:       Lea County Sheriff's Office – Captain V. Hernandez's Office
                1417 S. Commercial St, Lovington, New Mexico
Present:        Captain Victor Hernandez and Inv. D Ibarra

Before beginning the interview, I informed Inv. Ibarra of his *Garrity Rights* and protections under Article 14: NM Peace Officer Employer-Employee Relations (Peace Officer Bill of Rights).  Inv. Ibarra acknowledged his receipt and understanding by signing the department form.  I used a digital recorder to memorialize the interview.

Inv. Ibarra was not present at the CAC interview on June 15, 2022.

Inv. Ibarra does not recall hearing Ms. Perez's interactions regarding the bar tab with Inv. Brown.  He stayed behind to ensure his bill was paid.  I asked Inv. Ibarra, if he remembered the conversation between Ms. Perez and Inv. Brown regarding the bar tab.  Inv. Ibarra recalled hearing Pierpont's name, but it was regarding crossing the street.  I asked if he had his bar tab.  He stated he didn't know how the bar tabs were separated, but he remembered paying for them in the end.

I asked Inv. Ibarra if he heard the comment Inv. Brown made to Ms. Perez and Ms. Kesner regarding, "I could see why some women deserve to be hit?"   Inv. Ibarra stated, "no, not like that.  I know he was saying, 'cause, mmm, he says weird stuff sometimes, but nothing like deserving to be hit, that I remember."   I asked if Inv. Brown's demeanor was like that of a child regarding ditching class and complaining about the food.  Inv. Ibarra stated he did make comments like that, but we attended all the classes.

I asked Inv. Ibarra, as far as he knew, Inv. Brown's and his bar tab were included in the same bill.  Inv. Ibarra stated he believed he paid for both bar tabs but was not 100% sure.

**Investigator Z. Brown**

Date:           July 13, 2022
Time:           1442- 1541  (On Duty)
Location:       Lea County Sheriff's Office – Captain V. Hernandez's Office
                1417 S. Commercial St, Lovington, New Mexico
Present:        Captain Victor Hernandez and Investigator Z. Brown

Before beginning the interview, I informed Inv. Brown of his *Garrity Rights* and protections under Article 14: NM Peace Officer Employer-Employee Relations (Peace Officer Bill of Rights).  Inv. Brown acknowledged his receipt and understanding by signing the department form.  I used a digital recorder to memorialize the interview.

**File No. 1273-004**                                                          **MS_000263**

The interview began with the incident of the bar tab not being paid at the restaurant Delarosa. Inv. Brown denied Ms. Perez prompted him to pay his bar tab. Inv. Brown also denied he commented to Ms. Perez, "if he doesn't bring it, I ain't paying for it." Inv. Brown stated he and Inv. Ibarra paid for each other's drinks throughout the trip and Inv. Ibarra paid for the bar tab at the restaurant Delarosa. Inv. Brown stated that when he stood up after the meal Inv. Ibarra told him, "I got it big pimping." Inv. Brown said he walked out with Ms. Perez and Ms. Jessica Jimenez (HPD). Inv. Ibarra stayed behind and paid the bill.

I asked Inv. Brown if he commented in the presence of Ms. Perez and Ms. Kesner that some women deserve to be hit, including his wife. Inv. Brown said, "we were talking about how if a woman hits a man. In my personal opinion, if a woman has the balls to hit a man, she ought to accept the consequences of getting hit. I explained the situation with my ex-wife, how she would always beat me and tried to shoot me, and I never put my hands on her. I explained to them that I would always do my job regardless of how I feel."

We transitioned to the allegations at CAC. Inv. Brown stated he has six kids and knows how to speak with kids, and was never inappropriate or intimidating to the juvenile. He did not remember raising his voice to the juvenile. He admitted he told Ms. Santana (CYFD) that her email was anna@take yo kids.com, but the comment was made in the interview room, not in front of the juvenile. Inv. Brown said as far as saying, "fuck" he was being himself, but as far as being ugly to the juvenile, he stated he had no reason to be inappropriate to the kids.

Inv. Brown denied he was rude to Ms. Lucero. Inv. Brown explained that after Ms. Lucero finished her interview, she came out and asked Inv. Brown what questions she needed to ask. Inv. Brown said he asked Ms. Lucero if she could ask her if her dad had touched her inappropriately. Ms. Lucero then explained to Inv. Brown, she could not ask leading questions. Inv. Brown stated he responded, "I don't know what else to fucking do." Inv. Brown denied he demanded Ms. Lucero ask leading questions. He said he asked her if she could ask the question. Inv. Brown explained this was going to be the only way to ask the girl if her dad had touched her inappropriately. Inv. Brown denied becoming upset and did not bring up the DA to Ms. Lucero. Brown said he said we could contact the DA.

Inv. Brown denied telling Ms. Lucero, "it's the same fucking report number as the first time." He said he would never talk to her like that. Inv. Brown denied he raised his voice at the kid and demanded the child speak to him. Inv. Brown said that after the interview was complete, Ms. Santana talked to the juvenile and asked her directly about the allegations. Inv. Brown explained that the juveniles didn't like him because he lied to the juveniles at the scene. He explained that the kids asked if they would be taken away while on the scene of the shooting. Inv. Brown stated, that with the information he had at the time, he told them no and CYFD took custody of the kids after all. Inv. Brown said there was nothing ever derogatory said regarding the kids.

I asked again about the incident when he demanded the child speak with him. Inv. Brown said the only time he was rude and demanding was when the juveniles did not want them to see their tattoos at the Phoenix House. This incident did not occur on June 15, 2022. This was another CAC interview from a different disclosure.

Regarding the interview with the juvenile, Inv. Brown said Ms. Santana asked the questions, and it was not behind closed doors. Neither party recorded this interview.

**File No. 1273-004**                                                                                        **MS_000264**

# EXHIBIT 5

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

ZANE BROWN,

      Plaintiff,                                  **No. 2:23-CV-00355-DHU-GJF**

v.

LEA COUNTY BOARD OF
COUNTY COMMISSIONERS,

      Defendant.

## Declaration of Joe Clark

My name is Joe Clark. I am an adult over the age of 18. If called upon to testify I would competently do so as follows:

1.     I am Chief of Police at the Lovington Police Department ("LPD") in Lea County, New Mexico.

2.     Zane Brown applied for a job at LPD in or around 2024.

3.     One day, during Mr. Brown's application process, Lea County Sheriff Corey Helton appeared at my office and told me that we "need[ed] to talk." He then started on a monologue about the importance of keeping bad people out of law enforcement.

4.     It was apparent to me that Sheriff Helton was talking about Mr. Brown, although he did not refer to him by name.

5.     I pointed out to Sheriff Helton that we had not even hired Mr. Brown yet, and that he was still going through the application process like any other candidate. Mr. Helton then repeated his concerns.

6.     Eventually, Mr. Brown passed the background check and met the other qualifications to be hired as an investigator.

1

7.      Prior to Mr. Brown starting at LPD, I met with District Attorney Dianna Luce to ensure there were no *Giglio* or *Brady* issues that would affect her ability to prosecute his cases.

8.      DA Luce was adamant that she had no concerns about Mr. Brown's candor, and that he was not on any *Giglio* or *Brady* lists.

9.      DA Luce mentioned generally that Mr. Brown occasionally failed to show up for minor hearings or pretrial interviews and had sometimes failed to provide her office with videos from LPD's evidence department.

10.     However, these are the sorts of complaints that district attorneys frequently make about law enforcement officers. Nothing DA Luce said called Mr. Brown's competency into question.

11.     It should be noted that the District Attorney's Office can access LPD video footage online, without officer assistance.

12.     Mr. Brown started work at LPD in August 2024 and continues to be employed here. His job performance has been satisfactory.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and recollection.

Date: 6/8/2026

Signed by:

A285E3D1908D433...

Joe Clark

2

# EXHIBIT 6

**Monica Russell**

| | |
|---|---|
| **From:** | noreply@speakwrite.com |
| **Sent:** | Thursday, March 24, 2022 7:16 AM |
| **To:** | zbrown@leacounty.net |
| **Subject:** | [External] SpeakWrite Completed Job (6ac41a18973c47038465f28c49ba93cb-lewis_) (20220324_050102_pfz) |
| **Attachments:** | 6ac41a18973c47038465f28c49ba93cb-lewis_.doc |

==***CAUTION:* This email originated from outside of Lea County. Do not click on links or open attachments unless you recognize the sender and know the content is safe.***==



# Your Job Has Been Completed Zane.

Your SpeakWrite job has been completed and it is attached to this message.

SpeakWrite job number: **20220324_050102_pfz**

Custom file name: **6ac41a18973c47038465f28c49ba93cb-lewis_**

To access your completed document just double-click on the attached file.

To download your audio transcribed for this job click here. Then click on Download Audio.

 

Please rate this job:

Speaker 2:     So, are we gonna try to get him on that phone right now, or what, the DA, somethin'?

Other Speaker:     Oh, the, the Texas DA?

Speaker 2:     Anybody.

Other Speaker:     I mean, I tried to call him before, I gave him a ****.

Speaker 2:     Uh huh.

Other Speaker:     So, I'll keep tryin' to get ahold of him.  See if I can't get Archie, or whatever the fuck that dude's name is, uh, but yeah, I mean, I can get, I think it'll be pretty easy once I get back to the office to figure out what I, I'm doin' on this unlawful taking in Hobbes, and, you know, if I can get rid of it, I'm happy to get you somethin' in writing.

Speaker 2:     See, you're, you're, you're, you're sayin' that dealing with Texas is gonna be a whole lot easier than it is with your own people.

Other Speaker:     No, I think I can deal, deal with my own people so much easier 'cause I can get ahold of my people.

Speaker 2:     Uh huh.

Other Speaker:     I can't get ahold of Texas, so, no, I think, uh, but I need to get back to the office, figure, and look, look at this case, get into it, and then go from there, and then if I can get rid of it, I'm happy to get you something in writing.  Stand up, you know, either we will not file it or if it's been filed, we'll just **** forward, but I need to, I need to get back to the office and look at it first, so, and then type something out verbal for us to sign, so I'll get it in writing for ya.

Investigator Brown:     So, Texas would have to do their own paperwork, too, for him to –

Other Speaker:     Take the –

Investigator Brown:     – take the probation –

Speaker 2:     It'd take 5 minutes.

Investigator Brown:     If you can get ahold of 'em.

Other Speaker:     Yeah, that's –

Speaker 2:     That's the thing about Texas, you know, we, there's not a lot of red tape.

Other Speaker:     Yeah, so, no, and, you know, I'd like to figure out what I'm doin' with this case 'cause if, like you said, it directly affects your Texas case if I can tell 'em either hey, I'm

# EXHIBIT 7

Transcript of Corey Helton
Conducted on January 27, 2026

1 (1 to 4)

IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF NEW MEXICO

---------------------------x

ZANE BROWN,                     :

        Plaintiff,             :

   vs.                          : Case No.:

LEA COUNTY BOARD OF COUNTY   : 2:23-CV-00355-DHU-GJF

COMMISSIONERS, COREY          :

HELTON, and MICHAEL WALKER, :

        Defendants.           :

---------------------------x

DEPOSITION OF COREY HELTON

Conducted Virtually

Tuesday, January 27, 2026

2:39 p.m.

Job No.: 618183

Pages: 1 - 77

Recorded By: Sedrick Lampkins

Deposition of COREY HELTON, conducted virtually

Pursuant to Notice, before Sedrick Lampkins, Notary Public in and for the State of Texas.

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:

    BENJAMIN GUBERNICK, ESQUIRE

    WALDO GUBERNICK LAW ADVOCATES, LLP

    717 Texas Avenue

    Houston, Texas 77002

    346.394.8056

ON BEHALF OF THE DEFENDANTS:

    HALEY R. GRANT, ESQUIRE

    MYNATT SPRINGER, P.C.

    1660 Hickory Loop

    Las Cruces, New Mexico 88005

    575.524.8812

ALSO PRESENT:

    DOMINIC ADAMS - Videographer

C O N T E N T S

EXAMINATION OF COREY HELTON                PAGE

    By Mr. Gubernick                         6

E X H I B I T S

    (None marked)

Transcript of Corey Helton
Conducted on January 27, 2026

PROCEEDINGS

THE VIDEOGRAPHER: Here begins Media Number 1 in the videotaped deposition of Corey Helton in the matter of Zane Brown vs. Lea County Board of County Commissioners, Corey Helton, and Michael Walker in the United States District Court for the District of New Mexico, Case Number 2:23-CV-00355-DHU-GJF. Today's date is January 27, 2026. The time on the video monitor is 1439, that is, p.m., Central Standard Time. All parties of this deposition are attending remotely.

Would Counsel please voice identify themselves and state whom they represent?

MR. GUBERNICK: Ben Gubernick, Counsel for Zane Brown.

MS. GRANT: Haley Grant, Attorney for Defendants.

THE VIDEOGRAPHER: The court reporter for today is Sedrick Lampkins, also representing Planet Depos. The witness will now be sworn.

THE REPORTER: I am a notary authorized to administer oaths. And this deposition will be recorded by electronic means. All parties understand and agree that any certified transcript produced from the recording of this proceeding is intended for all uses under applicable procedural and evidentiary rules and laws and shall constitute written stipulation. The parties stipulate to the use and certification of this testimony consistent with applicable law of such. Hearing no objection, I will now swear in the witness.

Please raise your right hand, sir. Do you solemnly swear or affirm, under the penalties of perjury, that the testimony you shall give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

THE REPORTER: Counsel, You may proceed.

Whereupon,

COREY HELTON,

being first duly sworn or affirmed to testify to the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFF

BY MR. GUBERNICK:

Q    All right. Sheriff, nice to -- nice to see you again. Can you see me okay?

A    Yes.

Q    Okay. Or hear me okay.

A    Yes.

Q    Doesn't matter.

A    Both.

Q    Same meaning. Okay. All right. We -- we talked pretty recently, so I'm going to skip a lot of the preliminary stuff, but what did you do to prepare for your deposition today?

A    What have I done? I spoke to our attorney, Haley, the other day is all.

Q    Okay. And I'm not interested in the content of any conversations you had with Ms. Grant. But how long did you talk to Ms. Grant for?

A    About 20 minutes or so.

Q    Was that over the phone or --

A    Yes.

Q    -- where? Okay. Have you reviewed any documents?

A    No.

Q    Okay. Why don't you like Zane Brown?

A    Never said I didn't.

Q    Yeah, you did. I -- I deposed you a few weeks ago. You told me you didn't like him.

A    I don't recall that. I don't know.

Q    You don't know what?

A    I -- I don't understand the question. Whether I like him or not, what's that got to do with anything?

Q    I mean, that's -- I'm the one asking the questions. You just have to answer them.

A    I really have no opinion of him.

Q    Okay. How long have you known Zane Brown?

A    I was elected in 2018, so from June of 2018 until current.

Q    You didn't know him before then at all?

A    No.

Q    Had you ever heard about him?

A    I heard his name, but I didn't know him personally.

Q    Okay. All right. So prior to -- let's say prior to 2021, so '18, '19, '20, any issues at all with Zane Brown?

A    Not that I recall. I believe he was an investigator. The only time that -- that -- the one thing that comes to mind is the incident where he shot the dog in the backyard, and, you know, he took some social media abuse over that. But other than that, I don't recall any.

Q    He shot a dog in the -- in the yard?

A    Yes.

Q    Was that something wrong, or was that a good shooting to --

Transcript of Corey Helton
Conducted on January 27, 2026

9

A   It was good, but -- it was good.

Q   It's just bad optics.

A   Yes.

Q   Okay. All right. So it wasn't a disciplinary matter or anything. It was just -- sounds bad.

A   No discipline.

Q   Okay. Were you aware of any -- and so, you weren't aware of any other disciplinary issues prior to 2021?

A   No.

Q   To your knowledge, he was a competent detective?

A   At the time, yes.

Q   Okay. Did he receive any good conduct awards to your knowledge?

A   I don't recall.

Q   Okay. Can you name one bad thing -- well, okay. Aside from people posting on social media about shooting the dog, can you name one bad thing anybody had to say about him prior to 2021?

A   Prior to 2021, I don't recall any.

Q   Okay. All right. And you know Ahmaad White, correct?

A   I do.

10

Q   Okay. And you've known Ahmaad White, I'm assuming, for a very long time, right?

A   I would agree with that. Yes.

Q   Were you two detectives at HPD at the same time, or did you -- did you miss each other?

A   No. I -- I believe we were detectives at the same time.

Q   Okay. What's your -- what's your view of Ahmaad White? Is he a good person?

A   At the time, yeah. He was a good guy. Worked a lot of years with him. And, you know, we were on the SWAT team together. We taught firearms together. So, yeah, I would -- at the time, considered him a brother.

Q   Okay. Did you consider -- while you were both at HPD, did you consider him to be a competent law enforcement officer?

A   I did.

Q   Did you like being around him?

A   Yes.

Q   It's fair to say most people like being around Ahmaad White, correct?

A   I'd say that, yes.

Q   He's a fun guy to hang out with.

A   Yes.

11

Q   Okay. How do you feel about Ahmaad White now?

A   My opinion has changed.

Q   How has it changed?

A   Just the knowledge of some other issues that has happened over the last several years.

Q   Well, let's -- let's -- let's try to get into some specifics here. What other issues?

A   Well, other than applying here, he was under federal investigation for public corruption.

Q   Okay. What was that about?

A   You'd have to talk to the FBI.

Q   And that go anywhere, to your knowledge?

A   Not that I'm aware of.

Q   Okay. So anything else?

A   Not on that.

Q   Okay. So he applied to work for you guys, right?

A   He did.

Q   Okay. And Zane Brown voiced some concerns about the application process, right?

A   I -- I don't know for sure that. It's not in my wheelhouse.

Q   Well, what was your involvement, if any, in the hiring process?

12

A   At that stage, I -- the only part of the hiring process that I'm involved in is, once the decision to hire him has come, I have an interview with that candidate.

Q   Okay. So that's how it's supposed to work. But is that how it worked here?

A   It's how it's been since I've been here. I don't get involved with the hiring process.

Q   Did you know he was applying prior to --

A   I did.

Q   Okay. When did you find out he was applying?

A   I don't remember. You guys have the dates. He just -- he applied, and then was going through the process.

Q   I -- I'm not asking for the dates. I'm trying to figure out when, during the process, you learned he was applying.

A   I couldn't say. I -- I don't know if it was after the application was submitted. I couldn't answer that.

Q   Okay. Did you talk to anyone at HPD about Ahmaad White's application?

A   Me?

Q   Yeah.

Transcript of Corey Helton
Conducted on January 27, 2026

A   I heard that, but I don't know that for sure.

Q   Who'd you hear that from?

A   It was just word around here.

Q   Okay.

A   Walk into conversation. So I don't know for sure.

Q   Is this that Zane, Zane, Zane thing you were talking about?

A   I don't remember when this all -- I think this started, a lot of it --

Q   Okay.

A   -- but there was another name. Wasn't there a Chris Henderson? I remember a name Chris Henderson, but I don't remember how he played into it.

Q   Chris -- isn't that, like, a murder case, or am I thinking of something else?

A   It was part of that. I don't remember.

Q   Because was Chris Henderson the person who was accused of -- the DJ who was accused of shooting up a house, or am I --

A   No, I don't -- I thought that name Chris Henderson was on some of the complaint -- of the original complaint.

Q   Okay.

A   But I don't know for sure. But --

Q   Yeah.

A   -- again, that's -- that's the way it came in, through an email.

Q   Okay. Oh, you know, I think I remember what you're talking about. It was, like, a name or something in the email address. But, you know --

A   Yes. And I still don't know --

Q   -- I think it was the FBI.

A   Yeah, and I still don't know who that is.

Q   Okay, I got you. So how did Cody Rogers come to be the person who investigated all that?

A   Well, it's the undersheriff, so I think I had spoken to a couple of the deputies that were involved. And it just -- I kept hearing that Zane was, kind of, behind the scenes trying to talk to people about me interviewing them. And I just decided that the best thing that I could do was get the county to bring in an outside investigator.

Q   Okay. So how did you go about getting the county to bring in an outside investigator?

A   I went over to John Caldwell, the county manager -- or the county attorney's office, and asked him.

Q   Okay. And he's the --

A   How he picked Cody Rogers -- I just --

MS. GRANT: And, Sheriff, if you would please refrain from talking about any conversations that you had with John Caldwell.

THE WITNESS: Okay.

MR. GUBERNICK: Okay.

MS. GRANT: Go ahead.

Q   All right, so I just so I have a -- make sure I'm misunderstanding your answer, you weren't the person who picked Cody Rogers.

A   That's correct, I did not.

Q   Okay. All right. So you -- you learned or heard rumors that Zane Brown was, what, agitating about -- about this or what?

A   That's -- that's what I kept hearing. I kept hearing he was telling people to tell the truth. That they -- who -- somebody told me that -- that they would be -- what was the wording I heard? They would be -- I don't know. What's the word? I'm having a mental block here. Something about, I won't sue you if you testify and assert -- or if you tell the sheriff a certain thing. Again, I don't know the facts. That's just what --

Q   You mean immunized?

A   Do what?

Q   You mean -- you mean immunized? What do you mean?

A   No. I will keep you from being immune from the lawsuit.

Q   Okay.

A   That's the word I heard. If -- if you tell the truth or you do this. And the sheriff's going to talk to you because he's already talking to a couple of these deputies. You'll be immune from my lawsuit or prosecution or something to that effect. And I don't remember who that came from. It just seemed like that's what everybody in this office was talking about. So I requested the county bring in an independent investigator and let them handle it.

Q   Okay. And that -- can we agree that, you know, if your undersheriff is actually driving drunk, I mean, that's a big problem, right?

A   Yes. Yes. Absolutely.

Q   Huge problem.

A   Yes.

Q   He can't serve in that role, right?

A   Well, if -- yeah, if he's guilty of it.

Q   Right. So if he's doing it, you can't --

# EXHIBIT 8

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Robert Blanchard
Conducted on August 5, 2025

1 (1 to 4)

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF NEW MEXICO

--------------------------------x

ROBERT BLANCHARD,                :

         PLAINTIFF,     :

  v.                             : Case No.:

THE CITY OF HOBBS, LEA COUNTY    : 2:24-cv-00900-

BOARD OF COUNTY COMMISSIONERS,   : KWR-GJF

        DEFENDANTS.     :

--------------------------------x

CONTAINS CONFIDENTIAL PORTIONS

DEPOSITION OF ROBERT BLANCHARD

Hobbs, New Mexico

Tuesday, August 5, 2025

9:00 a.m.

Job No.: 592029

Pages: 1 - 233

Recorded By: Lisa Gross

---

**Page 2**

Deposition of ROBERT BLANCHARD,

held at the offices of:

CORE (Center of Recreational Excellence)

4827 N. Lovington Highway

Hobbs, New Mexico 88240

Pursuant to Notice, before Lisa Gross,

Notary Public in and for the State of New Mexico.

---

**Page 3**

A P P E A R A N C E S

ON BEHALF OF THE DEFENDANT, LEA COUNTY BOARD OF

COUNTY COMMISSIONERS:

    ALAN J. DAHL, ESQUIRE

    MYNATT SPRINGER P.C.

    1660 Hickory Loop

    Las Cruces, NM 88005

    (575) 524-8812

ON BEHALF OF THE DEFENDANT, THE CITY OF HOBBS:

    LUCAS WILLIAMS, ESQUIRE

    GWYN POWERS, ESQUIRE

    HINKLE SHANOR LLP

    400 N Pennsylvania Ave.

    Roswell, NM 88201

    (575) 622-6510

ON BEHALF OF THE PLAINTIFF, ROBERT BLANCHARD:

    BENJAMIN GUBERNICK, ESQUIRE

    WALDO GUBERNICK LAW ADVOCATES LLP

    717 Texas Avenue, Ste. 1200

    Houston, TX 77002

    (346) 394-8056

---

**Page 4**

C O N T E N T S

EXAMINATION OF ROBERT BLANCHARD                PAGE

  By Mr. Dahl                                 7, 216

  By Mr. Williams                              111

E X H I B I T S

(Attached to transcript)

DEPOSITION EXHIBIT                             PAGE

Exhibit A   Discovery Responses to              23

        Interrogatories

Exhibit B   Letter from John Ortolano Re: Robert  26

        Blanchard - Letter of Counseling

Exhibit C   Blevins letter                      39

Exhibit D   Captain Garrett's report to         54

        Chief Fons

Exhibit E   Captain Garrett letter of reprimand  63

Exhibit F   Plaintiff's Initial Disclosures     112

Exhibit G   Plaintiff's Complaint               116

Exhibit H   Hobbs Police Department Background   142

        Investigation

Exhibit I   Letter from Robert Blanchard to     151

        Captain Danny Garrett, Confidential

CONFIDENTIAL PORTIONS

Page 151, Line 10 to Page 155, Line 3

---

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Robert Blanchard
Conducted on August 5, 2025

Q   I'm sorry.  Did you have something else?

A   No.

Q   Okay.  And obviously, aside from that discipline that he founded, did you have any other issues with Michael Walker while you worked at HPD?

A   No.  I -- I -- I liked Michael Walker. I always thought that he was a good leader.  He -- he's the kind of person that had charisma that -- the kind that I gravitated towards, and I thought that I -- I wanted to be a part of the team that he was leading.

Q   And you're aware that Michael Walker is the undersheriff over at Lea County right now?

A   Yes.

Q   Does Michael Walker play any role, that you're aware of, in the lawsuit that you're bringing?

MR. GUBERNICK:  Object to form.

THE WITNESS:  I -- I'm sorry.  I don't know what that means when -- when that happens.  I don't know what I'm supposed to do.

BY MR. DAHL:

Q   I can -- I -- I'll -- I'll explain, unless Ben wants to.

MR. GUBERNICK:  I -- I can explain. I'm just -- I'm just making an objection for the record to preserve it so we can deal with it later.  Unless I direct you not to answer the question, you still have to answer the question.

THE WITNESS:  Yes, sir.

BY MR. DAHL:

Q   So let me rephrase it.  Are you aware of Michael Walker playing any role in the facts that underlie your current lawsuit?

MR. GUBERNICK:  Object to form.

THE WITNESS:  I -- I have a belief. I'm not certain.

BY MR. DAHL:

Q   Okay.  And what is your belief?

A   My belief is that -- and I can't remember who it was.  If it was him, Sheriff Helton, or both of them that had told me before the background investigation had started on Zane Brown that he was unqualified to be an officer and that when I did his background investigation, I was going to be able to see that when I reviewed his file for discipline, his disciplinary file.

Q   Okay.  Let me go ahead and introduce an exhibit.  These are just your responses to some of our discovery.  We call them interrogatories.  I don't know if you recall these.

MR. DAHL:  I'm going to mark this as Exhibit A.

(Exhibit A was marked)

MR. GUBERNICK:  It's a big table.

MR. DAHL:  It is a very large table. Let's see here.

MR. WILLIAMS:  Ben, would you like your own copy?

MR. GUBERNICK:  Yes.  If you have an extra, otherwise we're about --

MR. DAHL:  At least you're six feet tall.  I'm trying not to be too aggressive.

BY MR. DAHL:

Q   All right.  So if you'll look at this Exhibit A, Robert, and if you'll go to Page 3.

A   Uh-huh.

Q   At the bottom of Page 3, there's a paragraph that starts, Around this time.

A   Uh-huh.

Q   Do you see that?

A   Yes.

Q   It says, Around this time, Helton approached Plaintiff.  Plaintiff being you, correct?

A   (No audible response).

Q   Separately and told Plaintiff he heard Brown was in the hiring process at HPD.  Helton told Plaintiff that when Plaintiff does a review of Brown's background, Plaintiff would find disqualifying information.

Did I read that correctly?

A   You did.  Yes.

Q   So in that description, you indicated that it was Helton who had told you that you would find disqualifying information, right?

A   Yes, that's correct.

Q   But your testimony today is it may have been Undersheriff Walker that you had that conversation with?

A   I'm saying he may have been present, yes.

Q   Okay.  Let me get clarification of that.  So though -- the comment that you might find disqualifying information, are you testifying that Sheriff Walker -- excuse me -- Sheriff Helton said that and that Sheriff -- Undersheriff Walker may simply have been present?

A   Or vice versa.  Yes.

Q   Okay.  So one of them, Undersheriff

25

Walker or Helton said that, but you don't recall which one specifically?

A   Specifically, yeah.

Q   Okay. I just wanted clarification on that.

So going back to that discipline that Undersheriff Walker, who was -- what was his rank at that point in time with HPD?

A   He was a captain. Oh, he was a captain of Criminal Investigations Division.

Q   Okay. So the Captain Walker affirmed. What was the outcome of that? Was it ever --

A   Yes. So the outcome was he didn't allow me to call a witness to present evidence, which would have been Nathan Eubank. And he told me that he was going to uphold the discipline because it was Sergeant Keenan's belief or perception of what happened.

Q   And do you recall that discipline ever being overturned?

A   Yes.

Q   When was that?

A   I -- I don't remember the year, but it was when John Ortolano became the police chief.

Q   I'm going to go ahead and introduce

26

another exhibit that might refresh your memory.

MR. DAHL:  We'll mark this as Exhibit B.

(Exhibit B was marked)

MR. WILLIAMS:  Paper airplanes are not on your phone.

BY MR. DAHL:

Q   All right. Do you recognize this document, Robert?

A   I don't think that I have ever seen this document.

Q   Okay. Well, I'll just represent to you then that this is a memo by Chief Ortolano rescinding that discipline. And can you tell me the date on it?

A   August 31st, 2021.

MR. GUBERNICK:  I'm just going to object or just ask for clarification. Is this a one-page document? Looks like there's supposed to be a second page here.

MR. DAHL:  I believe it is just a one-page document.

MR. GUBERNICK:  Okay. The last paragraph ends in kind of an awkward way.

MR. WILLIAMS:  These guys aren't English majors.

27

MR. GUBERNICK:  Well, I know that. I think that's why I'm saying I'm not -- that's just -- I don't necessarily know that. I just -- I'm -- I don't really even care much. I'm just wondering if there was a second page to it or not.

MR. DAHL:  I -- I don't recall one, but if there is one --

MR. GUBERNICK:  Okay.

MR. DAHL:  -- I'm not introducing it.

MR. GUBERNICK:  All right. That's -- that's fine.

BY MR. DAHL:

Q   So Robert, is this -- if you'll look over this document for just a second, is this consistent with your recollection of John Ortolano and his decision to rescind that discipline?

A   He never talked to me about the decision. I think it was Eubank who told me, hey, yeah. They put a letter in your file about that.

Q   So you didn't approach the new chief to challenge that prior discipline?

A   Yes, I did.

Q   Okay. And this would have been seven years after that discipline had occurred?

A   Yes.

28

Q   And just to be clear on the nature of the discipline, was it just a written reprimand, or was it -- was there a suspension involved?

A   There was no suspension involved. It's just a -- a -- it says here, Letter of Counseling, but bears the same weight as a reprimand.

Q   Okay. And I was going to ask about that as well. I see Hobbs refers to letters of counseling, but you're telling me a letter of counseling and a -- a written reprimand are the same thing?

A   They're not the same thing, but they bear the same weight. It counts as previous discipline.

Q   Okay. What is the difference between a letter of counseling and a letter -- a written reprimand?

A   That's a good question that has never been formally answered, even though asked.

Q   Okay.

A   Okay. My understanding of it is -- is that these were not supposed to initially count as formal discipline, but it had ended up carrying the same weight and -- and held against officers.

Q   With respect to you approaching Chief

# EXHIBIT 9

Transcript of Diana Jurado
Conducted on March 9, 2026

1 (1 to 4)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

---------------------------x

ZANE BROWN,                     :

              PLAINTIFF,        :

   v.                           : Case No.

LEA COUNTY BOARD OF COUNTY      : 2:23-CV-00355-DHU-GJF

COMMISSIONERS, COREY HELTON,:

and MICHAEL WALKER,             :

              DEFENDANTS.       :

---------------------------x

DEPOSITION OF DIANA JURADO

Conducted virtually

Monday, March 9, 2026

10:29 AM

Job No.: 624435

Pages: 1 - 82

Recorded By: Steven Barry

Deposition of DIANA JURADO, conducted virtually.

Pursuant to Notice, before Steven Barry, Notary Public in and for the State of Maryland.

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:

    BENJAMIN GUBERNICK, ESQUIRE

    WALDO GUBERNICK LAW ADVOCATES LLP

    717 Texas Avenue, Suite 1200

    Houston, TX 77002

    (346) 394-8056

ON BEHALF OF THE DEFENDANTS:

    HALEY R. GRANT, ESQUIRE

    MYNATT SPRINGER P.C.

    1660 Hickory Loop

    Las Cruces, NM 88005

    (575) 524-8812

ON BEHALF OF THE WITNESS:

    CHELSEA R. GREEN, ESQUIRE

    HINKLE SHANOR, LLP

    400 North Pennsylvania Avenue, Suite 640

    Roswell, NM 88201

    (575) 622-6510

C O N T E N T S

EXAMINATION OF DIANA JURADO                    PAGE

    By Mr. Gubernick                            5

    By Ms. Grant                               75

E X H I B I T S

    (None marked)

Transcript of Diana Jurado
Conducted on March 9, 2026

water you drink, how long it's been. I don't --

BY MR. GUBERNICK:

Q   Okay. Well, let's imagine, you know, you're doing a DWI stop and you pull someone over and they're indicators of intoxication, but they're like, no, no, I'm fine. I -- I -- I -- I chugged a bottle of water before I got behind the wheel. How is that going to influence your investigation?

MS. GRANT: Object to form. Foundation.

MS. GREEN: Yeah. Same objections.

THE WITNESS: It'll influence it, yes, but again, it's the totality of what I'm seeing. And I mean -- yes, to answer your question, it would influence it. Yes.

BY MR. GUBERNICK:

Q   In what way?

MS. GREEN: From. Foundation.

MS. GRANT: Join.

THE WITNESS: Well, it depends on how they were acting. What I could see, what -- I mean, what I stopped them for. If they were driving erratically. I mean, then I could say, okay, well, a bottle of water probably wasn't sufficient, you know, but I'd have to be -- I'd have to see more. That couldn't just be what you're telling me right now. I'd have to see a lot more.

BY MR. GUBERNICK:

Q   Okay. And in fact, that someone would chug a bottle of water to try and make themselves safe to drive, that -- that, in fact, suggests this person is not safe to drive, right?

MS. GREEN: Form. Foundation.

MS. GRANT: Join.

THE WITNESS: That they chugged one bottle of water. I'm sorry. I'm trying to process your question.

BY MR. GUBERNICK:

Q   So I'm -- I'm just paraphrasing what Michael Walker tells me. He had a bunch to drink, he didn't think he was safe to drive, or he was at least concerned enough about it that he grabs -- that he orders some water and chugs that before getting behind the wheel. Can we agree that if someone feels the need to sober up or to do something to sober up, they are probably not safe to drive?

MS. GREEN: Form. Foundation.

MS. GRANT: Join.

THE WITNESS: I can agree with that.

BY MR. GUBERNICK:

Q   Okay. So based on that hindsight 2020, can we agree Zane Brown may well have been right about Michael Walker driving drunk?

MS. GREEN: Form. Foundation.

MS. GREEN: Join.

THE WITNESS: I would -- I would have to disagree with that, because again, I have no -- I can't tell you if Michael was drunk because I didn't see him drunk.

BY MR. GUBERNICK:

Q   Right. But my -- my -- my question was, can we agree that Zane Brown -- okay. Let me ask like this. Can we agree that Zane Brown may have been right.

MS. GREEN: Form. Foundation.

MS. GRANT: Object to form. Foundation.

THE WITNESS: Zane -- can you -- can you tell me what Zane's complaint was that he was --

BY MR. GUBERNICK:

Q   Michael Walker drove drunk after your birthday party.

A   And Zane said this because he was there at my party? I guess I'm confused as to where his complaint came from, because I was there and I didn't see him -- I didn't see Michael drunk, so that's --

Q   Okay.

A   -- why I'm trying to figure out the complaint. I'm sorry, I'm kind of confused.

Q   Okay. Whoever it is complained that Michael Walker may have been drunk and driven drunk after your birthday party, based on what I just told you about Michael Walker's statements under oath, that person may well have been right?

MS. GREEN: Form. Foundation.

MS. GRANT: Join.

THE WITNESS: That he drove --

BY MR. GUBERNICK:

Q   Yes.

A   I mean, hypothetically, could Zane have been right? Yes. Yeah. The way that you're saying it, yeah. I mean, Zane could have been right, yes.

Q   Okay. All right. So this -- this falling out with -- with Zane -- let me -- let me ask you like this. You mentioned earlier that there was an instance when Zane Brown lied about you not being assigned to a homicide case?

A   Not going out to the homicide case, yes.

Q   By going, you mean going to the scene?

A   Correct.

Transcript of Diana Jurado
Conducted on March 9, 2026

13 (49 to 52)

49

Q   Okay. So what did Zane lie about exactly? Just -- just so I understand.

A   From my knowledge, from what I heard that day, he told the sheriff that -- he told the sheriff one thing, and then he told Chief Martinez a separate thing about why I was not on there. The first one I can say I heard with my -- like, myself. The second one was what Chief Martinez told me Zane said about why I was not there.

Q   What's the one you heard yourself?

A   The one I heard myself, if I remember correctly, it was along the lines of, she does her own thing, she works at sex crimes. Something along those lines. I could be -- it's been a while. I don't remember exactly what he said, but I do remember getting up and interrupting that conversation and saying, no. I just wasn't called out to it. I was the only one that didn't get a callout.

Q   Okay. So just generally, when there's a homicide, are multiple detectives called out to it?

A   Right. They all have to come out to it. They're all called out to it.

Q   Okay. When you say all, we're not even just talking about the people on duty. All the

50

investigators are, drop what you're doing. Go to the scene, right?

A   Correct. Until -- until further notice. If you're not needed, or until you're dismissed by the sergeant or the person in charge, then they're like, okay, you guys can go home. But yes, we all have to go out to the scene. That's the way it was when I was there.

Q   Okay. I mean, again, I don't expect you to know if that's still the way it is now. I'm just trying to understand when you were in CID. All right. So do you remember who this -- who this homicide victim was?

A   No, I was not involved in that homicide at all.

Q   Okay. Well, did -- why didn't you go out there?

A   I wasn't called out there. Nobody --

Q   But you said that all the investigators go out there. Did you not know there was a homicide?

A   Correct.

Q   No one told you?

A   Nobody called me on it, no.

Q   Okay. You -- okay. So you had no

51

awareness of a homicide until how long afterwards?

A   I believe after I saw it -- if I remember correctly, maybe after I saw it on the staff report, or an email. Possibly an email. I don't recall exactly how I found out.

Q   Okay. So, remind me, who did you hear Zane complaining about this to?

A   To the sheriff.

Q   Okay. So he's talking to Helton, and then you interject and say, no, I wasn't there because I didn't get called out?

A   Correct.

Q   Okay. And then you mentioned there was another, I guess, story that you heard secondhand that contradicted that one. What was that?

A   I believe after that, before I filed my complaint, I talked to our chief, and I asked him directly because I wanted to know if there was a mix-up, if -- before I filed a complaint against Zane, I wanted to know what was going on. And he told me that when he was on scene, he asked -- Chief Martinez asked where I was at, because it is uncommon for not all investigators to be out on a scene of a homicide. And he said that Zane had mentioned -- this is from my recollection, he had

52

mentioned that I couldn't come out because I was at home.

Q   Okay. Is that J.W. Grady?

A   The chief?

Q   Yeah.

A   No. Chief Martinez.

Q   Okay. Chief Martinez. Yeah.

A   John Martinez.

Q   So is he -- is he the -- is -- so was he the chief deputy over CID at the time?

A   Correct.

Q   Okay. I understand.

A   He also goes out to the scenes. So the chief, the sergeant, and all the investigators will go out to a homicide scene.

Q   Okay. So the thing that -- all right. I think I understand. When did you -- you mentioned a while ago you thought you'd had a conversation with Michael Walker about the -- the birthday party drunk driving thing, but then you -- you -- you thought it was actually the sheriff?

A   Yeah, I -- I take that back because I -- I don't know why I thought it was Michael, but it couldn't have been --

Q   It's fine. It's fine. I'm not trying to -

53

- I'm not trying to trap you. I just wanted to know. Did you ever, to your recollection, talk to Michael Walker about the birthday party drinking allegations?

A   If I remember correctly, we talked about it recent -- not recently. It was whenever there was a video posted of us -- of all -- my party on social media. And so I believe we may have discussed that, but it wasn't anything about Zane in particular. It was just about the party.

Q   Okay. When was it posted on social media?

A   I don't -- I don't remember. It was posted maybe -- was it last year, maybe? It could have been last year.

Q   So it was posted well after the party?

A   Yes, well after. Michael and I didn't talk about Zane or the party or anything like that. I talked to the sheriff about it, but that was it.

Q   Okay. When you talked to the sheriff, did the sheriff -- okay. So you have a conversation with the sheriff, and Sheriff Helton asks you if Michael Walker was at the party. Is that a fair statement?

A   Yes, that's a fair statement.

Q   Did the sheriff mention anything about

54

Zane Brown during that conversation?

A   To my recollection, no, he hadn't. He just asked me to make a statement or write a statement. And I can't even say if it was him because I know I didn't talk to Cody. I didn't meet Cody until way after, and I don't -- I don't know if it was my chief or the sheriff, but I do remember somebody asking me, can you write a statement about everything you saw? And -- but I don't recall if it was the sheriff that asked me that, but then I don't even know if I submitted it because nobody interviewed me or asked me anything else about it. I wasn't -- I wasn't even -- like nobody followed up with that with me. I know a lot of people may have been involved, but nobody asked me anything about it, so I wasn't directly involved with the Zane situation. Not that complaint. My only complaint with Zane was the one we were discussing, and that's the issue that I had with Zane.

Q   Can we agree that if a -- if someone in a leadership position at the sheriff's office does drive drunk, that would be a big deal, right?

MS. GREEN: Form. Foundation.

MS. GRANT: Join.

55

THE WITNESS: Yes, it would be a big deal.

BY MR. GUBERNICK:

Q   Okay. In fact, it would be a big deal if anybody at the sheriff's office drives drunk, right?

A   Of course.

MS. GRANT: Same objections.

MS. GREEN: Yeah. Same objections. Sorry.

BY MR. GUBERNICK:

Q   Does it seem strange to you that nobody asked you how much Michael Walker had to drink?

MS. GREEN: Form.

MS. GRANT: Same objections.

THE WITNESS: No, I don't believe it was strange. Solely because there was so many people at my party and I just -- since I didn't really interact with him as much, maybe I assumed that's probably why I wasn't asked. I know there was several deputies of different ranks. Several supervisors were there. Michael was, yes, the one that had the most rank there, but he wasn't the only supervisor there. There was several others. So I believe that's probably why I was not asked if I could -- if I could explain that, I mean, in a sense.

56

BY MR. GUBERNICK:

Q   Is it -- well, have you ever seen things swept under the rug at LCSO?

MS. GREEN: Form. Foundation.

MS. GRANT: Join.

THE WITNESS: No.

BY MR. GUBERNICK:

Q   Chan Kim says it happens all the time. What do you think about that?

MS. GREEN: Form. Foundation.

MS. GRANT: Join.

THE WITNESS: I believe that's his opinion, and he is of a higher rank. So maybe he knows things I don't know. I don't have rank there.

BY MR. GUBERNICK:

Q   Do you know Chan Kim?

A   I know of him, yes.

Q   Do you know him personally?

A   No.

Q   Do you have any negative opinions or impressions about Chan Kim?

A   I don't have an opinion on Chan. I don't know him well enough to make one. I know he's a supervisor, and that's all really I can say about him.

Transcript of Diana Jurado
Conducted on March 9, 2026

15 (57 to 60)

57

Q   Okay. Have you ever heard anything bad about Chan Kim?

MS. GREEN: Form.

THE WITNESS: Of course I have.

BY MR. GUBERNICK:

Q   What?

MS. GREEN: Form. Foundation.

THE WITNESS: Just -- when I was at the PD, I heard he got fired from Lovington. I believe he was fired from being a chief in Lovington, if that's correct. I don't know if that's true. That's just something that I've heard about him being fired.

BY MR. GUBERNICK:

Q   Okay. That's back when you were at HPD?

A   Correct. That could be untrue, but it's -- you asked what I heard, so --

Q   Okay. Anything else?

MS. GREEN: Form. Foundation.

THE WITNESS: I have heard several things about him and his -- his supervisory -- his leadership, but I -- again, I -- I don't have anything negative to say about him because I don't know him well enough to say something negative about him.

58

BY MR. GUBERNICK:

Q   Okay. Okay. So you mentioned the complaint that you submitted against or about -- I don't want to put words in your mouth, about Zane Brown, you said that was the only complaint that you made?

A   On Zane? To my recollection, yes. I didn't have a problem with Zane.

Q   Okay. Did you at any time become aware that he complained about the hiring process for Ahmaad White?

A   No.

Q   Okay. So hearing this today, this is the first time you've ever heard that?

A   I believe with my attorney we've discussed it.

Q   I'm not interested in conversation with your attorney.

MS. GREEN: Yeah. Separate and apart from --

BY MR. GUBERNICK:

Q   Okay. So did you have -- prior to whatever conversations you had with your attorney, did you have any awareness of it?

A   No, no. Actually, I'm surprised because

59

Ahmaad told me the reason why he didn't go. So I'm confused as to that complaint. It's -- it's new information to me.

Q   Okay. Fair enough. Have you ever talked to Aileen Vizcarra about Zane Brown?

A   Yes, I have.

Q   Can you recall anything that you've talked to Aileen Vizcarra about related to Zane Brown?

A   I want to say she may have been the person that told me about all the videos that were recorded about Zane or the audios of Zane being recorded. So yeah, I want to say she may have been the one that -- that got the information about Zane's recordings and Zane's filing -- wanting to file a complaint on the major.

Q   Is it normal for people to be recording each other like that at LCSO?

A   It seems that way.

MS. GREEN: Form. Foundation.

MS. GRANT: Join.

BY MR. GUBERNICK:

Q   You said it seems that way?

A   Well, you know, I'm starting to realize that it may be normal behavior. I don't know.

60

Q   Well, and I mean normal in the context of LCSO. I don't mean normal in the context of police departments everywhere.

MS. GREEN: Form. Foundation. Go ahead.

THE WITNESS: I don't believe it's normal behavior, but I believe it has happened in our office just per my experience now.

BY MR. GUBERNICK:

Q   Does LCSO, in your opinion, and again, I'm just asking for your opinion, just what's in your head. Does LCSO have a toxic work culture?

MS. GREEN: Form. Foundation.

MS. GRANT: Join.

THE WITNESS: I don't believe so. But from the outside looking in, possibly people think that way. I don't believe so, though. No, I think it's more of a -- of a family. It was a family. I don't know anymore, but it was when I -- for several years it was -- it was good.

BY MR. GUBERNICK:

Q   When do you think it stopped being a family?

MS. GREEN: Form. Foundation.

MS. GRANT: Join.

THE WITNESS: I don't know. It may still

69

myself. There wasn't really a big event that happened as to why him and I kind of fell out or whatever.

Q    Okay. So would it be a fair statement to say there was gossip about him saying negative things about you, so you distance yourself from him?

A    That would be -- I would agree to that.

Q    Okay. During -- how many years about -- would you say you worked with Zane Brown as -- actually worked together with him on cases? Just ballpark it.

A    I'm going to ballpark maybe two and a half years where we got along pretty well and worked together well.

Q    Okay. During that time, did he, as far as you knew, do a good job on the cases you would work together?

A    During that time, yes, I think we worked well together. I know that there was some complaints from different agencies, but I didn't get really involved in any of that stuff.

Q    Okay. And if he hadn't been someone you could count on to do a good job, you wouldn't have worked with him, right?

70

MS. GREEN: Form.

THE WITNESS: I would agree to that.

BY MR. GUBERNICK:

Q    Have you ever heard Sheriff Helton talk about Zane Brown?

A    Other than that time when -- no, not even that. To me personally, he hasn't talked about things.

Q    You're not on -- you're -- you're -- well, actually, let me ask you this. Where -- where is your -- your office? Because I know CID is on the second floor, right?

A    No, it's on the first.

Q    Okay. So CID is on the first floor. Helton's office and the chief deputies --

A    On the second.

Q    -- they're on the second floor. Where's your office?

A    Mine's right at the entrance. When you go into the sheriff's office and you enter the lobby, my office is the second one to your -- to your left.

Q    Got you. So you're on the first floor?

A    Yeah. CID Hall, I'm on the other end.

Q    Okay. I think I understand. You ever see

71

Sheriff Helton pacing around, talking to himself?

A    No, I've never seen that.

Q    All right. If I -- if I represent to you that according to other people I've deposed, this is a frequent occurrence. Would you have any reason to disagree with it?

MS. GREEN: Form. Foundation.

MS. GRANT: Form. Foundation.

THE WITNESS: I've never seen him do that. I can't -- I mean.

BY MR. GUBERNICK:

Q    You're not on the second floor, though?

A    I'm not.

Q    Okay. You don't see Sheriff Helton very often, do you?

A    No.

Q    Okay. Would you say you have a close relationship with Sheriff Helton?

A    I wouldn't say close, but I do care a lot about him. I consider him family.

Q    Did you know him while you were at HPD?

A    I did.

Q    Okay. You mentioned you consider him family. What do you mean by that?

A    I just -- I -- that's how I see him.

72

Like, kind of, like, I just think he's -- I think he's a great person. So I do -- I would consider him like family because I do think --

Q    What personality traits would you say he has that make him a great person or even a good person?

MS. GRANT: Can we -- can we -- she was still speaking. I don't know if you had anything else to say Ms. Jurado, but I'd like to make sure she finishes what she's going to say.

BY MR. GUBERNICK:

Q    I thought you -- did you have anything else to say?

A    I just -- I think he's -- he's -- I mean, I've -- all the traits that he has, he's just -- to me, he's honest and kind and he stands with what he says.

Q    Okay. So yeah -- okay. So my -- my next question then was to list out the traits you think make him a great or even good person. You mentioned honesty, kindness, stands by what he says?

A    Correct.

Q    Okay. Would you say he's got a bit of an ego?

A    No.

# EXHIBIT 10

Transcript of Chan Kim
Conducted on August 7, 2025

1 (1 to 4)

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

-----------------------------------x

PATRICK BURKE,                      :

                PLAINTIFF,          :

    v.                              : Case No.:

LEA COUNTY BOARD OF COUNTY          : 2:24-cv-00601-JHR-GBW

COMMISSIONERS, AND COREY HELTON,    :

             DEFENDANTS.            :

-----------------------------------x

Deposition of CHAN KIM

Hobbs, New Mexico

Thursday, August 7, 2025

9:22 a.m.

Job No.: 593199

Pages: 1 - 171

Recorded By: Lisa Gross

Page 2

Deposition of CHAN KIM, held at the offices of:

CORE (Center of Recreational Excellence)

4827 N. Lovington Highway

Hobbs, New Mexico 88240

Pursuant to Notice, before Lisa Gross, Notary Public, in and for the State of New Mexico.

Page 3

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF, PATRICK BURKE:

    BENJAMIN GUBERNICK, ESQUIRE

    CURTIS WALDO, ESQUIRE

    WALDO GUBERNICK LAW ADVOCATES, LLP

    717 Texas Avenue

    Suite 1200

    Houston, Texas 77002

    (346) 394-8056

ON BEHALF OF THE DEFENDANTS, LEA COUNTY BOARD OF COUNTY COMMISSIONERS, AND COREY HELTON:

    ALAN J. DAHL, ESQUIRE

    MYNATT SPRINGER P.C.

    1660 Hickory Loop

    Las Cruces, New Mexico 88005

    (575) 524-8812

ALSO PRESENT:

    Roger Coughlin - Videographer

Page 4

C O N T E N T S

EXAMINATION OF CHAN KIM                    PAGE

    By Mr. Gubernick                        6

E X H I B I T S

    (None marked)

Q   Okay.  Have you become aware of that animosity since then?

A   Yes.

Q   Tell me about that.  What is this animosity, and how'd you come aware of it?  What -- give me all the detail you got.

A   Sure.  So I've got -- within the law enforcement community, I've got friends outside of our office.  Some of those are very good friends of mine that some of them hold, you know, ranking positions.  And just during conversation, I'd -- I'd understood that -- that the -- the sheriff was basically talking trash about Patrick to, you know, to different organizations.  There was rumors that he had prevented him from obtaining job -- some jobs at other law enforcement agencies and -- and things like that.

Q   Okay.  So you were hearing this from -- from who?  People at other law enforcement agencies?

A   Yes, sir.  Yes, sir.

Q   Okay.  So what were they telling you that -- that Corey Helton had, what, contacted them, told them to not hire Patrick Burke?

MR. DAHL:  Object to form and foundation.

BY MR. GUBERNICK:

Q   What do you mean by that?

A   Yes.  So basically my understanding was is he had learned that Patrick was applying at other places and that he would, you know, basically, I guess, sway their, you know, their opinion of -- of hiring him, I guess you could say.

Q   Okay.  And this was after Patrick Burke got back from Germany, I'm assuming?

A   I -- I'm assuming because I didn't even know that he had been back.

Q   Okay.  Got it.  So when you mean by -- by sway them, by sway people's opinions, what do you mean by that?

A   By, you know, an example would be like, you know, you don't want to hire this guy.  That's an example.  I'm not saying, you know, that's just kind of an example that I would give.

Q   Were -- are -- are you aware of -- of Mr. Helton doing that with other people, other former LCSO employees, as well?

A   Yes, sir.  I have heard.

Q   Okay.  Let -- let's talk about some of the other instances where you've heard about that happening.  With who else?

A   Okay.

MR. DAHL:  Object to form.

THE WITNESS:  Zane Brown would be one.

BY MR. GUBERNICK:

Q   Okay.  Let's talk about that.  What can you tell me about Zane Brown?

A   So again, talking to other people outside of our office, I understand that the sheriff might have gone to the chief -- chief of police in Lovington.  And I don't -- I don't remember if it was an ultimatum that he gave him about, maybe, supporting him if they hired Zane or -- I don't recall if it -- but it had something to do with, there again, going to say, hey, you know, don't hire this guy.  You don't -- you don't want to hire this guy, basically.

Q   Got it.  And can -- can you give me any -- any detail on who you might have heard that from?

MR. DAHL:  Object to form.

Go ahead.

THE WITNESS:  Chris Leyva.

BY MR. GUBERNICK:

Q   Chris Leyva said that?

A   Yes.  I believe he -- yes.

Q   And what -- where -- do you know where he was at the time?  I know he's at LPD now, I believe.

A   Who's that?

Q   Chris Leyva?

A   Yes, sir.  He's -- he's the assistant police chief in -- in Lovington.

Q   Okay.  Got it.  All right.  So you -- you mentioned something interesting a minute ago about ultimatums and -- and support.  Have you -- are you aware of instances where Mr. Helton has used the threat of, you know, either not giving or withholding support if people don't do what he wants vis-a-vis hiring decisions?

A   I hear that a lot.

Q   A lot?

A   Yes, sir.

Q   Okay.  Who are -- who are some people you've heard that from?

A   It's -- it's hard to say.  Again, you know, I have a life outside of -- out of law enforcement.  You know, just in talking -- I can't say specifically who I hear stuff.  I mean, I hear from people that -- that we work with.  You know,

I work on the second floor in administration, so I hear that, you know, I hear that in the halls.

Q   So who -- can you think of anyone specifically in the halls in the second floor you've heard that?

A   Well, I mean, I've -- I've heard that from Sheriff Helton himself.

Q   Well -- well tell me about that.

A   Okay.

Q   What Sheriff Helton said.

MR. DAHL:  Object to form.

MR. GUBERNICK:  I'm sorry, what's the objection to that?

MR. DAHL:  This calls for hearsay as to the truth of the matter.

MR. GUBERNICK:  As to what the defendants in the case said?

MR. DAHL:  The truth of the matter asserted.

MR. GUBERNICK:  I'm not going to argue about it.

BY MR. GUBERNICK:

Q   What -- what -- tell me what he said.

A   So again, it would be difficult for me to -- to -- to for verbatim recall exactly what has been said, but --

Q   Yeah, sure.

A   -- again, I've known -- I've known the sheriff to say things, in my opinion, that were -- that were negative.  I mean, it's just -- you know, again, it's, you know, I -- but specifically, yeah, it would be hard for me to go back and verbatim recall what I've heard and exactly in -- in the manner that it was said.

Q   But he said things to the effect of he's going to withhold support or punish people or that sort of thing?  What do you mean?

MR. DAHL:  Object to foundation.

THE WITNESS:  Yes.  I -- I would say in a -- in -- in a -- in a roundabout way, yes.

BY MR. GUBERNICK:

Q   Okay.  He said things that you've understood to mean that, right?

A   Yes.  Yes.

Q   Okay.  And did -- and when he said things like this, did you have any doubt that that's what he meant?

MR. DAHL:  Object to form.

THE WITNESS:  I -- I would say -- I wouldn't have -- I mean, no, because I hear it.  I mean, I hear it from the guy himself, so --

BY MR. GUBERNICK:

Q   Okay.  And you've known him for a very long time at this point, right?

A   Well, you know, yes.

Q   Yeah.  Okay.  And let me rephrase.  You spend a lot of time --

A   Yes, sir.

Q   -- around Mr. Helton the last five years, right?

A   Yes, sir.  Yes, sir.

Q   Okay.  All right.  Have you ever heard of him refer -- I'm -- refer -- talking about Mr. Helton here.  Have you ever heard of Mr. Helton refer to Lea County as his county?

A   I can't --

MR. DAHL:  Object to form.

THE WITNESS:  I can't say those exact words, but I mean, again, he's my boss.  But his ego shows that.

BY MR. GUBERNICK:

Q   What do you mean by his ego shows that?

A   Well, I mean, like I said, I can't say that that's -- that's what he said is, you know, this is my county, but again, I -- I've -- I've -- people told me that -- that he refers to the county as -- as his.  But I mean, I -- I've never heard him say it like that, but I mean, it's, you know, in my -- my opinion, I mean, our sheriff has ego.

Q   Okay.  Well, let's talk about his ego for a second.  What do you -- what do you mean by that?

A   So going back, it's like I -- I -- I talked to you about, you know, hearing comments coming from him.  I mean, there's times where he would say, I can't have my -- my support staff or my sergeant, basically, not support me, you know, in a roundabout way.  So specifically, I mean, that's, you know, again, I mean, I'm on the second floor.

Q   Do you -- so when you say support me, do you believe that he means support him personally or -- or support, you know, the institutional objectives of the sheriff's office?  What do you mean by that?

MR. DAHL:  Object to form.

THE WITNESS:  There again, I would say, because of his ego, I would say support me.  I -- I don't think it -- as leaders, I -- I don't think

talk about more of this, what you said about Jurado-Garcia. So was she up for promotion?

A   No. No, she was not.

Q   Okay. Okay. All right. Yeah. So I'm -- I'm a little confused then. What -- so what -- what exactly happened with Jurado-Garcia?

A   In this case --

MR. DAHL:  Object to form.

THE WITNESS:  In this case, they were trying to make the captain, Vicente Garcia, look like he was giving other people information about the process, which wasn't the case.

BY MR. GUBERNICK:

Q   Wait. Oh, so they were trying to make it look like Garcia was doing something wrong?

A   Correct.

MR. DAHL:  Form.

THE WITNESS:  Correct.

BY MR. GUBERNICK:

Q   Wait. So who was trying to make it look like Garcia was doing something wrong?

A   Diana.

Q   Diana Garcia?

A   Yes.

Q   Okay. Diana -- I mean, because everyone's got the similar name, so it's confusing, but --

A   Right.

Q   Okay. And so she -- okay. So she alleged that he had leaked questions?

A   Correct.

Q   But in fact, he was just saying, hey, what do you think about this format for --

A   Yes. Absolutely. Yes.

Q   Okay. So who did she make that allegation to?

A   I -- I don't -- I -- I don't know. I just -- there again, I just -- I --

Q   Was this the word around the office?

A   Yes.

Q   Okay.

A   Yes.

Q   Was she -- I mean, because that -- that -- that's a thing. That's a very -- can we agree that's a very serious allegation to make about somebody?

A   Yes. Yes.

Q   Can we -- can we agree that someone who's, you know, leaking questions, I mean, that

person has no business being LCSO leadership, right?

MR. DAHL:  Form.

THE WITNESS:  That's correct.

BY MR. GUBERNICK:

Q   Okay. Was -- was any investigation done of this, either of Mr. Garcia or Jurado-Garcia?

A   No.

Q   Okay.

A   Not to my knowledge.

Q   All right. So just from what you know, does this seem like another example of something being swept under the rug?

MR. DAHL:  Form.

THE WITNESS:  Yes.

BY MR. GUBERNICK:

Q   Are you aware of complaints against -- and I -- I'm going to specifically say we're -- I'm not going to -- I'm not talking about Karina Tello here.

A   Okay.

Q   Are you aware of complaints made against Sonia Estrada by people other than Karina Tello?

MR. DAHL:  Form.

THE WITNESS:  Again, unless something jarred my -- my memory, no.

BY MR. GUBERNICK:

Q   Let me see if I can help with that. How about sexual harassment complaints by male deputies against Karina -- against Sergeant Estrada?

MR. DAHL:  Form.

THE WITNESS:  No, not to my knowledge.

BY MR. GUBERNICK:

Q   Okay. You -- doesn't -- you don't -- you don't -- you haven't heard anything like that?

A   No.

THE REPORTER:  Can I just ask you guys to try to pause a second and not talk over each other? It would be really great.

MR. GUBERNICK:  Sure.

THE REPORTER:  Thank you.

MR. GUBERNICK:  No problem.

BY MR. GUBERNICK:

Q   Okay. Let's talk about some more about them. I think we talked about Zane Brown a bit earlier. Is LPD, are they allowed to attend

events organized by the Sheriff's Office?

A    It depends.

Q    Okay.  Walk me through it.  Let's hear the nuance.

A    So -- and -- and -- and this is recent, and it -- it's recent.  So we have -- we participate and support our Special Olympics.  I mean, we're -- we're huge supporters of that.  And so I -- I think I alluded to earlier, one of my areas of responsibilities are -- is our CERT team, which is our -- our Community Engagement Resource Team.  And so we sponsored -- we recently sponsored a -- a golf tournament.  I don't even remember what day it was.  It was three -- a month ago or so.  We sponsored a -- a golf tournament.  And being kind of the, I guess, the organizer or the chairperson, because I hold the highest rank, we discuss, you know, the organization of the golf tournament, what we're going to allow, what we're not going to allow.

And LPD, again, the Assistant Police Chief, Chris Leyva, had reached out to me months ago saying, hey, do you mind if we have a -- a -- a -- a booth out at the golf tournament?

And I said, no, I don't see why not, but I answer to our committee, so let me get the thoughts from the committee.

So as we got closer to the event, in -- in one of our meetings, I asked, I said, hey, what do you guys think about letting LPD have a -- a booth out there?

And they all objected saying, no, this is -- this is our -- this is our tournament.  This is our donation or our support back to the -- the -- this is one thing that we want to say it's -- it's ours exclusively.

So I'd said, fair enough.  And I failed to let Chris Leyva know that, hey, it's -- you guys aren't going to be able to come aboard.

Q    Okay.

A    But I figured he'd reach out to me, you know, as we get closer and say, hey, what was his decision?  But I found out that day during the meeting that Teresa Grady, who is a CID sergeant, criminal investigation sergeant, had reached out to Captain Roach, who's also on that golf committee, and asked if they could come out there and participate and where they would be set up.  And Roach had told them, well, we'd already discussed it and you -- you know, the board or the committee objected to you guys coming out there.

And she said, well, we just bought $4,000 worth of handouts.  What are we going to do with this?

And then I -- I don't know what word -- what information was exchanged, but then that's when I received a -- a call from Chris Leyva and Leyva said, hey, I understand that we can't go out there.

And I said, yeah, that's what the board -- that's what our committee is -- is suggesting is that they don't want anyone else, other law enforcement organization out there.

So he said, well, there's a sponsor that gave you guys a large sum of money that is not going to have a booth out there and they've offered that booth slot to us.

And I said, well, let me -- let me see what the board says.  Again, I can't say yes or no.

Q    Right.

A    So I went to Connie Balderaz, who's our -- he -- he was our office coordinator, Law Enforcement Torch Run coordinator.  She wasn't in the office.  So then I went to -- I called Fernando Jimenez, who is a regional director of Law Enforcement Torch Run.  And I said, hey, this is what's going on.  There's some miscommunication.  Some of it's my fault because I didn't reach -- let them know earlier.  But this is the -- what do you think?

And he says, well, the guy that -- that sponsored us, that -- that, you know, that offered the booth to them is a huge supporter of ours.  I -- let's let them come out and they've already bought this stuff and -- so we let them come out there.  And so they were out there.

The next day we're going along and the sheriff comes up to me and says, who invited LPD?  What is LPD doing here?

And I said, Sheriff, I said, they asked, and we agreed.

No one made a big deal out of it until a couple of weeks after that, we basically had a meeting with the sheriff and our committee.  And basically the whole thing was not about LPD being out there.  It was about Zane Brown being out there, you know, because he was with -- with him.  And I mean, the sheriff basically went off on me at that time saying that, you know, who

105

allowed this?

And I said, I didn't make this decision. Our regional director made this decision because I didn't want it to fall back on me solely.

Q   So Helton didn't care that LPD was there. He cared that Zane Brown was there?

A   That's how I took it. That's how I took it. Because that's who was brought up. He's like, why is Zane Brown at every event? You know? And I don't think -- that's -- that's me personally.

Q   Did that just -- just -- you know, take a step back. Did that make any sense to you?

MR. DAHL: Form.

THE WITNESS: Me personally? No.

BY MR. GUBERNICK:

Q   Okay.

A   No.

Q   So your -- your impression was that this was driven by Helton's personal animosity for Zane Brown?

MR. DAHL: Form.

THE WITNESS: I would say yes.

BY MR. GUBERNICK:

106

Q   Okay. Just in your experience, does Corey Helton, from what you've seen, you've known the guy for years, you've seen him operate, does he let his personal animosity towards people influence his decisions frequently?

MR. DAHL: Form.

THE WITNESS: Yes.

BY MR. GUBERNICK:

Q   Okay. And let's look at the flip of that. If he likes somebody on a personal level, does that influence -- does that frequently influence the decisions he makes involving that person?

MR. DAHL: Form.

THE WITNESS: Yes.

BY MR. GUBERNICK:

Q   Okay. All right. Are you aware of -- so again, we -- we've been talking a lot about kind of who's in the favor group and who isn't this time. You know, would you consider Jurado-Garcia to be one of those people who's in the favor group?

MR. DAHL: Form.

THE WITNESS: Me personally? Yes.

BY MR. GUBERNICK:

107

Q   Okay. Would you consider Michael Walker to be one of the people in that favor group?

MR. DAHL: Same objection.

THE WITNESS: Yes.

BY MR. GUBERNICK:

Q   Okay. How about Doug Evans?

MR. DAHL: Same objection.

THE WITNESS: Yes.

BY MR. GUBERNICK:

Q   How about Aileen Vizcarra?

MR. DAHL: Same objection.

THE WITNESS: Yes.

BY MR. GUBERNICK:

Q   Okay. What about Sonia Estrada? Well, I know she doesn't work there anymore, but what -- was she at some point in that favor group?

MR. DAHL: Objection to form.

THE WITNESS: In certain instances, yes, but no.

BY MR. GUBERNICK:

Q   Okay. So -- well help me understand that?

A   So I don't see her being -- because she has no -- just from what -- what she has told me and what I've heard, I mean, her and the sheriff

108

do not get along.

Q   Okay.

A   So I -- I'm not going to -- I can't say that she was in that group, but she is tight with some of the people in that group.

Q   I see. Okay. I understand.

A   So --

Q   So -- so let me -- let me -- let's just clarify and then we'll talk about with the favorite group. So Aileen Vizcarra, Walker, Doug Evans, Diana Jurado-Garcia, all these people get along with Corey Helton?

MR. DAHL: Form. Foundation.

THE WITNESS: Yes.

BY MR. GUBERNICK:

Q   Okay. What about Fernando Jimenez? Was he in that group? I mean, again, he doesn't work there anymore, but was he in that group?

MR. DAHL: Form.

THE WITNESS: Yes.

BY MR. GUBERNICK:

Q   Okay. From what you observed or, you know, did people in that group, were they treated preferably to people who were not in that group?

MR. DAHL: Form.

109

THE WITNESS: Me personally? Yes, I believe so.

BY MR. GUBERNICK:

Q   Okay. Do you feel like people in that group were allowed to get away with things that people outside of that group would not be allowed to get away from -- with?

MR. DAHL: Form.

THE WITNESS: Yes.

BY MR. GUBERNICK:

Q   Do you feel that that undermines the integrity of the Sheriff's Office?

MR. DAHL: Same objection.

THE WITNESS: It should.

BY MR. GUBERNICK:

Q   Okay. All right. Okay. So let -- let me talk about -- let's kind of circle back a bit to Patrick Burke. So Patrick Burke, he -- you know, you had -- you had this discussion, we'll call it, with him at his house. Then you -- you went back to the -- did you go back to the Sheriff's Office at that point?

A   Yes, I did.

Q   Okay. Did you talk -- who did you talk to when you got back? To anybody?

110

A   I don't -- I believe I met with the undersheriff, Undersheriff Walker, as soon as I got back, but I know I specifically called him as soon as I left Patrick's residence.

Q   Okay. Well, let's talk about that -- that call. What -- how'd that call go?

A   I basically told him that I went to Seminole to check on why, you know, Burke has -- has been not reporting for work and not answering his phone. And I -- I -- I told him what Burke had told me, and that was really the -- the gist of our conversation while traveling.

Q   Okay. So when you got back, you talked to Walker again, you believe?

A   Yes.

Q   Okay. What did you talk about at that -- that meeting?

A   So I think when I got back, I think he said that -- that he -- that Patrick was -- called him asking why I went there and yelled and embarrassed him in front of his neighbors and children.

Q   Okay. So your understanding was Patrick Burke had talked to Michael Walker some time between, right?

111

A   I already -- yes.

Q   Got it.

A   Yes, I believe so.

Q   Okay.

A   Or he called the sheriff. I don't -- I don't remember. I don't remember exactly who he called, but I just remember him saying, yeah, he complained that -- that you were -- and I believe that was at that time. I don't know. I just know that it was shortly after that is whenever I was told that he had already called the sheriff or the undersheriff and said that I was basically an -- an ass.

Q   I see. So your understanding is that Burke had called either Walker or Helton about it, I guess?

A   Right.

Q   And -- okay. I understand. All right. So did you end up -- did you speak to Helton at all about Patrick Burke after that?

A   No.

Q   Okay. Did you speak to Walker any more about Patrick Burke after that?

A   Not in particular about that incident.

Q   Yeah.

112

A   Again, I remember just after this all came about just hearing different things about what was alleged, what was not. You know, again, bits and pieces about him going to our -- I mean, just different things. I mean, it's -- there's just so much that I -- I mean, it was -- it was petty things so I -- I -- I didn't retain all that new information.

Q   So about petty things. What -- you mean there was --

A   Because I can't substantiate those. I mean, I can't say that, yeah, I agree or don't disagree because there's just so much talk in our office.

Q   Got it. So a lot of this talk, though, was about Burke trying to go places and Helton and stopping him from did that?

A   Yes.

MR. DAHL: Object to form and foundation.

BY MR. GUBERNICK:

Q   I understand. Did you hear -- and I know a few years ago, the LCSO donated, I believe it was five cruisers to the Lovington Police Department. Do you know about that?

113

A   Yes.

Q   Okay.  One of the allegations in Patrick Burke's complaint was that Corey Helton threatened to pull the plug on this donation if they hired Patrick Burke.  Do you know anything about that?

A   I -- I heard --

MR. DAHL:  Object to form and foundation.

THE WITNESS:  I heard about that.

BY MR. GUBERNICK:

Q   Who did you hear about that from?

A   I can't -- I can't say who I heard that.  There again, I mean, it could have been LPD.  It could have been -- I don't recall.  I just know that several people -- I heard that from several different people.

Q   Several people said that's what happened?

A   Yes.

MR. DAHL:  Form.

BY MR. GUBERNICK:

Q   Okay.  And this was contemporaneous with the event?

A   I -- I don't know.  I don't know if

114

those cars were given or I don't know if it was future donation.  I -- I don't know.

Q   Let me rephrase.  Let me rephrase.  Like, these -- these couple of people you heard this from, though, this was in close proximity to when the event allegedly happened.  It wasn't, like, three months ago?

A   I'm assuming.  I -- I don't know at what point he applied at LPD.

Q   Yeah.

A   I don't know when he went -- I -- I don't know the timeline.

Q   Oh, no, I -- I understand.  I guess what I'm saying is it -- let -- let's assume that he applied to LPD in -- in 2022.  You heard about this around the time he applied to LPD, not years later?

MR. DAHL:  Form. Foundation.

THE WITNESS:  I -- I -- I can't answer that.  Like I said, I don't know.  It's been, what, '21?  So it's been four years that I haven't heard of Burke and, you know, just bits and pieces.  So I -- I don't even know who he works for right now.

BY MR. GUBERNICK:

115

Q   Okay.  So this has been -- this has been something that's been a source of conversation at LCSO for the last four years?

MR. DAHL:  Object to foundation.

THE WITNESS:  No, just recently as far as --

BY MR. GUBERNICK:

Q   Oh, okay.

A   -- that.  But I'm just saying I can't give you a timeline as far as --

Q   No, I understand.

A   -- if it was close to when Burke applied for them or not.  I don't even know if he applied there.  I mean -- but I just -- I'm just telling you I heard that.  I don't know at what point I heard that.

Q   Got it.  Okay.  I -- I -- I understand.  Okay.  Based on -- I mean, you know, you -- what you -- what you know about Corey Helton and your experience with the guy, does this seem like -- does that seem like the sort of thing he'd do?  If you hire this guy, you don't get the cruisers?

MR. DAHL:  Object to form.

THE WITNESS:  Before I worked with him, yes.  I can now say that that's something I could

116

hear him saying.

BY MR. GUBERNICK:

Q   Okay.  All right.  I understand.

A   Yeah.  I mean, I -- I don't know for -- but I can -- I can see that.

Q   That would be in character for him?

A   Yes.

MR. DAHL:  Form.

BY MR. GUBERNICK:

Q   Okay.  Can we agree that that would be inappropriate if he in fact did that?

MR. DAHL:  Form.

THE WITNESS:  Yes.

BY MR. GUBERNICK:

Q   Okay.  Because that would -- I mean, you're -- you're -- you're basically conditioning because -- like LPD -- okay.  Let's just take a step back.  LPD is not the -- the best resourced police department in the world, right?

A   That's correct.

Q   Okay.  And LPD is dependent in a lot of ways on support from LCSO, right?

MR. DAHL:  Object to foundation.

THE WITNESS:  Yes.

BY MR. GUBERNICK:

**117**

Q  Okay. Okay. There's something else. Are -- are you aware that there were discussions in the last few years about possibly merging the SWAT teams at HPD and LCSO?

MR. DAHL:  Form.

THE WITNESS:  About the possibility of merging?

BY MR. GUBERNICK:

Q  Yes.

A  I --

Q  Or is that news to you? It didn't actually happen, so -- but --

A  Right.

Q  -- there -- it was discussed. Were you aware of that?

A  No. I mean, there once -- a regional SWAT team, but they had differences, they split, but I haven't heard anything about rejoining a regional SWAT team. No.

Q  Okay. Now I understand. Okay. That's fine. Is it important for people in law enforcement to be honest?

A  Yes, sir.

Q  Okay. If someone is dishonest, can they -- do they have any business being in law

**118**

enforcement?

A  Well, it depends on what your definition of honest is. I mean, honestly, it -- it just depends on what it is.

Q  Well, okay. Let me rephrase because -- yeah. I mean, obviously, like, to be a good detective, you've got to be willing to lie to suspects sometimes?

A  Absolutely.

Q  Right?

A  Yeah. Right.

Q  You know, that -- that's the job.

A  Right.

Q  It's not because you're immoral or immoral or a bad person. It's because this is how you get confessions out of people, right?

A  Right.

Q  Okay. But let's say in your -- you know, in your -- in your dealings with coworkers and with the community and in court and that sort of thing, is it important for a member of law enforcement to be honest?

A  Yes.

Q  Okay. Do you feel like Corey Helton has -- there instances where Corey Helton has not

**119**

-- has permitted dishonesty within LCSO?

MR. DAHL:  Form.

THE WITNESS:  Personally? Yes.

BY MR. GUBERNICK:

Q  Okay. Give me some examples of that, if you can?

A  I -- it would be difficult. I mean, I can't -- yeah. You're asking about, you know, five years' worth of, you know --

Q  I understand.

A  -- what goes on and to streamline it to one or two instances, it's -- it's just difficult.

Q  Okay. So this has been something that's happened quite a few times where you felt like there was some -- there was this -- someone had done something or said something dishonest and Corey Helton had let it fly?

MR. DAHL:  Form.

THE WITNESS:  Yes.

BY MR. GUBERNICK:

Q  Okay. You know, did -- because I mean, you -- you're -- you're in a senior leadership position, so I just want to give your -- your opinion of this. What example does that set as a leader?

**120**

A  I guess it depends on who follows you.

Q  Okay. But what do you mean by that?

A  Well, I mean, if you have a group that supports you, then what you say is gospel, whether it's the truth or not. They're going to speak as -- the gospel.

Q  So as long as you got a bunch of yes men around you, it doesn't really matter what example you're setting?

A  That's -- that's correct.

Q  Okay. And would you say this favored group we've been talking about, would you classify them as yes men?

MR. DAHL:  Form.

THE WITNESS:  Yes.

BY MR. GUBERNICK:

Q  And can we agree also that if you are permissive of lying by subordinates, they're more likely to lie?

MR. DAHL:  Object to form.

THE WITNESS:  If that's your culture, yes.

BY MR. GUBERNICK:

Q  Okay. Would you say that is the culture that Corey Helton has fostered at LCSO?

Transcript of Chan Kim
Conducted on August 7, 2025

121

A    With a small group?  Yes.

Q    Okay.  And that's that favored group we're talking about?

A    Yes.

Q    Okay.  What training does LCSO provide in -- because I know New Mexico has a very robust public records regime for retention of documents.  What -- what training does LCSO provide its employees on compliance with it?

A    You talking about, like, with the retention?

Q    Yes.

A    Records, retention, ER requests, things like that or --

Q    That sort of thing, yes?

MR. DAHL:  Object to form.

THE WITNESS:  I would say it depends on the people.  If it's their responsibility, I believe they -- they receive training.

BY MR. GUBERNICK:

Q    Okay.

A    Like, I -- I -- I -- I don't know.  Specifically, no.  That's not, for instance, patrol's forte to know what HIPAA requests are, how long you should hold onto records or evidence

122

or things like that.  I mean, everyone has got every responsibility.

Q    Does senior leadership -- do they comply with record retention requirements?

MR. DAHL:  Form.

THE WITNESS:  I can't vouch for senior leadership as a whole.

BY MR. GUBERNICK:

Q    Well, not -- again, you're right.  That's -- that's -- that -- that's too broad.  Well, let's try to do something a bit more concrete.  Are, you know, written communications, are those done via email?

A    Sometimes.

Q    When else -- what other medium would be used?

A    For directives or just passing along information?

Q    Yeah, just -- well, let's look at both.  So for directives first?

A    I would say as far as directives they're usually via email.

Q    Okay.  What about for passing along information?

A    We use text messages.  We do use -- we

123

use Slack.

Q    What -- what is Slack?

A    Slack is just another -- it's kind of like GroupMe.  It's just another platform to -- to, you know, send information, disseminate information.

Q    Okay.  So if let's say Corey Helton and Michael Walker are sending written communications back and forth, they'd be using the Slack system?

A    Not necessarily.  Again, that's another difficulty is we really don't have no directive as far as, okay, if it's this, this, and that, you send out an email.  If it's this, this, and that, it's via Slack.  If it's this and that, it's via text messages.  I can just tell you, for instance, if I call in to work and say, hey, I'm -- I'm going to be sick or, you know, I'm sick today, I can't go into work, I'm usually going to send a direct message to the undersheriff to -- on Slack and say, hey, look, I'm not going to be in today.  Or I'm going to text message him and say, I'm not going to be in today.  I wouldn't send them an email because, you know, I mean, we don't -- we check emails maybe once, twice, three times a day or whatnot.

124

Q    Okay.

A    But if it needs immediate attention, I'm usually going to text him or I'm going to send him a direct message on Slack.

Q    What -- what is the most used method of communication, then, between -- of text message, email, and Slack?

A    It's hard.  It -- it's preference.  It's -- it's personal preference as far as if I need to disseminate information that all the chiefs and administration need to know, like an -- a -- an ongoing incident, I'm going to put it on Slack.  If it's -- again, if it doesn't need immediate attention, I might just say, hey, you know, I'm going to send it via a text message.  I mean, it's just personal preference.

THE VIDEOGRAPHER:  Counsel, could I go off the record for a second for a problem?

MR. GUBERNICK:  Oh, yeah, we can do that.

THE VIDEOGRAPHER:  Just real quick?

MR. GUBERNICK:  Sure.

(A recess was taken.)

THE VIDEOGRAPHER:  We are back on the record approximately 1:01.

BY MR. GUBERNICK:

Q   Okay.  So if I remember correctly, before we went off record, we were talking a bit about -- about the systems that LCSO uses for internal communications.  And -- and specifically, I was interested in the Slack system because I haven't heard of this.

So -- so how is -- is -- so just like -- just so I understand it just conceptually, is it like a -- is -- do the messages appear on your phone?  Do they appear on a computer?  Is it like email?  How does it work?

A   Yeah, so you can -- I'm sure there's a -- there's a desktop.  It's on -- it was on my desktop on my old computer, but it's -- it's -- it's also an app on the phone.

Q   Got it.

A   And so basically the administrator can invite whoever to join the -- the -- the network.

Q   Okay.

A   And so we've got -- usually it's for our captains and above.

Q   So wait, it's captains and above?  So -- so it's a network.  So is it like a big chat room or something or --

A   Right.  Right.  Yes, it could be a chat or -- or private message.

Q   Okay.  Got it.  All right.  So do people post a lot of stuff for everyone to look at, or is it mostly just people sending private messages to each other?

A   No, mainly it's -- well, I -- I don't know how others use it if it's private messages because I'm not in that group.  But I know that the majority of us use it just to disseminate information that we all need that the command staff need to know about.

Q   Okay.

A   Whether it's a fatal accident or a homicide or a SWAT standoff or something like that.

Q   Well, you said that that group, what group are you referring to?

A   That'd be the -- the general group would be captains and up and -- and up.

Q   Okay.  You're -- you're in that group?

A   Yes.  Right.  I understand that.

Q   Right.

A   But I can also send a direct message --

Q   Oh, okay.

A   -- to the undersheriff or to the sheriff.  And it's just seen between the two.

Q   Okay.  Got it.  Okay.  I think I understand.  So is there stuff that other people, messages people send on chat that are sent to, you know, everyone that you see or how does --

A   No.

Q   No?  Everyone is just private messaging?

A   Only the people that are in that network can see the messages if it's in the group.  Because you can have it set-up with administration.  You can have it set up with patrol.  You can have it -- it's just like GroupMe.  You can -- you can group --

Q   Got it.

A   -- the people that want to be on the -- the network in a group or, you know, individually.

Q   So what group are you in?

A   I'm in the administration.

Q   Okay.

A   And then I can -- I can message anyone directly that's on -- on -- on the group.

Q   I understand.  So again, you mentioned the -- the groups were administration --

A   And I believe IT.

Q   IT?

A   So that would include all of the command staff and have our IT administrator.

Q   Got it.  And what was the other group?

A   I believe that's it on that.

Q   Okay.

A   Or individually we can message --

Q   Send a direct message?

A   Yes, sir.

Q   Okay.  I understand.  When did -- when did people start using Slack?

A   So as soon as I got promoted to chief deputy, that's the first time I'd heard of it is whenever I was invited by the undersheriff and said, this is what we use for -- for messaging.  And so he invited me, I accepted and that's --

Q   Okay.  So -- and that was Walker?

A   Yes, sir.

Q   Okay.  Just from what you've seen, do -- you know, people, there's, like, the undersheriff and the other chief deputies and the other high-ranking people, do they mostly use Slack or is this used infrequently?

A   Again, what I see the majority of the time is just information sharing of what's going on.  Like, for instance, if I had something come

141

A   You know, up until that incident, I had -- I had no issues or didn't hear of anything with -- with him. Without knowing the investigation, or how that came about, I couldn't say.

Q   Okay.

A   I mean, that would be unfair to say he shouldn't be working for us.

Q   Okay. All right. Can -- can -- can we agree, though, that arming a civilian ride-along passenger with a department AR-15 is not something that people should be doing?

MR. DAHL:  Object to form.

THE WITNESS:  Therefore -- again, without being in his personal --

BY MR. GUBERNICK:

Q   Okay.

A   I -- I don't know what the circumstances were.

Q   That -- that's fine. That's fine. All right.

You don't know, you're not aware of whether he has actually been disciplined?

A   Right. That's true.

MR. DAHL:  Object to form.

BY MR. GUBERNICK:

142

Q   And to your knowledge, is he still working at LCSO?

A   Yes.

MR. DAHL:  Same objection.

BY MR. GUBERNICK:

Q   Is he still on duty?

MR. DAHL:  Same objection.

THE WITNESS:  Yes.

BY MR. GUBERNICK:

Q   He -- he's out patrolling the streets, potentially --

MR. DAHL:  Same objection.

BY MR. GUBERNICK:

Q   -- arming more ride-along passengers?

A   He's working. Yes, sir.

Q   Okay.

MR. DAHL:  Are we done asking about that?

MR. GUBERNICK:  All right. I don't know. That's up to me.

MR. DAHL:  Well, I will move for another --

MR. GUBERNICK:  I -- I'm not asking you questions. No.

MR. DAHL:  I -- I will move for another

143

protective order if we're going to take care of the Quintana case today.

MR. GUBERNICK:  We're not taking care of the Quintana case.

MR. DAHL:  We absolutely are.

MR. GUBERNICK:  We're talking about abuses of power and lack of standards, and --

MR. DAHL:  Your questions had nothing to do with the sheriff.

MR. GUBERNICK:  Oh, no, no, no. And this whole thing was that we -- we talked about this earlier, that the sheriff is the person to let him -- let that guy be in the car. We -- we talked about this extensively. I mean, this is --

MR. DAHL:  Arming an individual had to do with the sheriff?

MR. GUBERNICK:  I don't know why he decided to do that. I mean, was this his only -- maybe this was his own bright idea.

MR. DAHL:  That's a great question for the Quintana case.

MR. GUBERNICK:  Okay. Well -- well, I -- I'm seeing what this witness knows. We'll also see what other witnesses know later, in --

MR. DAHL:  When they're noticed for the

144

Quintana case.

MR. GUBERNICK:  Okay. Again --

MR. DAHL:  Go ahead, Counsel.

MR. GUBERNICK:  All right.

BY MR. GUBERNICK:

Q   All right. Are you -- are you familiar with, I'm going to use the term blackballing? Are you familiar with this term?

A   Yes.

Q   Okay. So I'm going -- can we agree that it -- well, let me -- let me -- here, I'm going to ask it like this: So my understanding, when I think of blackballing, I think of, you know, basically someone being, you know, informally barred from working in an -- an industry, you know, by -- by a previous employer; is that -- is that a fair categorization, would you say?

A   Yes, sir.

Q   Okay. So an example of this would be -- so, like, what we talked about before with -- with Mr. Burke, you know, when he try -- he tries to get jobs at other employers, LCSO intervenes to try to stop that from happening.

Can we agree that would be an

Transcript of Chan Kim
Conducted on August 7, 2025

145

example of blackballing?

A  Yes, sir.

Q  Okay. Have you -- have -- have you -- have you seen this happen to other people at LCSO, them being blackballed, or former LCSO employees?

A  No. I -- I -- I can't -- I have not personally seen it.

Q  Okay. Have you --

A  I've not personally seen any of that. I'm just -- hear about things.

Q  So you have no firsthand --

A  Yes.

Q  Okay. Wait. So let -- let me stop you right there.

So you said you hear about it?

A  Correct.

Q  Have you heard about this happening to other LCSO employees?

MR. DAHL: Object to form.

BY MR. GUBERNICK:

Q  Ex-LCSO employees.

A  The only two that come to mind are Burke and Brown.

Q  Okay. Got it. All right. All right. So you -- you mentioned a bit before this incident

146

that happened at the -- at an event that -- that LPD showed up for, and Brown was there, and you got yelled at by Corey Helton?

A  Well, I didn't say yelled at. I just said --

Q  Okay. Let me -- yeah. I don't want to put words in your mouth.

A  Right. Yes, sir.

Q  Yeah. But I'm not -- I'm not asking you to agree with my characterization.

A  Got it. Right.

Q  I'm just trying to make sure we're talking about the same thing.

A  Yes, sir.

Q  Did -- have -- have -- have you ever heard Corey Helton say anything else about Zane Brown?

A  Again, I hear it all the time. I can't name a particular -- other than what I alluded to earlier about the meeting that we had, to where they pretty much bashed me. They, you know, basically saying it was my -- I'm the one that let them out there. I mean, that whole meeting, he says, why -- why is Zane at every event? I mean, that's -- and there are other people in there that

147

heard that. I mean --

Q  Yeah.

A  I mean, that type of behavior.

Q  So -- and so I guess I'm just trying to pin down -- so you -- you -- you say you can't pin down another, like, specific example of Helton talking about Brown. Over the past few years, has Helton talked about Brown a lot?

MR. DAHL: Object to form.

THE WITNESS: Yes, sir.

BY MR. GUBERNICK:

Q  Okay. Is he talk -- or have those communications been favorable or unfavorable? Has he been like, gosh, I miss Zane Brown? I wish he still worked here?

A  No.

MR. DAHL: Object to the form.

THE WITNESS: No.

BY MR. GUBERNICK:

Q  Does that seem petty to you?

A  Absolutely.

MR. DAHL: Object to form.

BY MR. GUBERNICK:

Q  All right. What did -- did you know Zane Brown while he was at LCSO?

148

A  Yes, sir. I was his immediate supervisor at one time.

Q  Okay. How -- how long were -- were you his immediate supervisor?

A  Maybe two years.

Q  Okay. When -- around when was that? I'm not asking for exact years. Just give me an idea.

A  Maybe '19, '20.

Q  Okay. In your view, was he a competent, what was it? Was this when he was a detective?

A  Yes.

Q  Okay. Yeah. So you were the CID Sergeant?

A  That's correct.

Q  Okay. In your view, was he a competent detective?

MR. DAHL: Form.

THE WITNESS: Yes.

BY MR. GUBERNICK:

Q  Okay. And back during that time frame, when you were his direct supervisor, was that his reputation in the department?

MR. DAHL: Form.

149

THE WITNESS: Competent, yes.

BY MR. GUBERNICK:

Q   Okay. Are you aware that Mr. Brown got demoted at some point?

MR. DAHL: Form.

THE WITNESS: No, sir.

BY MR. GUBERNICK:

Q   Okay. You're not aware of any of that?

A   No.

Q   Okay. All right.

So are -- are you familiar with any of the disciplinary action that was taken against Zane Brown?

MR. DAHL: Form.

THE WITNESS: I was present whenever he was placed on administrative leave.

BY MR. GUBERNICK:

Q   Okay. Who was -- who was -- who was with you?

A   It was myself, the sheriff, and -- and Zane Brown.

Q   Okay. I think I may actually have heard a recording of this -- this -- this incident. Mister -- during the meeting, just -- just remind me if this is correct, is it true

150

that Helton realized that Zane Brown was recording the conversation?

A   Yes, sir. At some point, yes.

Q   Okay. And that's when he was put on administrative leave?

A   No. I believe he was in there to be placed on administrative leave.

Q   Okay. That was actually going to be my next question.

A   Yes, sir.

Q   So why -- why were you in the room for that?

A   I -- I -- I believe just as a witness to say, you know, a lot of times, when you're handing out that, you know, leave or something like that, you have someone there to -- you know, to kind of witness that.

Q   Okay. So how did you come to be in the room? Did Helton just be like, hey, I need you for something? Or --

A   I was the only one available.

Q   Okay. Got it. All right. Okay. Did you -- did you know anything about why Zane Brown was being put on administrative leave?

MR. DAHL: Object to form.

151

THE WITNESS: I don't believe so.

BY MR. GUBERNICK:

Q   Okay. Okay, good. And that's -- that's -- that's a -- a fine answer. Okay.

I want to talk about -- and I'm assuming LCSO has a policy on intra-office fraternization, right? Or, you know, dating coworkers, right? Or does it?

MR. DAHL: Object to form and foundation.

THE WITNESS: I'm sure there is. And common sense tells me what it should be, but I can't personally recite or know exactly verbatim what it states.

BY MR. GUBERNICK:

Q   Oh, no. And this isn't a memory bust.

A   Right.

Q   But I'm just -- I'm just --

A   Right.

Q   I mean, I'm assuming there is one, but -- I mean, well, you said common sense suggests there -- there should be. What -- what do you mean by that?

MR. DAHL: Object to form.

THE WITNESS: Basically, I would say

152

don't fraternize with -- you know, with your own troops.

BY MR. GUBERNICK:

Q   Is it a problem if a supervisor is fraternizing or sleeping with a subordinate?

MR. DAHL: Object to form.

THE WITNESS: In my personal opinion?

BY MR. GUBERNICK:

Q   Yeah.

A   Yes.

Q   Okay. Have there been instances where you've observed -- or are you aware of instances where this practice has happened and it's been permitted?

MR. DAHL: Object to form.

THE WITNESS: Again, I'm sure just hearing things that go on.

BY MR. GUBERNICK:

Q   All right.

A   I hear about it. But again, without a particular case, I don't -- I wouldn't be able to recall.

MR. GUBERNICK: Okay. I mean, why don't just try and narrow it down? And we'll give you some examples, then.

# EXHIBIT 11

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

ZANE BROWN,

     Plaintiff,                                    No. 2:23-CV-00355-DHU-GJF

v.

LEA COUNTY BOARD OF
COUNTY COMMISSIONERS,

     Defendant.

### Declaration of Ahmaad White

My name is Ahmaad White. I am an adult over the age of 18. If called upon to testify I would competently do so as follows:

1. In or around July 2022 I received a call from Lea County Sheriff Corey Helton. I recorded the call.

2. Once some initial connection issues were resolved, Mr. Helton stated he was "reaching out to [me] as a friend" and that he was "kind of worried about [me] right now."

3. I asked Mr. Helton if something had happened. Mr. Helton responded that he wanted to "caution [me] with anything that [I] have involved with Zane Brown." Mr. Helton then added, "I'm not gonna say anymore."

4. I tried several times to get Mr. Helton to provide more information. Each time, he responded by saying that he "didn't know what's true" and "didn't know what's lies" but that I "need[ed] to mind [my] own business" and "stay clear."

5. Two minutes into the call, I told Mr. Helton that I intended to call Mr. Brown to find out what was going on.

1

6. Mr. Helton's tone of voice then became irritated, and he stated: "[the HPD and LCSO SWAT teams] are in the middle of a SWAT reunification. I would hate for that to be stopped immediately."

7. At the time, I was a SWAT operator at the Hobbs Police Department. For some time, I had been advocating for the LCSO and HPD SWAT teams to be combined, as they would improve operational efficiency, enhance officer safety, and better protect the community.

8. I understood Mr. Helton's statement to be a threat, akin to a mobster saying "nice house you have here, be a real shame if it burned to the ground."

9. We then talked for several minutes about SWAT issues. Near the end of the call Mr. Helton circled back to "cautioning" me about Mr. Brown, and encouraging me to "make the [SWAT merger] work[.]"

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and recollection.

Date: 6/8/2026

Signed by:

_____

Ahmaad White

2

# EXHIBIT 12

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

ZANE BROWN,

      Plaintiff,                              No. 2:23-CV-00355-DHU-GJF

v.

LEA COUNTY BOARD OF
COUNTY COMMISSIONERS,

      Defendant.

### Declaration of Aaron Rodriguez

My name is Aaron Rodriguez. I am an adult over the age of 18. If called upon to testify I would competently do so as follows:

1.      I am personally acquainted with Zane Brown.

2.      Several years ago, Mr. Brown and I were briefly coworkers at the UPS center in Hobbs, New Mexico.

3.      One morning, while Mr. Brown and I were about to leave set out to deliver packages, a man who I have since learned was Lea County Sheriff Corey Helton entered the store.

4.      Sheriff Helton criticized UPS for hiring Mr. Brown, and stated that Mr. Brown was in trouble with the Lea County Sheriff's Office.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and recollection.

Date:  6/8/2026

DocuSigned by:

_____
450243D580AC447...
Aaron Rodriguez

1

# EXHIBIT 13

**Page 1**

IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF NEW MEXICO

-------------------------x

ZANE BROWN,                    :

    Plaintiff,            :

vs.                           : Case No.:

LEA COUNTY BOARD OF COUNTY    : 2:23-CV-00355-DHU-GJF

COMMISSIONERS, COREY          :

HELTON, and MICHAEL WALKER,   :

    Defendants.          :

-------------------------x

DEPOSITION OF MICHAEL WALKER

Conducted Virtually

Tuesday, January 27, 2026

10:32 a.m.

Job No.: 618183

Pages: 1 - 79

Recorded By: Sedrick Lampkins

**Page 2**

Deposition of Michael Walker, conducted virtually

Pursuant to agreement, before Sedrick Lampkins, Notary Public in and for the State of Texas.

**Page 3**

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:

    BENJAMIN GUBERNICK, ESQUIRE

    WALDO GUBERNICK LAW ADVOCATES, LLP

    717 Texas Avenue

    Houston, Texas 77002

    346.394.8056

ON BEHALF OF THE DEFENDANTS:

    HALEY R. GRANT, ESQUIRE

    MYNATT SPRINGER, P.C.

    1660 Hickory Loop

    Las Cruces, New Mexico 88005

    575.524.8812

ALSO PRESENT:

    DOMINIC ADAMS - Videographer

**Page 4**

C O N T E N T S

EXAMINATION OF MICHAEL WALKER                    PAGE

    By Mr. Gubernick                              5

E X H I B I T S

    (None marked)

P R O C E E D I N G S

THE VIDEOGRAPHER: Videotaped deposition of Michael Walker in the matter of Zane Brown vs. Lea County Board of County Commissioners, Corey Helton, and Michael Walter in the United States District Court for the District of New Mexico, Case Number 2:23-CV-00355-DHU-GJF. Today's date is January 27th, 2026. The time on the video monitor is 10:32 a.m., that is, Central Standard Time. All parties of this deposition are attending remotely.

Would Counsel please voice identify themselves and state whom they represent?

MR. GUBERNICK: Ben Gubernick, Counsel for Zane Brown.

MS. GRANT: Haley Grant on behalf of Defendants.

THE VIDEOGRAPHER: The court reporter for today is Sedrick Lampkins, also representing Planet Depos. The witness will now be sworn.

Whereupon,

MICHAEL WALKER,

being first duly sworn or affirmed to testify to the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFF

BY MR. GUBERNICK:

Q   Okay. All right. Nice to see you again, Undersheriff. I want to say the first time we talked was, maybe, nine months ago; does that sound about right? Maybe a bit less than that.

A   I'm not really sure.

Q   Okay.

A   I don't remember what month it was.

Q   All right. This is the second time -- this is the third time I've deposed you, right?

A   Yes.

Q   Okay. I -- I want to say that, you know, the first time was in the (indiscernible) case, correct?

A   Correct.

Q   That was sometime, like, over the summer --

A   Right.

Q   -- maybe? That sound about right?

A   Yes.

Q   Okay. And I think you told me at that deposition that you'd been -- you hadn't had anything to drink for about six months; is that right?

A   That's correct.

Q   Have you -- it's been another, you know, six months now. Have you still not had anything to drink?

A   Yeah. It's 14 months.

Q   Okay. Congratulations. Okay. How long have you known Zane Brown?

A   When I came to work at the sheriff's office is when I met him.

Q   Remind me what year that was.

A   2018.

Q   Okay. He was already there, right?

A   Correct.

Q   Okay. Then you hadn't run into him prior to that?

A   Not that I remember.

Q   Okay. Remind me. You were at HPD prior to coming to the SO, right?

A   Correct.

Q   Okay. You just don't -- don't believe you would have run into him at some point? Or just don't remember?

A   If I did, I don't remember. I don't know.

Q   Okay. All right. So what were your -- well, like, let me -- let me -- let me ask you this. What interaction did you have with him in that first, like, year or two that you were at the SO? I know you weren't his direct supervisor, right?

A   Correct.

Q   Did you have much interaction with him?

A   I just might have seen him at the table or in the hallways --

Q   So --

A   -- basically, or on scenes.

Q   Okay. Would you -- did you -- I mean, did you talk to him frequently?

A   Yeah, I would say I did.

Q   Okay. So you were on -- where were you -- would you say -- when you say you would talk to him, was that just, like, chit chat, you know, small talk, or just work stuff or what?

A   I can remember a little bit of chit chat. I don't -- I don't really recall the conversations, but they were all friendly.

Q   Okay. Did you have any -- so prior to, let's say, 2021 -- so '18, '19, '20, did you have any problems with Zane Brown?

A   No. Not that I can remember.

Q   Okay. Personally, did you have any issues with him?

Transcript of Michael Walker
Conducted on January 27, 2026

9

A  No.

Q  How about professionally, did you have any issues with him?

A  No.

Q  Okay. He seemed to be a competent -- well, I -- I know he was promoted to detective at some point, but he -- he seemed to be a competent law enforcement officer?

A  As far as I know, yes.

MS. GRANT: Object to form. Foundation.

MR. GUBERNICK: Okay. All right.

Q  Were you aware of any -- anyone -- again, let's use prior to 2021. Are you -- were you aware of anyone at the SO who did not like Zane Brown?

A  Not that I remember.

Q  Okay. And you agree that, you know, sometimes people in supervisory roles are brought in to kind of mediate interpersonal issues at an office, right?

A  Right.

Q  Again, that never happened with Zane Brown?

A  Not that I remember.

Q  Okay. Did you -- were you aware of any -- anyone at the -- at LCSO being -- prior -- again,

10

prior to 2021, dissatisfied with Zane Brown's job performance?

A  Not -- again, not that I remember.

Q  Okay. All right. Who -- who was his direct supervisor; do you know?

A  It had been Jeremy Grady.

Q  And was -- Grady was over investigations at that point or what?

A  Yes.

Q  Okay. Got you. So Jeremy Grady -- I've heard the name J.W. Grady; is that the same person?

A  Yes.

Q  Okay. Was J.W. Grady Brown's supervisor from 2018 to 2021, to your knowledge?

A  I don't recall when -- when Grady was promoted. So prior to his promotion, I don't know. I don't even remember who was the supervisor (indiscernible).

Q  I understand. I understand. So Zane Brown was a detective in -- in 2018?

A  Yes, that's -- I believe so.

Q  Okay. So he'd already been promoted to detective at some point, or investigator?

A  Yeah. I don't know when that was.

Q  Okay. All right. And it's possible that

11

someone else was, I guess, the -- what -- is it captain over investigations before J. W. Grady?

A  To my knowledge, it's always been a sergeant.

Q  Or sergeant. I'm sorry. So it's possible that someone besides J. W. Grady was the sergeant over investigations for part of that time?

A  It's possible.

Q  Okay. So in the -- in the year -- in the -- from 2018 to 2021, you never heard -- did you hear anything negative from J. W. Grady about Zane Brown?

A  Not that I remember.

Q  Okay. How many detectives were in investigations, about?

A  I want to say five.

Q  Okay. And that number is pretty consistent over time?

A  Yeah, I think -- I want to say we're up to seven now.

Q  Okay. Oh, okay. I understand. All right. So -- and just to remind me -- just so -- just so I -- I -- I -- we're -- I -- we're clear, when did you -- when did you first meet Diana Garcia?

A  Oh, that was when I was at the police

12

department. I don't know what year it was.

Q  Was she there at the same time, or what was -- how -- remind me how that worked.

A  She was where?

Q  The Hobbs Police Department.

A  Yeah, she got hired there, and again, I don't remember the year. I just remember that's where she started.

Q  Okay. So she was at the Hobbs Police Department same time as you?

A  Yes.

Q  So how -- how did she get over to LCSO? Was she hired by you and Helton?

A  I'm pretty sure that we hired her. But I can't remember -- I don't remember to be sure. The only thing I remember was that me and one other guy from the Hobbs Police Department started on the exact same day, but I don't recall if Diana came over before or after.

Q  Who is this other guy from the Hobbs Police Department?

A  Wimberley. Scott Wimberley.

Q  Okay. And he's -- is he still -- is he still in LCSO? What happened to him?

A  Yes. He's still here.

21

couple of her friends, I believe Wimberley, I think Tello and Dominguez. Sonia, I believe, went. That's the only ones I remember.

Q   Okay. What did you drink there, if anything?

A   I remember having a beer there, and then I switched over to water.

Q   Why did you switch over to water?

A   I just -- just didn't want to leave there intoxicated.

Q   So you knew you -- so the -- you -- so you were drinking the water to sober up a bit?

A   Yeah. I just didn't -- I didn't want no more beer, not around people. My -- majority of my drinking was at home by myself.

Q   Okay. All right. What -- was it -- was it common knowledge that you were -- you had a drinking problem at the SO --

A   I can't --

Q   -- or was it something you wouldn't tell people about?

A   Repeat that -- the second --

Q   Was it common knowledge at the so that you had a drinking problem?

A   I don't know.

22

Q   Okay. Did -- well, let me ask you this. Did anybody at the SO ever confront you or, you know, try to, like, intervene, try to say, Hey, you know, Michael, you got to do something about this?

A   No.

Q   Okay. All right. So you switched over to water and -- who -- who was the last person to leave?

A   I have no idea.

Q   Were people still there when you left?

A   Yes.

Q   Who was there when you left?

A   I don't recall. I don't remember.

Q   All right. Fair to say most people were gone by that point, though, right?

A   Probably half of the people were probably gone.

Q   Okay. Andy Dominguez and Karina Tello were still there, right?

A   I don't know. I don't remember.

Q   Did they leave at the same time as you?

A   I don't remember that.

Q   Okay. If they say they left at the same time as you, would you have any reason to disagree with that?

23

A   No.

Q   Okay. If they say they saw you get into your vehicle, would you have any reason to disagree with that?

A   No.

Q   Okay. All right. Where -- how long is the -- well, actually, let me ask you, what -- what vehicle were you driving?

A   My truck.

Q   So just your personal car, not a -- not a state vehicle?

A   Correct.

Q   Or I should say county vehicle.

A   Right.

Q   Okay. And where do you live in relation to -- like, how many miles from Applebee's?

A   Oh, maybe one.

Q   Short drive?

A   Short. Yeah.

Q   Have you ever driven drunk before?

A   Yes.

Q   When?

A   Oh, back when I was drinking, it wasn't -- I -- I know that there were times that I had drank, drove, and then wondered what that -- why I

24

did it. Because I just didn't know.

Q   I'm sorry. I didn't catch that last part. Wondered why you did it?

A   Yeah. Like I don't -- like, once I got home, I felt like I was -- that I had drank too much to drive.

Q   Okay. I mean, because obviously, it's a very reckless thing to do, especially for someone in your position, right?

A   Yep.

Q   Okay. Were you engaged in a lot of self-destructive behavior back when you were drinking?

        MS. GRANT: Object to form. Foundation.

A   I wouldn't say so.

Q   Can we agree that, you know, driving drunk is pretty self-destructive behavior?

A   It could be.

Q   Okay. All right. Okay. How long have you known Ahmaad White?

A   Whenever he came on to the police department, whatever year that was.

Q   Oh, you mean HPD?

A   Yes.

Q   Okay. So he was up there the same time you were, right?

# EXHIBIT 14

## Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

- - - - - - - - - - - - - - x

ZANE BROWN,                     :

    Plaintiff,          : Civil Action No.

  v.                          : 2:23-CV-00355-DHU-GJF

LEA COUNTY BOARD OF COUNTY      :

COMMISSIONERS, COREY            :

HELTON, and MICHAEL WALKER,     :

    Defendants.             :

- - - - - - - - - - - - - - x

REMOTE VIDEOTAPED DEPOSITION of ZANE BROWN

Wednesday, January 28, 2026

9:03 a.m. MT

Job No.: 617477

Pages: 1 - 172

Stenographically Reported By:

Michelle M. Yohler, CSR, RMR, CRR

## Page 2

Videotaped deposition of ZANE BROWN, held remotely pursuant to notice before Michelle M. Yohler, a Certified Shorthand Reporter, Registered Professional Reporter, Registered Merit Reporter, Certified Realtime Reporter, CSR No. 84-4531, in and for the State of Illinois.

## Page 3

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:

    MR. BEN GUBERNICK

    WALDO GUBERNICK LAW ADVOCATES LLP

    717 Texas Avenue, Suite 1200

    Houston, Texas 77002

    346.394.8056

    ben@wglawllp.com

ON BEHALF OF THE DEFENDANTS:

    MS. HALEY R. GRANT

    MYNATT SPRINGER P.C.

    1660 Hickory Loop

    Las Cruces, New Mexico 88005

    575.524.8812

    hrg@mynattspringer.com

ALSO PRESENT:

    Mr. Corey Helton, Defendant

    Mr. Peyton Abrams, Videographer

## Page 4

E X A M I N A T I O N S

WITNESS                                    PAGE

ZANE BROWN

    By Ms. Grant.............................    8

E X H I B I T S

EXHIBITS                                   PAGE

No. 1   8/25/22 Notice of Brown IA

        BN 100 to 101.......................   109

No. 2   White Complaint

        BN 1056 to 1078.....................   111

No. 3   Pre-Disciplinary Hearing

        BN 462..............................   113

No. 4   Plaintiff's Email Complaint

        BN 462..............................   116

No. 5   Audio Recording

        Hernandez Notification Call to

        Plaintiff...........................   118

No. 6   Notice of Administrative Leave

        BN 313..............................   120

No. 7   Audio Recording

        Martinez and Plaintiff Call

        BN 680..............................   120

        (Continued)

Transcript of Zane Brown

Conducted on January 28, 2026

particular conversation that seemed to be -- kind of changed how you felt Sheriff Helton perceived you?

A It wasn't more of any -- any interactions with him. I never -- I was placed on administrative leave, and then I think I saw him again during my disciplinary hearing.

But in between everything happening, it was always everybody was like: The sheriff's in the briefing room talking crap about you. He's calling you worthless. He's going to say -- he's telling everybody he's going Giglio you. He's going to have your certification. He's going to have you arrested. You're worthless. You're trash. You're garbage.

And that was just constantly what I was hearing from patrol officers and everybody at the sheriff's office after I was placed on admin -- administrative leave.

Q Okay. All right. And were -- who was relaying this information to you?

A You want to know all their names?

Q Yeah, that would be great.

A I've heard it from Chan Kim, Jon Martinez, Jeremy Grady --

Q I'm sorry. I'm going to have to slow you down just a little bit there.

So Deputy -- DC Jon Martinez, Chan --

A Chan Kim --

Q -- Kim.

A Jeremy Grady. I've heard it from Vicente Garcia; I've heard it from Michael Thomas, Jeremy Shimer, Jeannette Sandoval; Deputy Warlick, Deputy Holley, Deputy Jackson. Pretty much -- who else...

I mean, it pretty much -- I don't know. That's the names I can think of off the top of my head.

Q I got you. I got you.

A It's quite common.

Q And in these communications was it, like, people are calling you up and telling you, or, you know, go out for a beer with somebody? Or how -- how did all these kinds of conversations usually make their way to you?

A I'll get a phone call, like: Hey, the sheriff said this. Or he's -- he's down in the briefing room on his favorite topic right now.

And -- or if I meet them -- like, see them out driving around or talking to them in the court

parking lot, I get told that.

Q Okay. I got you.

All right. So, in your mind, not -- of course I'm not going to ask you to tell me what the sheriff's perspectives are, but do you have any sense of why it was the sudden shift in how the sheriff seemed to receive you or be talking about you?

A I think it was, like, because of the taking a -- I guess, the complaint against Undersheriff Walker because, I don't know, that's when it started. So, like, personal trying to protect his undersheriff.

Q I got you. Okay.

In the communications that you had, the phone calls, whatever folks from the sheriff's office were telling you at that point in time, did they share with you anything that -- any reasons that the sheriff gave for why he was feeling this way?

A No, no one ever really knew what was actually -- what actually took place with everything. It was just like: Hey, he was down here -- he saw you or something happened and just going off.

Q I got you.

Okay. Since you've left the sheriff's office, do you have any kind of a relationship with the sheriff?

A No, just crossing paths doing our jobs.

Q Okay. And tell me a little bit what that's like. Are you all able to say hello, or can you be cordial with each other? What are those interactions usually like?

A I haven't -- they're normally pretty negative. I haven't actually been face to face with him, but any time that he's there, he makes his presence known and kind of throws fits.

Q Okay. So you've not had any face-to-face interactions with him since, but when you're maybe on scene for a crime that you're involved -- or that you're both investigating, you said he would, like, throw a fit?

A It's more like community events is where I've been present with him.

Q Okay. Is this something that you would see -- kind of see him doing, or is that something that you hear about what was going on?

A I've personally heard him act out of character at one community event, but all the

Transcript of Zane Brown
Conducted on January 28, 2026

other ones that he's been present for, I'll have someone come tell me: The sheriff's here.

Obviously, see each other, but then they'll come tell me he's, like -- he's talking crap about me. And: "Why is Zane here?" And this is his county, and I need his permission to be there and all this good stuff.

Q Okay. And this one that we're talking about, this one instance where you personally heard the sheriff, was that at a fundraiser for the sheriff's office?

A It was at a -- I don't know -- well, I do now know that the sheriff's office hosted a Special Olympics at the golf course in Hobbs.

Q Okay.

A It was a community golf tournament.

Q Okay. You were present for that?

A Yes, ma'am, I was.

Q Were you a golfer or...

A No, the Lovington Police Department had a booth out there, and I was asked to volunteer.

Q Got you.

Okay. Let's talk about Undersheriff Walker. Tell me a little bit about when it was that you first met Undersheriff Walker and...

A I knew who he was throughout my career before he became the -- the undersheriff at the sheriff's office, and didn't really start interacting with him.

Same, it was never -- never any negative interaction with him up until the point where I -- I was tasked with doing Ahmaad White's background, and it kind of -- he would walk around the office and he -- he likes to joke and -- like, you were able to joke and, like, talk crap with him and just be -- be yourself.

And then after the -- I was tasked with doing Ahmaad White's background, the relationship kind of stopped and kind of started having problems with him then. But I didn't know him up until he became the undersheriff.

Q I got you. Okay.

And you said that he was not negative before this point and you didn't interact with him much. So you were just kind of like you see him in the office and you say hello kind of a thing before --

A Yes, ma'am.

Q Okay. And it doesn't sound like you were friends with each other. You're not spending any

kind of time together outside of the office?

A No, ma'am.

Q And tell me how you perceived this shift in your relationship. What happened and how -- how did you seem to think that things were negative after that point?

A I didn't really think things were negative up until the point whenever I was -- I was tasked with Ahmaad White's background, and I spoke up on the things that I thought were weird, and it kind of just died down.

And I would see him in the office, and he really wouldn't talk to me the way that he -- he typically would in the past.

And then I started having a lot of problems with another investigator, Diana Garcia, and I -- she started complaining. And I was getting write-ups, but the write-ups were coming directly from Walker, not from -- the previous one was from my supervisor. So then, per policy, the write-ups weren't matching what policy was saying.

Q I got you. So was -- it was actually Walker's signature on all these write-ups?

A Yes.

Q Okay.

MS. GRANT: My pen has died, so why don't we just take a quick five-minute break and then we'll come back on.

THE WITNESS: Yes, ma'am.

THE VIDEOGRAPHER: Okay. We are going off the record. The time is 10:39 a.m.

(WHEREUPON, a recess was had.)

THE VIDEOGRAPHER: We are going back on the record. The time is 10:52 a.m.

BY MS. GRANT:

Q All right, Mr. Brown. I think when we last left off, we were talking about Walker and the fact that he had signed some of your disciplinary notices; is that right?

A Yes, ma'am.

Q Okay. And at any time during your employment with the sheriff's office, while you weren't on administrative leave, did you ever fail to receive a notice of any internal investigations in, like, a written form?

A Not that I know. I don't think so.

Q What about any notices of discipline?

A I don't think so.

Q What about notices of intent to discipline?

145

about things that you knew from your attorney with Sergeant White?

A About this case?

Q Yes.

A No.

Q Have you had any discussion with Sergeant White concerning his employment application with the Lea County Sheriff's Office for which you conducted that background investigation?

A Yes.

Q Okay. And I believe you mentioned earlier there was a conversation that you had with Sergeant White while the investigation was pending; is that correct?

A Whenever I was trying to get hired on with Hobbs Police Department.

Q When you were trying to get Hobbs -- hired on with Hobbs Police Department?

A Yes.

Q Okay. But you testified earlier that what you -- what Sergeant White wrote in his -- in his complaint that was Bates-numbered -- give me a second here -- excuse me, Exhibit Number 2, you said that Sergeant White called you during the pendency of his investigation and you reported

146

that there were irregularities and bias in that investigation; is that right?

A Yes.

Q Okay. Did you also write that in your discovery responses --

A Yes.

Q -- County?

Okay. So you did have a conversation with Sergeant White about biases that you noticed in his application during the pendency of his investigation?

A That wasn't your question.

Q Okay.

A Your question was if I discussed my case with White.

Q No, that was my other question. Now --

A And your second --

Q -- I'm --

A -- and then your second question was if I discussed the background process with him, which I did.

Q You did. Right. But did you discuss the -- you discussed there was some kind of bias in how the background investigation was being conducted; is that right?

147

A Yes, ma'am.

Q Okay. All right. Let me pull up another exhibit.

Let me go ahead and share my screen.

(Exhibit shared.)

BY MS. GRANT:

Q Okay. Mr. Brown, do you see what I'm showing you here on the screen?

A Yes, ma'am.

Q Okay. Do you see the date on the upper left-hand area of this document, June --

A Yes, ma'am.

Q And that's June 28th of 2022.

And it looks like this is a document that was sent from Captain Victor Hernandez to you?

A Yes, ma'am.

Q Okay. At the bottom of this document, is this your signature here?

A Yes, ma'am.

Q Okay. I'm going to go ahead and mark this document as Exhibit Number 18.

But let me ask you this: So you signed this on June 28th of 2022. Is that -- so I presume then that that's when you received this document?

148

A Yes, if that's what it stated.

Q Okay. Let me get this in the chat box.

I'll stop sharing first.

(WHEREUPON, Brown Deposition Exhibit No. 18 was marked for identification.)

BY MS. GRANT:

Q Okay. And I'm going to play another recording for you. This comes from Bates number 236 of the County's disclosures. I'll let you know once it looks like there's something to hear.

All right. Here we go.

(Audio recording played.)

BY THE WITNESS:

A Do you want me to acknowledge this or listen to it all?

BY MS. GRANT:

Q Well, let's do this: Is this a recording between you and Captain Victor Hernandez?

A Yes, ma'am.

Q Okay. And the date that was mentioned here was July 13th of 2022; is that correct?

A Yes.

Q And this was -- this interview was concerning an Internal Affairs matter; is that right?

# EXHIBIT 15

Transcript of Craig Bova
Conducted on August 11, 2025

1 (1 to 4)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

--------------------------------x

ROBERT BLANCHARD,,                    :

PLAINTIFF,       :

v.                          : Case No.:

THE CITY OF HOBBS, LEA COUNTY    : 2:24-CV-00900-KWR-GJF

BOARD OF COUNTY COMMISSIONERS,     :

DEFENDANTS.    :

--------------------------------x

DEPOSITION OF CRAIG BOVA

Conducted virtually

Monday, August 11, 2025

10:33 a.m.

Job No.: 595440

Pages: 1 - 74

Recorded By: Leyhbert Sharp

---

Deposition of Craig Bova, conducted virtually.

Pursuant to agreement, before Leyhbert Sharp, Notary Public in and for the State of Texas.

---

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF, ROBERT BLANCHARD,:

BENJAMIN GUBERNICK, ESQUIRE

WALDO GUBERNICK LAW ADVOCATES LLP

717 Texas Avenue, Ste. 1200

Houston, TX 77002

(346) 394-8056

ON BEHALF OF THE DEFENDANTS, LEA COUNTY BOARD OF COUNTY COMMISSIONERS:

ALAN J. DAHL, ESQUIRE

MYNATT SPRINGER P.C

1660 Hickory Loop

Las Cruces, NM 88005

(575) 524-8812

ON BEHALF OF THE DEFENDANT, THE CITY OF HOBBS:

CHELSEA GREEN, ESQUIRE

HINKLE SHANOR LLP

400 N Pennsylvania Ave.

Roswell, NM 88201

(575) 622-6510

---

INDEX

21

reviews typically take?

A. On average, probably not that long. 30 minutes, maybe.

Q. Okay. This is not a whole day thing --

A. No.

Q. -- or half day thing?

A. No.

Q. All right. So you mentioned that Blanchard would come in sometimes to do this. Was there anyone else who would do file reviews? I'm not talking about HPD. I just mean any employers that will come in to --

A. Other law enforcement agencies would be the same -- same process.

Q. Okay. So like -- so when you say other law enforcement agencies, would people come in from like, Carlsbad or Artesia or something like that?

A. Yes.

Q. Okay. Does that still happen now?

A. Yeah.

Q. All right. Let's look at a document. We'll call this Exhibit A. This is City of Hobbs 5 in the city's production. Here's one for you. Here's one for your attorney. All right.

(Plaintiff's Exhibit Number A was

22

marked for identification.)

THE DIGITAL TECHNICIAN: Do you say Exhibit 5?

MR. GUBERNICK: This is Exhibit A that's Bates numbered City of Hobbs 5.

THE DIGITAL TECHNICIAN: Thank you.

BY MR. GUBERNICK

Q. Okay, all right. Have you seen this document before?

A. Yep.

Q. What is this thing?

A. Zane Brown came to review his personal file on July 12th. He claimed that there was not disciplinary notices in his personnel file. And this is a document to state that fact.

Q. Okay. So I see some initials at the bottom.

A. Yeah.

Q. It's CB. Is that you?

A. That's me.

Q. Do you recall initially in this document?

A. Yeah. I created this document.

Q. Okay. So you -- did you write the -- so the text here, the -- the typewriting, as of today, July 12, 2022. Did you write that?

A. Yes.

23

Q. Okay. Where'd you write this?

A. Computer.

Q. In your office?

A. Yeah.

Q. Okay. And then this was still at the old courthouse?

A. Correct.

Q. Okay. So, yeah, I know the -- it took a while for the court to move to the new building, but it was gone by the time this happened. Let me rephrase. The new court -- the old court had been converted for county office use when this document was created?

A. It's always used for county office.

Q. Oh, even when the judges were in there? I did not know. Okay. Interesting. Okay.

A. Yeah.

Q. Okay. So you -- you typed this up in your office?

A. Uh-huh.

Q. Okay. Who wrote this, include in Zane Brown personnel file; is that you?

A. That's me.

Q. Okay.

A. This document.

24

Q. All right. I see some other initials, from Zane Brown. That looks like that's initial -- I think it's CB. Did Zane Brown initial this in your presence?

A. Yes.

Q. Okay. Whose idea was it to create this document?

A. It was mine.

Q. Okay. Why did you want to -- why did you think it was a good idea to create this document?

A. Because he was -- like I said, he came to review his file. He thought that there should have been disciplinary notices in his personal file. He didn't see them, and I wanted to document that he said that.

Q. Okay. So this was on July 12, 2022. Was Zane Brown still a county employee at the time?

A. Yes.

Q. Okay. So -- okay. This is dated July 12, 2022. That's when this document was created?

A. Correct.

Q. Okay. It says include in Zane Brown personnel file. Why did you think it was important to have this included in the Zane Brown personnel file?

Transcript of Craig Bova
Conducted on August 11, 2025

**25**

A. So I have a document stating that.

Q. Okay. Were there any -- were there any items in his file that he was not shown?

A. That he was not shown?

Q. Yes.

A. No. He saw his whole file.

Q. Okay. So what we were talking about earlier, take the whole thing out, put it on the conference room table.

A. Yeah.

Q. And he looked through everything?

A. I believe he got a full copy.

Q. Yeah, I know it was a bad question. Everything was presented to him for him to look through, right?

A. Right.

Q. Okay, all right. Okay. I'm gonna represent to you that, you know, at least in the -- the county's production now, there are some disciplinary documents that predate this document. What can you -- what can you tell me about that? How can you explain that? Explain that.

A. He complained that there were not disciplinary notices. I said, this is all we have. He said, I've got disciplinary -- I've got the

**26**

disciplinary notice in my truck. Go get it. He produced a document.

Q. Okay. So Zane Brown -- just one document or multiple documents?

A. I can't --

THE DIGITAL TECHNICIAN: I didn't get the answer. I'm sorry. You guys cut out.

THE WITNESS: I remember one. I added it after this was created.

BY MR. GUBERNICK

Q. Got it. Can you explain or do you know -- okay. So in his presence, you added that document to the file. Can you explain why there would be a disciplinary document?

A. Created by SO that they -- that did not make it to the -- to my office. He added it.

Q. Okay. Is that normal for documents not to make it to your office?

A. Occasionally that happens.

Q. Okay. Has that ever happened with any other CSO employees that you know of?

A. I think so. I mean, the SO was a mess when I started. So there was lots of documents that HR did not have.

Q. When -- and remind me, when did you start?

**27**

A. It'll be 10 years in November.

Q. Okay. So this is July 12, 2022 when this document was created. Was the sheriff's department still on this on July 12, 2022?

A. No. Sheriff Helton and under Sheriff Walker did a lot of good for the office and cleaned things up quite a bit.

Q. Okay. So -- well, let me ask you this. During the Helton administration, so the time that he's been sheriff and Walker's been under sheriff, has this happened to people other than Zane Brown where you'll have a disciplinary document that hasn't made it over to the county?

A. I can't think of --

MR. DAHL: Object to form.

But you can answer here.

THE WITNESS: I can't think of any specifically. But could it have happened with others? Possibly.

BY MR. GUBERNICK

Q. You're not aware of any instances?

A. I -- I cannot pinpoint any.

Q. Okay. Would it be fair to say that, you know, from what you've observed LCSO during the Helton administration has been pretty good about

**28**

getting stuff that's supposed to be in personnel file over to HR?

A. Yes.

Q. Okay. Did you do any follow up with anyone at LCSO to figure out why this document wasn't -- hadn't already made it over to HR?

A. Yeah. I called Walker after Brown produced the document, and I asked him about it. He just said I -- I had it in my file. I didn't give it to you.

Q. Did he explain why he didn't give it to you?

A. Just busy or -- I don't -- I don't remember exactly what he said, but I -- I think it was just an oversight on his part.

Q. Okay. Did he say -- he said oversight or that was just what you inferred?

A. That's what I inferred.

Q. It shock to anyone else?

A. No.

Q. Okay.

A. No.

Q. All right. Can you think of any other instances -- actually strike that. Forget that question. Ask a different one.

Okay. So who was the -- so when Zane -- let